### IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 00-6193-CIV LENARD/Simonton**

**THOMAS BUTLER,**

      **Plaintiff,**

v.                                                                      **CONSENT CASE**

**JOHN POTTER, Postmaster,**
**United States Postal Service,**

      **Defendant.**

_____/

### NOTICE OF FILING OF EXCERPTS OF PLAINTIFF'S DEPOSITION

COMES NOW the Defendant, by and through the undersigned counsel, to provide this Notice Of Filing Of Excerpts of Plaintiff's Deposition referred to in Defendant's Motion for Summary Judgment and incorporated Concise Statement of Material Facts As To Which There Exists No Genuine Issue To Be Tried (CSMF) including the following:

1.    Deposition Cover pages 1-4;
2.    Pages 9-11 and Defendant's Exhibit #1;
3.    Pages 11-14 and Defendant's Exhibit #2;
4.    Pages 14-18 and Defendant's Exhibit #3;
5.    Pages 18-21 and Defendant's Exhibit #4;
6.    Pages 22-28 and Defendant's Exhibit #5;
7.    Pages 28-32 and Defendant's Exhibit #6;
8.    Pages 32-40 and Defendant's Exhibit #6;
9.    Pages 41-42 and Defendant's Exhibit #6;
10.   Pages 48-61 and Defendant's Exhibit #7;
11.   Page 65 and Defendant's Exhibit #9;
12.   Page 64 and Defendant's Exhibit #10;
13.   Page 61 and Defendant's Exhibit #11;
14.   Pages 62-66 and Defendant's Exhibit #12;
15.   Pages 68-75 and Defendant's Exhibit #13;
16.   Pages 75-78 and Defendant's Exhibit #14;
17.   Pages 79-87 and Defendant's Exhibit #15;
18.   Pages 88-90 and Defendant's Exhibit #16;
19.   Pages 90-101 and Defendant's Exhibit #17;
20.   Pages 113-114;



21.    Pages 32-40 and Defendant's Exhibit #6.

As of this drafting, a transcript of the rest of Plaintiff's deposition has been ordered, but is not yet complete.  Upon completion, the Defendant will filed the remaining Excerpts of Plaintiff's Deposition referred to in Defendant's Motion for Summary Judgment and incorporated CSMF.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By _____

CHARLES S. WHITE
Assistant United States Attorney
Fla. Bar No. 394981
99 N.E. 4th Street, Suite 322
Miami, Florida 33131
Tel. (305) 961-9286
Fax. (305) 530-7139

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was furnished by U.S. Mail on March 14, 2003 to Stewart Lee Karlin, Esq., Attorney for Plaintiff, 315 S.E.7th Street, Suite 200 Ft. Lauderdale, Florida 33301.

By _____

2

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:   00-01337-CIV SEITZ

THOMAS BUTLER

         Plaintiff,

VS.

JOHN POTTER, Postmaster,
United States Postal Service

         Defendants.

_____/

                    99 Northeast 4th Street
                    3rd Floor
                    Miami, Florida  33132-2111
                    February 6, 2003
                    3:30 p.m.

<u>Deposition of THOMAS BUTLER</u>

         Taken before Elaine Somma, Certified

Shorthand Reporter and Notary Public in and for the

State of Florida at Large, pursuant to Notice of Taking

Deposition filed in the above cause.

         - - - - - - - - - -

CERTIFIED COPY

2

```
 1   APPEARANCES:

 2

 3

 4

 5

 6              ON BEHALF OF THE PLAINTIFF:
                     STEWART LEE KARLIN, P.A.
                     315 S.E. 7th Street
 7                   Second Floor
                     Fort Lauderdale, Florida  33131
 8              BY:  STEWART KARLIN

 9

10              ON BEHALF OF THE GOVERNMENT
                     U.S. ATTORNEY'S OFFICE
                     99 Northeast 4th Street
11                   Suite 300
                     Miami, Florida  33132
12              BY:  CHARLES WHITE
                          ASSISTANT U.S. ATTORNEY
13

14
                     ALSO PRESENT:
15                   Randle Smith, Attorney
                     U.S. Postal Service
16

17
                     Laura Taylor-Laury
18                   Labor Relations Specialist
                     U.S. Postal Service
19

20                       I N D E X

21   Witness                    Direct    Cross

22   Thomas P. Butler               4
23

24

25
```

1

## 2     E X H I B I T S

3

4                  PAGE

| | |
|---|---|
| 5   Government Exhibit No. 1 | 9 |
| 6   Government Exhibit No. 2 | 12 |
| 7   Government Exhibit No. 3 | 15 |
| 8   Government Exhibit No. 4 | 19 |
| 9   Government Exhibit No. 5 | 23 |
| 10   Government Exhibit No. 6 | 29 |
| 11   Government Exhibit No. 7 | 43 |
| 12   Government Exhibit No. 8 | 51 |
| 13   Government Exhibit No. 9 | 55 |
| 14   Government Exhibit No. 10 | 56 |
| 15   Government Exhibit No. 11 | 59 |
| 16   Government Exhibit No. 12 | 62 |
| 17   Government Exhibit No. 13 | 68 |
| 18   Government Exhibit No. 14 | 75 |
| 19   Government Exhibit No. 15 | 80 |
| 20   Government Exhibit No. 16 | 88 |
| 21   Government Exhibit No. 17 | 90 |
| 22   Government Exhibit No. 18 | 102 |
| 23   Government Exhibit No. 19 | 104 |
| 24   Government Exhibit No. 20 | 105 |

25

```
 1   Thereupon:

 2   THOMAS BUTLER,

 3   was called as a witness by the Government, was first

 4   duly sworn and testified as follows:

 5                  DIRECT EXAMINATION

 6   BY MR. WHITE:

 7        Q    My name is Charles White and I am an

 8   Assistant U.S. Attorney representing the Postal Service

 9   in the case that you have filed.

10             We are here for your deposition today so I

11   would like to get some ground rules straight before we

12   begin.

13             Let me start by asking can you state your

14   name for us?

15        A    Thomas P. Butler.

16        Q    You are the plaintiff in this action; is

17   that correct?

18        A    Yes.

19        Q    Have you ever given a deposition before?

20        A    I don't recall.

21        Q    Have you ever given testimony under oath in

22   a proceeding before?

23        A    I don't recall.

24        Q    Is there anything that would refresh your

25   recollection about whether or not you have, perhaps even
```

5

```
 1    speaking with your lawyer?

 2         A    I am not sure.

 3         Q    Well let me go through the ground rules with

 4    regard to a deposition.

 5              It is an opportunity for the lawyers in the

 6    cases to discover the evidence that the other side has

 7    and that is precisely what we are here do today.

 8              I on behalf of the defendant will be asking

 9    you questions.  You have already been placed under oath

10    so it is very important that you understand the nature

11    of the questions and that you give a response audibly to

12    allow the court reporter to take down your answer.

13              Do you understand so far?

14         A    I believe so.

15         Q    If at any time you do not understand the

16    question, it is confusing or you didn't hear it, feel

17    free to stop me so we can straighten it out.  Nobody is

18    here to trick you.

19              We are just basically here to discover what

20    the evidence is so that we can adequately deal with

21    these proceedings.

22              Do you understand that?

23         A    Yes.

24         Q    Are there any questions that you have with

25    regard to the manner in which I intend to conduct this
```

```
 1    deposition?

 2         A    No.

 3         Q    Great.  Let's begin then.

 4              How long have you been an employee of the

 5    United States Postal Service?

 6         A    Since 1987.

 7         Q    Do you know precisely when you started?

 8         A    To the best of my recollection it is August

 9    3rd.

10         Q    Where were you hired and what were you hired

11    as?

12              That is two questions but we will see

13    whether we can get by with it.

14         A    Rephrase the question.

15         Q    Was that here in Miami that you were hired

16    with the postal service?

17         A    Yes.

18         Q    In what position?

19         A    A mail handler.

20         Q    Can you describe for me what that is?

21         A    A mail handler, some of the functions are to

22    move the mail around from place to place in containers.

23         Q    What level, if there are different levels of

24    employees, is a mail handler?

25         A    Level 4.
```

1          Q     Can you describe briefly for me the nature

2    of the level system within the Postal Service in terms

3    of employees.  There is a level one but there a level

4    ten and that is a level 4,  so how does it work?

5          A     I am not sure.

6          Q     Are you still employed with the Postal

7    Service?

8          A     Yes.

9          Q     And serving currently in what capacity?

10         A     I am an SDO.

11         Q     What is an SDO?

12         A     Supervisor of mail processing, deliveries

13   and processing.

14         Q     Can you briefly describe for me your duties

15   and responsibilities as an SDO for the Postal Service?

16         A     Not briefly.

17         Q     Take whatever time you need.

18         A     In charge of employees, functions with

19   paperwork, in charge of operations.

20               That's all that I would like to say at this

21   time.

22         Q     Are there any other duties and

23   responsibilities as an SDO that you performed other than

24   those that you just described?

25         A     There could be.

1      Q    Where would we go to find out what

2  responsibilities and duties that you have?

3      A    Probably in the office I think they have a

4  copy of the job descriptions and duties.

5      Q    Are you aware of what other duties and

6  responsibilities there were and you are just not telling

7  me or do you have to go and look them up in order to

8  know them yourself?

9      A    That's the general duties.  I mean if you

10  want specifics you can go from a list and it lists them

11  all.

12      Q    You mentioned that you deal with employees.

13  What level of employees do you deal with as an SDO?

14      A    Level 4, level 5, level 6 and then those

15  that are underneath me.  Of course, you have your upper

16  layer of management that go up in the twenties I

17  believe.

18      Q    In relation to a level 4, level 5 and level

19  6 employee, where would an SDO be on that ladder?

20          Is it one of the levels or is it a whole

21  different scale?

22      A    It is a different scale.  I mean we are

23  considered an EAS position where they are considered in

24  a labor position.  That is the difference.

25      Q    In terms of paperwork that you would be

```
 1   responsible for completing, maintaining, can you

 2   describe briefly what kind of paperwork that you are

 3   talking about?

 4        A    I have daily reports, I have weekly reports,

 5   we have incident reports, OPS-13 information, key

 6   computer inputs as well as paperwork.  So there is other

 7   types, safety forms.

 8        Q    Let me now turn to the first of a series of

 9   exhibits and I will mark this as Defendant's exhibit 1

10   and I have a copy for you as well and one for your

11   counsel.

12             (The document referred to was thereupon

13             marked as Government's Exhibit Number 1 for

14             Identification, a copy of which is attached

15             hereto.)

16   BY MR. WHITE:

17        Q    I would like to get you to review it for a

18   moment and I will ask you some questions about it.

19             MR. KARLIN:  Can I have one minute with my

20   client?

21             MR. WHITE:  Sure.

22             (Thereupon a short recess was had)

23   BY MR. WHITE:

24        Q    Have you had a chance to review the document

25   that we placed before you as Defendant's exhibit No. 1?
```

```
 1          A    I reviewed this document.
 2          Q    Do you in fact recognize this to be what we
 3    would call a standard form, otherwise known as a
 4    Notification of Personnel Action used by the Postal
 5    Service?
 6          A    Yes.
 7          Q    Can you briefly describe the nature of the
 8    information contained on this document.  What is it
 9    reflecting?
10          A    Employee information, has my Social, name,
11    date of birth.  Indicates to me that it is my employment
12    date, has my address; it gives a finance number.
13          Q    Have you ever seen this document before?
14          A    I can't be sure that I have seen this
15    document.
16          Q    Have you ever reviewed your official
17    personnel folder contained by the Postal Service?
18          A    I am not sure whether I have reviewed this.
19    I have reviewed some files but I don't know if this is
20    what you are pertaining to.
21          Q    Do you recognize this as being the document
22    that the Postal Service itilizes, Form 50, that reflects
23    the date of your hire and at what level and what
24    position and at what location?
25          A    I don't know the location other than the
```

 1    finance number and I am not familiar with that at this

 2    point.

 3         Q    Towards the center of the document it says

 4    Miami, Florida 33152?

 5         A    Okay, correct.

 6         Q    Duty station name Miami, Florida; is that

 7    correct?

 8         A    Correct.

 9         Q    Any reason to doubt this is the PSF-50 that

10    reflects your hiring as you early indicated as a mail

11    handler level 4 position Miami, Florida on or about

12    August 3rd 1987?

13         A    I can't be sure that this is that document.

14         Q    That wasn't the question.  Do you have any

15    reason to doubt it?

16         A    I am not sure.

17         Q    Does that mean that you do have a reason and

18    you just don't want to share it with us?

19         A    I am just not sure that this is that

20    document.

21         Q    Do you have any other document that you

22    suggest is authentic?

23         A    No.

24         Q    How long did you remain as a mail handler

25    level 4 employee for the Postal Service?

```
 1          A    Approximately until 1990.

 2          Q    What happened?

 3          A    I got a promotion.

 4          Q    What were you promoted to?

 5          A    Supervisor.

 6          Q    What kind of a supervisor?

 7          A    Supervisor of mail relief.

 8          Q    What is a supervisor of mail relief?

 9          A    A supervisor of mail relief covers different

10  operations basically when other individuals have their

11  days off.

12          Q    I have placed before you a document which we

13  have now marked as Defendant's Exhibit No. 2.

14               (The document referred to was thereupon

15               marked as Defendant's Exhibit Number 2 for

16               Identification, a copy of which is attached

17               hereto.)

18  BY MR. WHITE:

19          Q    Do you in fact recognize this document to be

20  a letter reflecting your promotion effective September

21  22, 1990 the letter itself being dated September 20,

22  1990?

23          A    Repeat the question please.

24          Q    Did you ever see this letter before?

25          A    I have seen one similar to this.
```

1      Q    Is there another letter other than this

2  which reflects your promotion?

3      A    I have not seen that.

4      Q    Does this appear to be the letter that you

5  received that officially notified you of your selection

6  to the position of supervisor of mail relief back in

7  September of 1990?

8      A    It appears to be.

9      Q    Do you have any reason to doubt its

10 authenticity?

11     A    I'm not sure.

12     Q    What is it that you are not sure about?

13     A    Just the authenticity of it.  It appears to

14 have the information but you are asking me about the

15 authenticity of it and I do not know.

16     Q    Do you know whether or not this document is

17 maintained in your official folder with the Postal

18 Service?

19     A    At least one similar.

20     Q    At least one similar to what?

21     A    To this.

22     Q    Is there another letter other than this?

23     A    I do not know.

24     Q    Do you know whether or not this is in your

25 official personnel folder?

```
 1          A    No, it appears to be a letter, a copy that I
 2   got.
 3          Q    How long did you maintain your position as a
 4   supervisor of mail relief with the U.S. Postal Service?
 5          A    That I am not sure.
 6          Q    Well, there came a point when your position
 7   changed from a supervisor of mail relief to one of an
 8   SDO as you described yourself as currently being; is
 9   that correct?
10          A    I went from-- there were a couple of changes
11   in that period of time that I am not really familiar
12   with.  One was from a 15 to 16 and one was from a relief
13   to an SDO.
14          Q    Let me hand you a document that I have now
15   marked as Defendant's Exhibit 3.  I will let you look at
16   it, review it and we will talk about it.  Do you
17   recognize this document?
18          A    It looks to be similar to one that I
19   received.
20          Q    Just so that we can establish what it is
21   that you are looking at, do you recognize this to be a
22   new or newer form of a PS-50, that being a notification
23   of personnel action utilized by the United States Postal
24   Service?
25          A    It appears to be different than that last
```

```
 1     one that you showed me.
 2           Q    But that is in fact what this document is,
 3     is that right?
 4                The document that you are now looking at is
 5     marked Defendant's Exhibit No. 3
 6                     (The document referred to was thereupon
 7                     marked as Defendant's Exhibit Number 3 for
 8                     Identification, a copy of which is attached
 9                     hereto.)
10     BY MR. WHITE:
11           Q    That is a notification of personnel action
12     otherwise known as a PS Form 50 utilized by the United
13     States Postal Service at least in February of 1993; is
14     that right?
15           A    Correct.
16           Q    And in fact this one which is Defendant's
17     Exhibit No. 3 is a personnel action regarding your
18     status as an employee with the Postal Service, is it
19     not?
20           A    Yes.
21           Q    Can you briefly describe for us what the
22     event is which is documented in Defendant's Exhibit No.
23     3?
24           A    Item 79 highlights it as a promotion.
25           Q    What promotion were you getting?
```

```
 1          A     The position was titled highlighted 52
 2   Supervisor of Distribution Operation.
 3          Q     That was effective as of what date?
 4          A     Item number one effective 2-20-93.
 5          Q     Where were you assigned to work?
 6          A     Miami.
 7          Q     But is there a particular location in Miami
 8   that you can discern from looking at Defendant Exhibit
 9   No. 3?
10          A     GMF.
11          Q     What is GMF?
12          A     General mail facility.
13          Q     Where is that located?
14          A     This form doesn't state where it is other
15   than the nine digit key code but the address is 7200
16   Northwest 22nd Street.
17          Q     That is the big one over on the west side of
18   the airport, is that right?
19                That is the big facility over on the west
20   side of the airport; is that correct?
21          A     It is a postal facility, yes.
22          Q     And that is where it is located?
23          A     Yes.
24          Q     I notice here in entry number 61 it has--
25          A     Excuse me, where did you say?  What side of
```

```
 1    the street did you say?

 2           Q    On the west side of the airport.

 3           A    Correct.

 4           Q    I notice here on Defendant's Exhibit 3 it

 5    says on entry 61 grade/step 16 02.

 6                What does that mean?

 7           A    Well, 16 is the grade and I believe the 02--

 8    I am not sure what the 02 is.  It could be--

 9           Q    I am sorry, you had something that you want

10    to say?

11           A    I am not sure what this is.

12           Q    Is this your first time promotion to a 16

13    reflected in Defendant's Exhibit 3?

14           A    Yes.

15           Q    Prior to that you were a 15?

16           A    Correct.

17           Q    Do you know what the letters EAS stands

18    for?  Do you recognize them standing for executive

19    administration schedule?

20           A    I am not sure what that stands for.

21           Q    How long did you remain as a SDO at the

22    GMF?

23                MR. KARLIN:  In Miami you are talking

24    about?

25                MR. WHITE:  I assume you are talking about
```

```
 1    that's where the GMF is.
 2              MR. KARLIN:  There could be one in another
 3    county.
 4              THE WITNESS:   Are you referring to this on
 5    Exhibit No. 3?
 6    BY MR. WHITE:
 7         Q    Yes, sir.
 8         A    Yes.
 9         Q    How long did you remain as an SDO there at
10    that GMF?
11         A    I became excessed from that facility to
12    South Florida approximately sometime in 1994.
13         Q    When you say excessed, what does that mean?
14         A    I was told that they had too many
15    supervisors for employees and therefore they would have
16    to take either volunteers or junior supervisors, and had
17    to send them away.
18         Q    Send them where?
19         A    Away from the GMF facility.
20         Q    They also called the GMF facility the Miami
21    plant, is that another name for it?
22         A    I am not sure.
23         Q    How would they send employees or do you know
24    back then who was excessed, in your terminology?
25         A    I lived in southwest Miami.  I was excessed
```

```
 1    up to Pembroke Pines.
 2         Q    Let me hand you then what we have now marked
 3    as Defendant's Exhibit No. 4.
 4                   (The document referred to was thereupon
 5                   marked as Defendant's Exhibit Number 4 for
 6                   Identification, a copy of which is attached
 7                   hereto.)
 8    BY MR. WHITE:
 9         Q
10    I will give you a moment to review that document and we
11    will talk about it.
12         A    Okay.
13         Q    Do you recognize the document that we have
14    placed before you as Defendant's Exhibit No. 4?
15         A    This looks familiar to one that I received.
16         Q    Does it appear to be a letter drafted or
17    dated September 26, 1994 addressed to you by the Human
18    Resources Manager for the South Florida Division of the
19    Postal Service?
20         A    Yes.
21         Q    And the nature of this letter is that the
22    Miami plant has been identified as having excess SDO
23    positions and pretty much as you just described, they
24    are looking for volunteers or reassignments; is that
25    right.
```

20

```
 1              MR. KARLIN:  I object.  The letter speaks

 2     for itself.  Go ahead and answer.

 3              THE WITNESS:  Repeat the question.

 4     BY MR. WHITE:

 5         Q    Is this in fact the letter that you received

 6     advising you that you had been transferred to a new

 7     location?

 8         A    That is a different question.  Could you

 9     repeat it once more please.

10         Q    Does this letter which is Defendant's

11     Exhibit 4 appear to be the letter that was sent to you

12     on or about September 26, 1994 advising you, in your

13     words, that you were excessed as an SDO and as a

14     consequence you were being tranferred to a different

15     location?

16         A    It appears to be so.

17         Q    Any reason to doubt the authenticity of this

18     letter?

19         A    It appears to be similar to the one that I

20     was issued.

21         Q    Again do you have any reason to doubt the

22     authenticity of that letter?

23         A    It appears to be the letter that I was sent.

24         Q    There came a point in time during your

25     tenure as an SDO at the Broward facility to which you
```

```
1    were transferred-- I'm sorry, what is the the name of it
2    according to that letter, Defendant's Exhibit No. 4?
3         A     There are a couple of names for it.  They
4    call it the South Florida plant; they call it South
5    Florida.
6         Q     How long did you continue to work there?
7         A     I am presently there.
8         Q     So since your transfer in September of 1994
9    you continued to work at that same facility?
10        A     No.
11        Q     When did you not work at that facility in
12   between September, 1994 and now?
13        A     Scheduled days off, vacations, I had a job,
14   a detail as-- no, I take that back.  There were periods
15   of time that I wasn't working there.
16        Q     Other than those scheduled days off,
17   vacations or did you say there was one detail or more
18   than one?
19        A     Correct, the detail I believe was just prior
20   to that when I was in Miami.
21        Q     So other than scheduled days off and
22   vacations, did you remain at that facility to which you
23   were transferred back in December of 1994?
24        A     As per the Form 50, I believe so.
25        Q     Do you have any reason to believe that you
```

```
 1   worked anyplace else?

 2        A    Yes.

 3        Q    Where else?

 4        A    I worked at a golf course.

 5        Q    In between September '94 and the present?

 6        A    Yes.

 7        Q    Where else?

 8        A    I worked at two different golf courses.

 9        Q    Let's refocus the question and say in the

10   course as an employee with the United States Postal

11   Service in between September of 1994 and the present,

12   were you assigned to work at any other facility other

13   than that reflected in Defendant's Exhibit 4?

14        A    No.

15        Q    There came a point in time in early 1997

16   during which you made your wishes known that you wanted

17   to be considered for another promotion; is that correct

18   or not correct?

19        A    There was another position.

20        Q    Was that a correct statement, that you did

21   want to be considered for a promotion in early 1997?

22        A    Yes.

23        Q    Let me hand you what we have now marked as

24   Defendant's Exhibit No. 5.

25                 (The document referred to was thereupon
```

```
 1              marked as Defendant's Exhibit Number 5 for
 2              Identification, a copy of which is attached
 3              hereto.)
 4              THE WITNESS:  Excuse me, could you repeat
 5    that?  Would you consider a lateral a promotion?
 6    BY MR. WHITE:
 7         Q    For purposes of this discussion, yes, and it
 8    will become apparent when we look at the next document,
 9    Defendant's 5, if you could go ahead and take a look at
10    that.
11         A    Okay.
12         Q    Do you recognize this document?
13         A    Yes.
14         Q    What is it that you recognize this document
15    to be?
16         A    It is a request by me on 2-23-97 to be
17    considered for a level 16 SDO position at the same
18    facility, South Florida Mail Processing Center on to
19    Tour 3.
20         Q    When you say Tour 3, if you can describe for
21    me what the nature of the tours are at the postal
22    facility that you worked at.  How many tours are there?
23         A    There are three tours.
24         Q    Roughly are they work shifts, is that right?
25         A    Excuse me?
```

1        Q      Are they work shifts?

2        A      What do you mean by work shifts?

3        Q      I have had some cases in which we have

4    federal employees working at let's say the VA Hospital

5    and they will have three shifts.   There is a day shift

6    that will start somewhere around 7.  I think that would

7    end somewhere around 4:00.

8            Then there is an afternoon shift starting

9    somewhere at 3:00 that goes to midnight.

10           Then there is the graveyard shift that

11   starts roughly 12:00 and ends at 7:00 so that during the

12   three shifts the entire 24 hour period is covered, is

13   that correct?

14           Is that a similar sort of shift that you are

15   talking about in terms of three tours at the Postal

16   Service?

17       A      Yes.

18       Q      At the time that you wrote this letter which

19   is Defendant's Exhibit 5 asking to go to Tour 3, which

20   tour were you on?

21       A      Tour 1.

22       Q      What was tour 1 in relation to hours, not

23   precisely, but roughly?  Is that the day shift, evening

24   shift or the graveyard shift?

25       A      Which tour was that, Tour 3 or Tour 1?

25

```
 1          Q     The first one that you had been on, that is

 2    Tour 1?

 3          A     That is the one that immediately follows

 4    Tour 3.

 5                MR. KARLIN:  He is asking the hours.

 6    BY MR. WHITE:

 7          Q     If you can break it down to the three times

 8    that I just mentioned, the first one starting sometime

 9    in the morning and ending in the afternoon.

10                Then you have the afternoon shift that

11    begins in the afternoon and runs to midnight.

12                Then you have the graveyard shift that

13    starts at midnight and runs to the morning which is Tour

14    1, correct?

15          A     Tour 1 I believe would fall under your

16    graveyard shift definition, but I believe it started-- I

17    don't recall if it started I think 2250 or 2350.  I know

18    they have changed it.

19          Q     We are talking military time?

20          A     10:30.

21          Q     And Tour 3 would be then the one that starts

22    roughly what time?

23          A     If you would subtract eight hours from that

24    time plus a lunch, then you would get a base for Tour 3.

25                But they have staggered times and it does
```

```
1    vary.

2         Q    So we are talking roughly 6:00 to 7:00

3    o'clock in the morning, maybe a little later for the

4    start of Tour 3?

5         A    That would be Tour 2.

6         Q    Which one is Tour 1?

7         A    The one that starts around 10:30.

8         Q    At night?

9         A    Right, p.m.

10        Q    And it runs until about seven in the

11   morning.  Then Tour 2 starts at 7:00 and runs until 3:00

12   or 4:00 in the afternoon?

13        A    Approximately, yes.

14        Q    Why did you want to be transferred to a

15   different tour?  Well, let's return to Exhibit No. 4.

16        A    I indicated that I would like to learn about

17   a different way of processing mail.  It is considered

18   the outgoing mail.

19        Q    Let me follow-up that up a little bit.  Are

20   there different responsibilities then at the plant that

21   you worked at from '94 until '97 depending upon the tour

22   that you were in?

23        A    The job functions would be similar, but they

24   would be different classes and type of mail.

25        Q    You indicate in this document Defendant's
```

 1    Exhibit 4 that you wanted to learn about the processing

 2    of outgoing mail.  But is there a certain time that

 3    outgoing mail happens?  Wouldn't it occur at different

 4    times?

 5         A    Correct.  I would like to go back and

 6    rephrase the sentence prior to that.   I said different

 7    classes.  What I was referring to was outgoing, meaning

 8    they process all the classes of mail that I am aware of

 9    on each of the tours.

10              So what I meant by that is the outgoing mail

11    which is what you are alluding to now, outgoing mail is

12    considered mail that is from outside your district, the

13    330, 331 area.  It would be like mail from California

14    would be an example, even mail in north Florida would be

15    considered outgoing.

16         Q    Outgoing mail is not limited to the mail

17    that has come into the facility, been processed and then

18    outgoing from the facility?  That is not what we are

19    talking about?

20         A    That's correct.

21         Q    Outgoing is something other than that which

22    is generated in the local communities, is that right?

23         A    Not exactly.  I don't believe so.  I am not

24    sure on that.  It could be other scenarios.

25         Q    Basically as you have described it, it is

1    mail coming from outside the state or outside the

2    southern part of the state; is that right?

3        A    No.

4        Q    What is outgoing mail?

5        A    Outside of the 330 331 area.

6        Q    What's the designation of 330?

7        A    Southern part of the state, but it would

8    also include areas such as Naples and Fort Meyers.

9        Q    Back in March of 1999, there appears to be

10   have been an incident that took place at the facility

11   that you worked at; is that correct?

12       A    I have no way of knowing that.

13       Q    Do you know someone by the name of Sergio

14   Fernandez?

15       A    Yes.

16       Q    Who is Sergio Fernandez?

17       A    Sergio Fernandez could have been an MDO at

18   South Florida if we are talking about the same

19   individual.

20       Q    Did you know somebody by the name of Sergio

21   Fernandez who worked at the same facility that you did

22   from September of 1994 through 1997?

23       A    Yes.

24       Q    Was there more than one that you knew?

25       A    I'm not sure.

```
 1          Q    What was the name of your supervisor during

 2    that time period?

 3          A    I believe it was more than one.

 4          Q    Was Sergio Fernandez one of those

 5    supervisors?

 6          A    During that time frame, yes.

 7          Q    Did you have more than one supervisor by the

 8    name of Sergio Fernandez?

 9          A    No.

10          Q    Let me hand you what we have marked as

11    Defendant's Exhibit No. 6

12               (The document referred to was thereupon

13               marked as Defendant's Exhibit Number 6 for

14               Identification, a copy of which is attached

15               hereto.)

16    BY MR. WHITE:

17          Q    I am going to get you to look through that

18    for a few minutes.

19          A    What is your question now after reviewing

20    this?

21          Q    Have you had a chance to review that

22    document?

23          A    Yes.

24          Q    Do you recognize this to be a copy of your

25    administrative complaint that you filed under Case No.
```

```
 1   3330018-97?

 2        A    It appears to be.

 3        Q    And down towards the bottom portion of the

 4   page there is a report indented which basically states

 5   as follows:

 6             On March 5, 1997 the following occurred.

 7   After a 30 minute meeting in the MDO office (Angelo Tom,

 8   Sergio, Rosie).

 9             Have I read that correctly?

10        A    Yes.

11        Q    It continues, "I was counseling employee

12   Julio Burges.  Mr. Fernandez broke up the counseling and

13   began harassing me about my operation.  He pulled me

14   away for 40 minutes.  Mr. Fernandez has been harassing

15   me creating a stress environment since I first came to

16   SFMPC.  He has made me have lunch during a meeting that

17   was scheduled at my lunch time.  On February 19th he was

18   vindictive towards me concerning a staffing problem.  He

19   stated I'll take care of that, I'll put you in charge of

20   the SFM".

21             On February 25th he threatened me  stating

22   "this is your training week, wait until next week."

23             On April 26, 1996 he changed my hours

24   worked--

25        A    Excuse me, that is April 12th.
```

```
 1        Q    Thank you.

 2             Continuing on, "I had Joann Feiont correct

 3   his violation of FLSA.  On March 4 of 1997 seven

 4   employees met with Joann concerning employee complaints

 5   of Sergio Fernandez.  I feel my operation and self have

 6   suffered corresponding reprisals.  On numerous occasions

 7   Mr. Fernandez has humiliated and embarrassed me in front

 8   of my employees and peers.  He intimidates employees and

 9   supervisors on the workroom floor. On March the 5th,

10   1997 I went home stressed out".

11             Is that the nature of the complaint that you

12   posed?

13        A    The nature of the complaint was

14   discrimination.

15        Q    Well according to your document that is what

16   you stated, what I have just read to you; is that

17   correct?  I pretty much read the document.

18             MR. KARLIN:  Just answer the question.

19             THE WITNESS:  The discriminating factors

20   were listed color-white; age-over 40, religion-Quaker,

21   national origin U.S. and sex-male.

22        Q    I see the portion of the document where you

23   indicated those factors but what I am asking is the

24   factual allegations that I just read to you consistent

25   with that which you reported on this document which is
```

```
 1   Defendant's Exhibit No. 6?

 2        A    Yes.

 3        Q    That is what you were complaining about, all

 4   of those facts; is that right?

 5        A    That is what I listed.

 6        Q    That is what you were complaining about

 7   because you didn't list anything else in terms of the

 8   facts, correct?

 9        A    That's all that I listed.

10        Q    When you went home you indicated that you

11   were stressed out.  What happened?

12             MR. KARLIN:  You mean what happened after he

13   went home?

14   BY MR. WHITE:

15        Q    Let's back up and explore this.  You just

16   indicated that discrimination was the problem that you

17   are complaining about that was as a result of these

18   facts, is that right?

19        A    Yes.

20        Q    The fact is that you indicated that you

21   checked off color white, religion Quaker.

22             You are white; is that correct?

23        A    Yes, I am.

24        Q    Are you a Quaker?

25        A    Yes, I am.
```

1      Q    And you are over forty?

2      A    Yes.

3      Q    What is your age?  When were you born?

4      A    January 24, 1954.  My age is 49.

5      Q    And your national origin is the United

6  States of America?

7      A    Yes.

8      Q    And you are a male?

9      A    Yes.

10     Q    In what way were you the subject of

11  discrimination based on your color as outlined in this

12  complaint?

13     A    This was a precomplaint that I listed all

14  the discriminating factors.

15     Q    And they are?

16     A    Color, religion, age, over 40, race,

17  national origin and sex.

18     Q    And my question is how did your color play a

19  part in these facts that you complained about?

20     A    These discriminating factors were-- I would

21  say that should not be there as a discriminating factor

22  as I list it.

23     Q    Why did you include it?

24     A    I told you I included everything at the

25  time, all the different discriminating factors.

```
 1          Q    Why?

 2          A    Because I wasn't sure at the time anything

 3    about the EEO process.

 4          Q    Okay.  Let's move on to the next

 5    discriminating factor that you listed, religion being

 6    Quaker.

 7               Tell us how does your religion fit into

 8    these facts?

 9          A    I had an ongoing discrimination and

10    harassment that I put up with for a considerable amount

11    of time, even before even getting to that point, which

12    is turning the other cheek basically.

13          Q    I don't understand what you are saying.  As

14    it relates to religion, when did you feel that your

15    religion was the subject of some sort of discriminatory

16    treatment?

17          A    When did I feel that?

18          Q    Yes, sir?

19          A    On or about 3-5-97.

20          Q    So prior to this there were no incidents as

21    it relates to your religion; is that correct?

22          A    That is not correct.

23          Q    That is what I am asking.

24               When is the first time that you felt that

25    you were subjected to wrongful discrimination based on
```

```
 1   your religion during your employment with the Postal

 2   Service?

 3        A    Between '94 and '97.

 4        Q    But is there a specific date?

 5        A    No one specific date.

 6        Q    Nevertheless, is this the first time that

 7   you complained about it, at least in writing, that being

 8   that which is contained in Defendant's Exhibit No. 4?

 9        A    You say complained about it, complained

10   about it what?

11        Q    Wrongful discrimination based upon your

12   religion?

13        A    In writing, probably in writing.

14        Q    This would have been the first time?

15        A    Yes.

16        Q    How were you discriminated against based

17   upon your religion during your employment with the

18   Postal Service prior to March 5th, 1997?

19        A    Once again it goes back to turning of the

20   cheek, I did that for so long because my religion states

21   for me to do this.

22             But I was walked on continuously and it was

23   non-stop.  I mean it just seemed to never end.

24        Q    How did your employment subject you to

25   discrimination based upon your religion?
```

```
 1              Did it not give you days off because you
 2  were a Quaker?
 3              Did they refuse to promote you because you
 4  were a Quaker?
 5      A    No, I don't believe so.
 6      Q    What happened to you because you were a
 7  Quaker as it relates to your employment discrimination
 8  prior to March 5th, 1997?
 9      A    Continued harassment.
10      Q    Like how, what would they do?
11      A    One thing they did was prior to me leaving
12  for annual leave, around Christmastime they had two
13  MDO's, Jack Watson and Sergio Fernandez.
14      Q    For the record an MDO is a manager of
15  distribution operation, that is a supervisor above a
16  SDO; is that correct?
17      A    Yes.
18      Q    Go ahead?
19      A    They usually distribute their jobs to
20  different sides of the buildings and I was currently
21  under Watson's side and Sergio gave me additional
22  responsibilities to complete before I was to leave for
23  my vacation.
24              This occurred approximately 6 a.m. and I was
25  scheduled to leave at 7:00 a.m.  I was not able to leave
```

```
 1   until approximately 9:00 a.m. and had to drive to Miami
 2   which is approximately 30 minutes from there for me just
 3   in time to help my wife with the bags to load into the
 4   Super Shuttle to catch a plane flight.
 5          My leave slip was not granted, in fact was
 6   stated that they would take it away from me and not even
 7   give me the leave.  At this point I had plane tickets
 8   and everything.
 9          What he asked me to do was to write up
10   disciplinary procedures on a number of employees-- I
11   want to say-- I don't recall exactly, but seven to nine
12   which is an excessive amount of employees to do
13   disciplines in an hour, plus it occurred at the busiest
14   time of the night during a holiday season.
15      Q    When did this take place?  Would this have
16   been December, 1996?
17      A    Correct.
18      Q    What impact if any did your religion have on
19   this action?
20      A    On that particular action?
21      Q    Yes, sir.
22      A    Just turning the other cheek, doing what I
23   was instructed to do to the best of my ability.
24      Q    So that I understand what you are saying,
25   because of your religion, when confronted with this
```

1   behavior on behalf of your supervisor, you turned the

2   other cheek.  Is that what you are saying?

3        A    I did what I was instructed to do.

4        Q    Do you know whether or not anybody at the

5   Postal Service in a supervisory position over you knew

6   what your religion was?

7        A    I am not sure.

8        Q    Let me move to the next category that you

9   list on this information for precomplaint counseling

10  which is Defendant's Exhibit No. 6.  You indicate

11  age-over 40.

12            What role did your age play in the set of

13  facts that you have laid out here as taking place on or

14  about March 5th, 1997?

15       A    A manager who was under 40 made it very

16  difficult for people over 40.

17       Q    What role did your age play as far as your

18  supervisors were concerned?

19       A    I don't know as they were concerned.  I

20  don't know the answer to that.

21       Q    You also list as the next discriminating

22  factor race: Caucasion (Non-Hispanic).

23            What did your race have to do with the

24  events that you described here on March 5th, 1997?

25       A    The ones that I have listed, the manager who

1    was Sergio in this particular case was using the fact

2    that I was not Hispanic to treat me as such.

3         Q    On what basis do you say that?

4         A    Based on other races.

5         Q    What did he say?  What did he do that let

6    you know that the fact that you were not Hispanic was

7    the reason that he did this?

8         A    I did not see him doing this to any other

9    Hispanic supervisor.

10         Q    In other words, the only basis that you have

11    to believe that race played a part in it are those facts

12    which you listed and which we read a few moments ago; is

13    that correct?

14         A    I am not sure.

15         Q    Are there any other facts upon which you

16    base your claim that his actions were based on your

17    race?

18         A    I don't recall.

19         Q    The next discrimination factor that you list

20    is your national origin that you list as USA; is that

21    correct?

22         A    That's correct.

23         Q    Can you tell how you national origin played

24    a part as what you characterized as discriminating

25    conduct taking place as set forth here on March 5th,

1    1997?

2         A    I was born in the United States and he was

3    not born in the United States.

4         Q    How did that play a part in this behavior

5    that you assert took place on March 5th, 1997?

6         A    The fact that I was not Hispanic.

7         Q    Is there any other factor that you believe

8    that demonstrates that national origin played a part in

9    the events that you outlined here as taking place on

10   March 5th, 1997?

11        A    Not in the ones that I outlined here.

12        Q    Are there any others that are not listed?

13        A    I am not sure.

14        Q    Is there anything that would refresh your

15   recollection?

16        A    I am not sure.

17        Q    The last category that you have under

18   discriminating factors listed here is your sex being a

19   male.

20             What part did your being a male have in the

21   discriminatory factors that you list here as taking

22   place March 5th, 1997?

23        A    Once again that was originally these

24   discriminating factors were listed as a cover all.  That

25   one does not really apply and has been amended.

```
1              MR. KARLIN:  Can we take two minutes?

2              MR. WHITE: Sure.

3              (Thereupon a short recess was had.)

4    BY MR. WHITE:

5         Q    Let's continue so that we can move as far as

6    we can.  Government's Exhibit No. 6, the last question

7    or two, going to the third page of that exhibit I think

8    that you have it under Section G and it says "anonymity"

9    and it says "you have the right to remain anonymous at

10   the counseling stage of the EEO complaint processing.

11   Do you desire anonymity" and you indicated yes; is that

12   correct?

13        A    Yes.

14        Q    So from the prospective of the agency, the

15   Postal Service, nobody knew at this point that you were

16   complaining about apparent discrimination, is that

17   right?

18        A    I believe so.

19        Q    You believe that is correct, is that right?

20   You have to answer out loud to all the questions.

21        A    You said nobody at the Post Office occurring

22   outside the EEO process?

23        Q    Yes, beyond those to whom you are reporting

24   in anonymity, nobody else including your supervisors

25   knew that you were complaining about discriminatory
```

```
 1   activity at this point in time, that being March of 1997

 2   when you are filing this precomplaint for counseling; is

 3   that correct?

 4        A    As far as I believe, no.

 5        Q    Do you have any reason to believe that

 6   anyone else did know, other than those to whom you were

 7   reporting it anonymously?

 8        A    I am not sure.

 9        Q    I believe that you had previously

10   participated in some sort of EEO activity back in 1993;

11   is that correct?

12        A    I am not sure.

13        Q    You weren't complaining about any of that in

14   1997 were you, that wasn't an issue in this case?

15   Whatever may have happened back in '93 was done, is that

16   right?

17        A    It was not a part of this issue.

18        Q    After you went home from work in March of

19   1997, you approached a physician with regard to the

20   stress and the problems that you were having with regard

21   to your employment; is that correct?

22        A    I am not sure.

23        Q    Let's mark this as 7.

24             (The document referred to was thereupon

25             marked as Defendant's Exhibit Number 7 for
```

48

```
 1          Q     So you didn't spend the night over in a bed
 2     at the hospital; you were not admitted?
 3          A     I was admitted for processing.
 4          Q     How long did you stay?
 5          A     I don't recall exactly the time.
 6          Q     More than a day?
 7          A     No.
 8          Q     Other than the emergency treatment you are
 9     talking about that you acquired on Flamingo Road on or
10     about March 5th, 1997, were there any other medical
11     personnel that you saw prior to seeing Dr.
12     Lopez-Brignoni?  Did you see anybody else?
13          A     Prior to that?
14          Q     Yes, sir?
15          A     No.
16          Q     When you started seeing her, Dr.
17     Lopez-Brignoni, is she the only one that you saw for the
18     rest of 1997 or were there others?
19          A     I believe I was cleared by the medical unit
20     in that year.
21          Q     When you say the medical unit, whose medical
22     unit?
23          A     U.S. Postal Service was the medical unit.
24          Q     When did that take place?
25          A     I am not sure of the date offhand.
```

```
 1        Q    Can you give me an approximation in relation

 2  to April 14, 1997 when this letter was apparently

 3  written?

 4        A    That was after.

 5        Q    After the letter was written?

 6        A    Yes.

 7        Q    Was it before or after you started back to

 8  work in October of 1997?

 9        A    It was before I started back to work to get

10  clearance.  I wanted to make sure that I could get

11  clearance to go back to work.

12        Q    Returning to the document, Defendant's

13  Exhibit No. 7, does this appear to be the document that

14  you got or I'm sorry, does this appear to be the letter

15  that she wrote on your behalf?

16        A    It appears the same as this.

17        Q    Yes, sir.

18        A    It appears to be one of the letters that she

19  has written, yes.

20        Q    Do you know what if any response was given

21  to you by the Postal Service in response to Dr.

22  Lopez-Brignoni's letter?

23        A    I had some phone attempts to Joann Feindt.

24        Q    Let me back up and address the substance of

25  Dr. Lopez-Brignoni's letter.  She wrote it April 14,
```

```
 1   1997 and you had left work March 5th, March 6th of 1977
 2   stressed out, right?
 3        A    Yes.
 4        Q    Did you return to work after you went home
 5   stressed out March 5th, 1997?
 6        A    Did I return to work after that?
 7        Q    Did you return to work during the month of
 8   March, 1997? .
 9        A    I don't recall.
10        Q    After you went home stressed out on or about
11   March 5th, 1997, when is the next time that you worked
12   for the Postal Service?
13        A    I believe it was after-- I am not sure.
14        Q    Can you give an approximation of when you
15   returned to work, what month?
16             After you left work stressed out on March
17   5th, 1997, can you tell me the approximate date, the
18   month and year when you went back to work for the postal
19   service?
20        A    I am not sure.
21        Q    Did you go back the next day?
22        A    I don't believe so.
23        Q    Did you go back the next week?
24        A    I am not sure when I went back.
25        Q    So you don't know if you went back the next
```

1       Q    Do you think there might have been another

2    one?

3       A    I am not sure.

4       Q    How many complaints did you file as it

5    relates to the allegations that took place March 5th,

6    1997?

7       A    I am not sure.

8       Q    Have you told your lawyer of all that you

9    know of?

10          MR. KARLIN:  He can't answer that question.

11          MR. WHITE:  Well, that's true.

12          Then I will ask your lawyer if there are any

13   other complaints, please produce them.

14          MR. KARLIN:  I certainly will.

15   BY MR. WHITE:

16      Q    This appears to be, Defendant's Exhibit

17   Number 11 appears to be a complaint that you filed with

18   the EEO stemming from the events of March 5th, 1997; is

19   that correct?

20      A    Yes.

21      Q    You caused this to be filed?

22      A    Pardon me?

23      Q    You caused this to be filed; is that

24   correct?

25      A    I don't understand the question.

```
1          Q    But for you and your allegations against the
2    Postal Service on March the 5th, 1997 this would not
3    have been filed, right?
4               MR. KARLIN:  He is asking you if you filed
5    the complaint.  Did you file it?
6               THE WITNESS: Yes.
7    BY MR. WHITE:
8          Q    In the body it says, "see previously
9    submitted attached info plus info attached notice
10   attached dated June 15, 1997 I no longer desire or
11   request anonymity", correct?
12         A    That's correct.
13         Q    This is the first time that you released the
14   anonymity that we previously talked about; is that
15   correct?
16         A    In writing, yes.
17         Q    Is there any other way that you asked that
18   your anonymity be released prior to June 6, 1997?
19         A    I am not sure.
20         Q    The second page of this document Defendant's
21   Exhibit No. 11 is  the handwritten letter entitled
22    "Additional Info"; is that correct?
23         A    Yes.
24         Q    Let me hand you what we will mark as
25   Defendant's Exhibit 12.
```

```
 1              (The document referred to was thereupon

 2              marked as Defendant's Exhibit Number 12 for

 3              Identification, a copy of which is attached

 4              hereto.)

 5  BY MR. WHITE:

 6       Q    Take a moment on look at it and when you are

 7  ready, we will talk about it.

 8            Do you recognize Defendant's Exhibit 12 to

 9  be the appeal form that is appeal form 287 that you

10  filed with the United States Merit Systems Protection

11  Board?

12       A    You are saying 287.

13       Q    Excuse me, I am reading a bad copy, 283?

14       A    Yes, 283.

15       Q    Do you recognize this to be the appeal form

16  that you filed with the Merit Systems Protection Board

17  on or about June 6, 1997 regarding your forced leave or

18  on the document here it is called forced furlough?

19       A    Yes.  It appears to be so.

20       Q    What are the issues that you are raising

21  with the Merit Systems Protection Board in this

22  document?

23       A    This was-- repeat the question please.

24       Q    What are you appealing in this document with

25  the Merit Systems Protection Board?
```

```
 1   10, it makes reference to their refusal to recognize

 2   medical documentation, does it not?

 3        A    No, it says they refused to accept the

 4   medical documentation.

 5        Q    What medical documentation were you talking

 6   about in your appeal?

 7        A    I am not sure.

 8        Q    Well, do you think it was the same

 9   documentation that we previously talked about in

10   Defendant's Exhibit No. 9 and Defendant's Exhibit No. 7,

11   those letters from Dr. Lopez-Brignoni?

12        A    I am not sure.

13        Q    Is there any other medical documentation

14   that you can think of that you were talking about when

15   you appealed the decision to the Merit Systems

16   Protection Board in Defendant's Exhibit 12?

17        A    I am not sure.

18             MR. WHITE:  Well, counsel are there any

19   other records?

20             MR. KARLIN:  You are asking me.  I can't

21   testify.

22             MR. WHITE:  I asked you to produce them.

23             MR. KARLIN:   I produced whatever I had in my

24   file.

25   BY MR. WHITE:
```

```
 1          Q    Are there any other documents that you are
 2    referring to that you can think of, sir, beyond those
 3    two letters that we previously talked about, Defendant's
 4    Exhibit 7 and 9?
 5          A    I am not sure.  Stu was not the attorney
 6    then.  It was Roscoe Long.
 7          Q    Is there any other forced furlough other
 8    than the enforced leave that we talked about?
 9          A    I am not sure.
10          Q    Continuing on Page 2 of Defendant's Exhibit
11    12 it says, "What action would you like the board to
12    take in this case" and this is your handwriting that I
13    am reading here below that, correct?
14          A    Right.
15          Q    It says "to be restored to position and be
16    placed back at work with all benefits," correct?
17          A    That's what it says.
18          Q    Other than the enforced leave that we talked
19    about earlier that was ratified by Robert Dillion, did
20    you lose any other position in May of 1997 or June, 1997
21    to which you needed to be restored?
22          A    I would have to say yes.
23          Q    What was that?
24          A    The 204-B's were being used on our tour.
25          Q    To be clear, a 204-B is a Postal designation
```

```
 1        A    Well, 11 is a complaint.  I don't understand

 2   your connection to restoring to the same place, the same

 3   position.

 4        Q    Okay.  Let's move on.  We have marked this

 5   defendant's Exhibit Number 13.

 6             (The document referred to was thereupon

 7             marked as Defendant's Exhibit Number 12 for

 8             Identification, a copy of which is attached

 9             hereto.)

10   BY MR. WHITE:

11        Q    Do you recognize this?

12        A    It appears to be similar to something that I

13   received.

14        Q    Does this appear to be appellant's

15   prehearing submission filed on your behalf with the

16   Merit Protection Board styled Thomas Butler versus

17   United States Postal Service, case no.

18   AT-0752-97-0767-1-1?

19        A    Yes.

20        Q    I am not going to read through here but

21   basically this lays out various submissions that you are

22   filing with the Merit Systems Protection Board that

23   describes the notification to you by Sergio Fernandez of

24   his proposal placing you on enforced leave, is that

25   right?  Do you see that in paragraph one?
```

```
 1              I am just trying to describe the nature of
 2    the document as it relates to the proceedings if you can
 3    verify what the nature of the proceedings were?
 4         A    I am not sure on that charge here--
 5         Q    We are going back to Defendant's Exhibit No.
 6    8.  We have a letter that we talked about earlier
 7    drafted by Sergio Fernandez, remember?
 8         A    Correct.
 9         Q    And basically he is proposing to put you on
10    enforced leave, right?
11         A    Correct.
12         Q    Okay.  Here we are looking now at
13    Defendant's Exhibit No. 13, the submission, and in
14    paragraph one you are talking about the same letter,
15    although he characterizes it now or you characterize it
16    now in your submission as a notice of proposed adverse
17    action dated May 2nd, specifically the notification by
18    Fernandez that you are going to be put on enforced
19    leave, correct?
20              You are talking about the same thing here,
21    right?
22         A    First of all, this was prepared by Roscoe
23    Long.
24         Q    Is there any other event that is being
25    described that you are aware of in paragraph one of
```

1    Defendant's Exhibit 13 than that letter that we have

2    already talked about, Defendant's exhibit 8?

3              Are you aware of any other proposed action

4    that took place on or about May 2nd involving yourself

5    and Sergio Fernandez and a proposal to place you on

6    enforced leave other than that which is contained in

7    this exhibit?

8         A    I know I was on family medical leave and

9    this was against the law for him to propose that.  I was

10   supposed to have protection under the Family Medical

11   Leave and I was also on limited duty.  They were

12   supposed to provide me with limited duty and they didn't

13   do that either.

14        Q    Let me go back and look at Defendant's

15   Exhibit 11.

16             The date of the event in Defendant's Exhibit

17   11 is March 5th, 1997, right?

18        A    The date of the event?

19        Q    That's right, that is when the

20   discrimination that you allege took place, right?

21        A    That is the date-- no, the discrimination

22   took place prior to that and including that.

23        Q    Let me help you.  We are looking here at

24   Defendant's Exhibit 6, in which you layed out your

25   information on the precomplaint counseling.

```
1              Remember we went over this already and you

2    had made the allegations with regard to what took place

3    on or about March 5th, 1997 which sent you home stressed

4    out, right?

5         A    That's correct.

6         Q    These are the events which culminated in

7    your administrative complaint filed on June the 6th,

8    1997 which are reflected in Defendant's Exhibit 11,

9    right?

10        A    When you say culminated, is that like the

11   straw that broke the camel's back?

12        Q    No, this is the precomplaint counseling

13   Defendant's Exhibit 6, this is what started the

14   administrative process.

15        A    Yes.

16        Q    And it ended up with you filing a complaint

17   which is Defendant's Exhibit 11, is that right?

18        A    That is part of the same case, yes.

19        Q    Is there something else, some other

20   discrimination that I am missing than that which is

21   contained in these two documents?

22        A    Yes.

23        Q    What's that?

24        A    Disparity of treatment, I am being treated

25   differently.
```

```
 1          Q    How so?

 2          A    Because I was not Hispanic.

 3          Q    We talked about that earlier as we went

 4   through the specific allegations that you have listed

 5   here all of the factors, is that right?

 6          A    I just mentioned that.

 7          Q    You mentioned earlier as we went through the

 8   discrimination factors each of the categories, color,

 9   religion, age, race, national origin and sex, is that

10   right?

11          A    We went over those things, yes.

12          Q    Is there some other form of discrimination

13   that you didn't include in this document, that being

14   Defendant's Exhibit 6?

15          A    Just the ongoing harassment and

16   discrimination.

17          Q    In what fashion were you the subject of

18   ongoing harassment?

19          A    Many times, many ways and I told you about

20   one of them back before Christmas.  That was only one

21   example.

22          Q    When you were made to stay an unduly large

23   amount of time as you anticipated going on vacation,

24   that event?

25          A    That event.
```

```
 1        Q    What other instances can you recall?

 2        A    At this time I can't recall any but there

 3   are many more.

 4        Q    The stress that you suggest that you have

 5   suffered in your information on the precomplaint

 6   counseling, Defendant's exhibit 6, that is what

 7   culminated in your not returning to work, is that right,

 8   that stress? .

 9        A    You have to rephrase that question because

10   the doctor had let me come back.  Then the employer

11   wouldn't let me come back so the question is--

12        Q    The doctor by her own words let you come

13   back with limitations, is that correct?

14        A    She said I can come back part time.  I don't

15   know if that is a limitation or not.

16        Q    Well your job was full time, wasn't it?

17        A    My job was full time.

18        Q    And the doctor said that you couldn't go to

19   work full time.  She said that you had to go back part

20   time, didn't she?

21        A    That is what she said but also on the job

22   injury is limited duty, and they must found work.  They

23   found work for other people and this is an example of

24   your last question.  This is disparity of treatment.

25   There were other people-- they find work for and they
```

1    didn't find work for me.

2         Q    That wasn't the only limitation that your

3    doctor placed on your return to work?

4         A    Look at that first letter dated May 8th.

5    Put it out and let's look at it.

6         Q    We are looking now at Defendant's exhibit 9

7    which is the letter of May the 8th, correct?

8         A    No, this is the second-- this is the full

9    time one.  Where is the first one?

10        Q    The first one is the letter dated April 14,

11   1997 Defendant's Exhibit Number 7.

12        A    Might as well start with the first one, part

13   time basis gradually increasing over the next two weeks

14   until he is back to work in his detail on a full time

15   basis.

16             They very well could have placed me on say

17   Tour 2 which I believe it where a 204-B was temporarily

18   covering for some reason or another and that would have

19   satisfied the medical doctor's suggestion or whatever it

20   is called.

21        Q    Dr. Lopez-Brignoni also limited you to not

22   returning to the supervision of Sergio Fernandez, is

23   that correct?

24        A    She writes "it is imperative that he not

25   return to work under this Mr. Fernandez as this will

```
 1    aggravate a recurring problem".

 2             She didn't say anything that he couldn't go

 3    back to work and work could have been offered under

 4    limited duty.

 5        Q    Well, it puts you back at work not under

 6    Sergio Fernandez.  It would have involved putting you on

 7    a different tour, correct?

 8        A    Could have been.

 9        Q    These were the issues that were presented to

10    Mr. Dillion, weren't they?

11        A    Some of the issues.

12        Q    Let me move on to Defendant's Exhibit No.

13    14.  This is marked 14.

14             (The document referred to was thereupon

15             marked as Defendant's Exhibit Number 14 for

16             Identification, a copy of which is attached

17             hereto.)

18    BY MR. WHITE:

19        Q    Do you recognize this to be a letter written

20    on Postal Service letterhead, Appeals Processing Center

21    dated September 19, 1997 in which they in essence

22    acknowledge receipt of your complaint of discrimination

23    filed June 6, 1997?

24        A    It appears to be so.

25        Q    Did you ever receive a copy of this letter
```

```
 1    prior to today?

 2         A    I received something very similar.

 3         Q    Did you get it back in September of 1997?

 4         A    I don't recall.

 5         Q    Do you remember after you filed your

 6    complaint they sent you a letter framing the issues that

 7    they understood you to be complaining about?

 8         A    I don't recall.

 9         Q    Read through that letter and take a look at

10    it.  It is written to you, right?

11         A    This letter is addressed to me.

12              MR. KARLIN:  What was the question?

13    BY MR. WHITE:

14         Q    Do you remember receiving this letter back

15    in September of 1997?

16         A    I don't remember receiving it but I believe

17    I received it.

18         Q    Do you remember being asked whether or not

19    the issues that they were going to investigate based on

20    your complaint was that "you were harassed by your

21    supervisor about your job performance and subsequently

22    placed on enforced leave, the date of the incident being

23    March 5th, 1997".

24              Now this is the EEO action not the MSPB,

25    correct?
```

```
 1        A    I believe-- you are saying they are

 2   different.  I agree that they are different.

 3        Q    I am not saying anything.

 4             MR. KARLIN:  Just try to answer the

 5   question.

 6             THE WITNESS: I believe so.

 7   BY MR. WHITE:

 8        Q    Did you object to the specific issue that

 9   they indicated that they were going to investigate, that

10   being you were harassed by your supervisor about your

11   job performance and subsequently placed on enforced

12   leave on the date of the incident March 5th, 1997.

13             Did you object to that issue?

14        A    I don't recall.

15        Q    Do you know of any other issue that you put

16   forth as it relates to the EEO complaint that ended

17   18-97?

18        A    I don't recall.

19        Q    Are you in possession of any letter which

20   would indicate or any other writing that would indicate

21   that you had any other issue that you wanted them to

22   investigate?

23        A    I am not sure.

24        Q    Is there some place that you need to go to

25   look to see if you do have such a document?
```

1      A    I am not sure if Roscoe has any of that

2  information.

3      Q    Have you had such a document would you have

4  made it available to your lawyer, the one who is sitting

5  here with you now?

6      A    If I had it I would.

7          MR. KARLIN:  Can we just take two minutes,

8  I'm sorry.

9          (Thereupon a short recess was had.)

10 BY MR. WHITE:

11     Q    On or about July 25, 1997 you received

12 something from Toby Lowe, a labor relations specialist,

13 did you not?

14     A    I don't recall.

15     Q    Do you know who Toby Lowe is?

16     A    Yes.

17     Q    Who is Toby Lowe?

18     A    She worked for the Post Office in the Labor

19 Department.

20     Q    Do you know what her duties and

21 responsibilities there were?

22     A    No.

23     Q    Did you participate with your lawyer Roscoe

24 Long as it relates to the various administrative

25 proceedings that you were taking part in back in the

1    summer of 1997?

2              I am not asking you what you talked about

3    but were you engaged with him in terms of did you know

4    what he was doing and was he asking you questions about

5    what was going on so that you all could work together to

6    resolve your differences with the Postal Service?

7         A    I tried to do that long distance.  He was

8    not from Miami so I tried through written

9    correspondence, some phone.

10        Q    Did there come a point in time during the

11   summer of 1997 that you were trying to gather discovery

12   or review the various files of the Postal Service as it

13   relates to your employment?

14        A    I am not sure.

15        Q    Let me try it this way.  I am going to hand

16   you what we have marked as Defendant's exhibit 15.

17              (The document referred to was thereupon

18              marked as Defendant's Exhibit Number 15 for

19              Identification, a copy of which is attached

20              hereto.)

21   BY MR. WHITE:

22        Q    Do you recognize the handwriting on this

23   document?

24        A    Yes, sir.

25        Q    Whose handwriting is that?

```
 1          A    That is mine.

 2          Q    This appears to be then a letter or a

 3    statement written to you.  It says up in the left hand

 4    corner Bob Dillion, does it not?

 5          A    Yes.

 6          Q    Who is Bob Dillion?

 7          A    Bob was Sergio's boss at the time I believe.

 8          Q    On the right-hand side it has August 1st,

 9    1997?

10          A    8-1-97.

11          Q    Underneath it goes on and I am not going to

12    read the whole thing but it says "On July 25 1997 I

13    received a package from labor relations specialist Toby

14    Lowe" does it not?

15          A    Yes.

16          Q    Having reviewed this document, do you now

17    remember receiving such a package from Toby Lowe?

18          A    Yes.

19          Q    What package did you receive from her?

20          A    It was a package of information.

21          Q    Why would Toby Lowe have reason to give you

22    a package of information?

23          A    I am not sure.

24          Q    What did you do with this package once you

25    received it?
```

1      A    I looked at it.

2      Q    Is there anything unusual about it?

3      A    Yes.

4      Q    What was unusual about it?

5      A    There was a letter of warning in this file

6  that I had never received.

7      Q    Before we get into the substance of it, what

8  is a letter of warning?

9      A    It is a form of discipline.

10      Q    What form of discipline is it?

11      A    I don't understand the question.

12      Q    When you say it is a form of discipline,

13  what kind of discipline?

14      A    It is a letter that is put in your file that

15  is designed to have you improve upon the situation.

16      Q    Is it fair to say that they are issued or

17  served on employees who management feels violated some

18  rule, regulation, policy or procedure with the Postal

19  Service?  Is that the general idea of what a letter of

20  warning is?

21      A    Could be some of the things in it.  I am not

22  saying that is all of the things.

23      Q    Does the employee have an opportunity to

24  contest it in any fashion, the issuance of a letter of

25  warning or proposed discipline action?

```
 1          A    There is an appeal process.

 2          Q    As it relates to a letter of warning, do you

 3    remember this letter of warning that we are talking

 4    about here in Defendant's Exhibit 15?

 5          A    I was never issued this letter of warning; I

 6    don't know how it got in my file.

 7          Q    This letter, that being Defendant's exhibit

 8    15, it suggests a letter of warning was drafted by Jack

 9    Watson.  Who is Jack Watson?

10          A    He is an MDO.

11          Q    Was he one of your supervisors out there at

12    the Postal Service when you were working there in

13    February of 1997 before you went on your enforced leave?

14          A    I am not sure.

15          Q    Had you ever work under Jack Watson before?

16          A    Yes.

17          Q    When?

18          A    He was-- I am not sure of the exact dates.

19          Q    Was it for a short time or for an extended

20    period of time that you worked under Jack Watson?

21          A    I am not sure of the dates.

22          Q    Would it have been for longer than a year?

23          A    I am not sure of the dates.

24          Q    How long have you known Jack Watson?

25          A    Approximately sometime in '97 to today.
```

1    Q    Do you remember this letter of warning that

2    was issued apparently by or drafted by Jack Watson back

3    in February of 1997?

4    A    As a matter of fact, I think I might even

5    have known him in '96 if my recollection is right. He

6    gave me a positive merit evaluation in '96 I believe.

7    Q    Is it fair to say based on that statement

8    that he was one of your supervisors in 1996?

9    A    I am not sure.  Like I said, there were

10   usually two MDO's on Tour 1 and they have different

11   parts of the building.  So I am just not sure.

12   Q    Let's look at the disciplinary proceeding

13   first.

14        If a letter of warning is going to be

15   drafted by a supervisor, what does he do after he has

16   drafted it.  He has it in his hand; what is he supposed

17   to do with it?

18   A    I don't know.

19   Q    Have you ever drafted one yourself?

20   A    Have I ever drafted a letter of warning?

21   Q    Yes.

22   A    Yes.

23   Q    How many times?

24   A    I am not sure.

25   Q    Have you been trained by the Postal Service

1    and do you have experience in the procedures to be

2    followed with regard to letters of warning?

3         A    Yes.

4         Q    Do you know whether or not a letter of

5    warning, once it is drafted by a supervisor, is supposed

6    to be issued or otherwise served upon the employee?

7         A    Repeat the question.

8         Q    Let me rephrase it.

9         A    Okay, rephrase the question.

10        Q    What does a supervisor do with a letter of

11   warning once he has drafted it?

12        A    That is his choice.

13        Q    What can he do with it?

14        A    He can issue it, he can destroy it, he can

15   hold it in abeyance.  He can do a lot of different

16   things with it.

17        Q    When you say issue it, what do you mean?

18        A    Issue it, give it to the employee.

19        Q    How long after the drafting of a letter of

20   warning is a supervisor required to issue it to the

21   subject employee?

22        A    I don't know.

23        Q    What is the longest that you ever heard?

24        A    I don't know.

25        Q    What happens if he doesn't issue it?

```
 1        A    I guess it becomes untimely.

 2        Q    How long of a period of time must transpire

 3   before it becomes untimely?

 4        A    I don't know.

 5        Q    Do you remember the substance of the letter

 6   of warning drafted by Jack Watson back in February of

 7   1997 as it relates to you?

 8        A    I don't remember it, no.

 9        Q    So you don't remember what he is saying that

10   you did wrong?

11        A    No, I don't remember.

12        Q    You just have a recollection based on this

13   letter that he issued one, is that right?

14        A    I have a recollection that I found it in a

15   file that Toby Lowe had.  I never received it, no.

16        Q    I stand corrected; I used the word issued.

17   You found a letter drafted by the Jack Watson but it had

18   never been issued to you; is that correct?

19        A    I believe it was drafted by Jack Watson but

20   never issued to me, no.

21        Q    You simply found it when you reviewed the

22   package produced to you by Toby Lowe?

23        A    That's correct.

24        Q    What happened to that letter of warning

25   after you discovered it?
```

1    A    I don't know what happened to it.

2    Q    Did you talk to anybody about it?

3    A    I talked to Toby, I talked to Bob Dillion, I

4    talked to-- let's see who else.

5    Q    Do you know remember why it was that Toby

6    Lowe was giving you this package that we discussed a

7    little bit here today?

8    A    I. don't know exactly why.

9    Q    After you talked with Toby Lowe and Bob

10   Dillion about this letter of warning, what happened?

11   A    They said-- Bob said it was never issued and

12   it is in there by mistake, I don't understand how it got

13   in there by if a mistake, I don't know how something got

14   into your file by mistake.

15   Q    As a result of the drafting of this letter

16   of warning, did you ever lose any money?

17   A    Not directly because of this letter, no.

18   Q    Did you lose any position within the Postal

19   Service as a result of the drafting of this letter of

20   warning back in February of 1997?

21   A    Not that I am aware of.

22   Q    Was there any consequences that you suffered

23   as a result of the drafting of this letter of warning

24   back in February of 1997?

25   A    Any consequences?

```
 1          Q    Yes.

 2          A    What do you mean by consequences?

 3          Q    Did you suffer in anyway?

 4          A    Yes.

 5          Q    How so?

 6          A    Mental anguish, it compounded my recovery.

 7          Q    Did you suffer any adverse action within the

 8   Postal Service as a result of the drafting of the

 9   February of 1997 letter, the letter of warning?

10          A    I had some additional adverse action, yes.

11          Q    What was that?

12          A    The letter of placement on enforced leave

13   came after that letter.

14          Q    Other than your placement on enforced leave,

15   what if any adverse action did you suffer as a result of

16   the drafting of that letter of warning of February,

17   1997?

18          A    I am not sure.

19          Q    You say you are not sure?

20          A    I don't recall.

21          Q    Can you think of any?

22          A    I probably can.

23          Q    I'll wait; go ahead.

24          A    Am I allowed to look at personal notes?

25               MR. KARLIN:  I rather you not.
```

```
 1              THE WITNESS:    I don't recall.
 2   BY MR. WHITE:
 3         Q    Let me move up to Government Exhibit Number
 4   16.
 5              (The document referred to was thereupon
 6              marked as Defendant's Exhibit Number 16 for
 7              Identification, a copy of which is attached
 8              hereto.)
 9   BY MR. WHITE:
10         Q    This appears to be a letter drafted by
11   Robert Dillion dated August 6, 1997 addressed to you.
12   Take a second at look through that.
13         A    Okay.
14         Q    All right.  You have read this letter?
15         A    Yes.
16         Q    The substance of letter he is making
17   reference to the letter of warning that we have been
18   talking about of February, 1997; is that correct?
19         A    Yes.
20         Q    And he indicates that it was never issued;
21   is that correct?
22         A    Yes.
23         Q    And therefore, it should not appear in any
24   records of the Postal Service; is that correct?
25         A    Yes it shouldn't have.
```

1      Q      And he also indicates that any copies or

2   records of the letter will be destroyed; is that

3   correct?

4      A      That is what he says.

5      Q      Did you ever see any copy at the drafting of

6   this letter of August 6, 1997?

7      A      I don't believe so.

8      Q      In fact, you don't even have a copy of it;

9   is that correct?

10     A      I don't think so.

11     Q      You received this letter from Mr. Dillion

12  back in August of 1997, is that right?

13     A      Thereabouts, yes.

14     Q      Actually this letter is dated August 6th.

15     A      You said I received it?

16     Q      You received it in August of 1997.

17     A      I come into possession of it.  I sent it to

18  him.

19     Q      You wrote the letter that Mr. Dillion

20  signed?

21     A      No, that's not the letter, I'm sorry.  I

22  sent him a letter; I don't see it in your documentation

23  here.  I sent him a letter.

24     Q      You were complaining about the existence of

25  your letter of warning?

```
 1          A     In that letter?

 2          Q     This letter?

 3          A     This is from Dillion.  I did receive it

 4  somewhere around August 6th.

 5          Q     Effectively that letter of warning was

 6  abandoned by the Postal Service in the month of February

 7  of '97, wasn't it?

 8          A     It it not supposed to be in my file.

 9          Q     It was never issued upon you?

10          A     Correct.

11          Q     You were never sanctioned as a result of

12  whatever the conduct was which was contained in that

13  letter of warning, is that right?

14          A     Correct.

15          Q     It was effectively abandoned by the Postal

16  Service, wasn't it?

17          A     I am not sure.

18          Q     Are you aware of any action taken upon it

19  that we are not considering here?

20          A     I am not sure.

21          Q     Let me hand you the next exhibit I think

22  this is 17.

23                (The document referred to was thereupon

24                marked as Defendant's Exhibit Number 17 for

25                Identification, a copy of which is attached
```

```
 1                    hereto.)

 2   BY MR. WHITE:

 3        Q    Let me ask whether or not you recognize this

 4   document.

 5        A    Yes.

 6        Q    What do you recognize this document to be?

 7        A    It is a settlement agreement through the

 8   MSPB.           .

 9        Q    And it is styled United States of America

10   Merit Systems Protection Board, Atlanta Regional Office,

11   right?

12        A    Yes.

13        Q    Thomas P. Butler, Complainant versus the

14   United States Postal Service Agency?

15        A    Correct.

16        Q    Case AT=0752-87-0767-1-1, is that right?

17        A    Yes.

18        Q    That appears to be the same case number and

19   style on Defendant's Exhibit 13 that we previously

20   talked about, your submission; is that correct?

21        A    Same case number.

22        Q    Is that correct?

23        A    Yes.

24        Q    Looking to the last page of that document it

25   appears to be--
```

```
 1          A    Which document?

 2          Q    I'm sorry, Defendant's Exhibit 17, the

 3    settlement agreement, it appears to have your signature

 4    there, is that right?

 5          A    Yes.

 6          Q    That is in fact your signature?

 7          A    Yes.

 8          Q    You signed it October 15, 1997, at least by

 9    the document; is that correct?

10          A    Yes.

11          Q    That is your lawyer's signature in addition

12    to yours on October 7, 1997?

13          A    To the right, yes.

14          Q    How long had you been working with Mr. Long

15    as it relates to these proceedings prior to your signing

16    this document?

17          A    The best estimate would be from when the

18    MSPB appeal would have been dated, that would have been

19    the time frame.

20          Q    I am not going to ask you the substance of

21    his counsel but I am going to ask you whether or not you

22    had an opportunity to meet with your lawyer and discuss

23    with him the nature of the proceedings that you were

24    involved with, both the administrative complaint as well

25    as the Merit Systems Protection Board appeal prior to
```

```
 1    your signing off on this settlement agreement?

 2         A    No.

 3         Q    You didn't meet with him?  Did you talk with

 4    him?

 5         A    Yes.

 6         Q    Did you have an adequate opportunity to talk

 7    with him about these proceedings before you signed the

 8    settlement agreement?

 9         A    I am not sure what you mean by adequate.

10         Q    Who hired Mr. Long?

11         A    I believe it says on the appeal Scialla &

12    Associates.

13         Q    How did you find Mr. Long to represent you?

14         A    Through the union.

15         Q    Did you have an adequate opportunity to

16    speak with Mr. Long about your situation in these

17    proceedings?

18         A    Once again I have to ask you what do you

19    mean by adequate.

20         Q    Did you understand what the nature of the

21    proceedings were?

22         A    He told me it was--

23              MR. KARLIN:  Don't tell him what he said.

24    You can't say it.  That is attorney-client privilege.

25              THE WITNESS:   Oh, attorney-client
```

```
 1   privilege.

 2   BY MR. WHITE:

 3        Q    Were you satisfied with the representation

 4   that you received from Mr. Long as it relates to the

 5   proceedings?

 6        A    At the time under the conditions, I was

 7   satisfied.

 8        Q    Did Mr. Long assist you in understanding the

 9   nature of the settlement agreement?

10        A    Yes.

11        Q    Did he answer all your questions as it

12   relates to the nature of the settlement agreement?

13        A    I am not sure.

14        Q    Are there any questions that you can think

15   of that he didn't answer?

16        A    I am not sure.

17        Q    Did you read the settlement agreement before

18   you signed it?

19        A    Yes.

20        Q    Did you talk with him about it after you

21   read it?

22        A    Yes.

23        Q    Were you satisfied with the services of your

24   lawyer, Mr. Long?

25        A    What do you mean satisfied?
```

1        Q     Content.

2        A     Content?  I don't understand the question.

3        Q     Happy; was there anything that you thought

4   that he should have done that he didn't do?

5        A     I am not sure.

6        Q     Can you think of anything that he should

7   have done that he didn't do?

8        A     What I would have like to have done?

9        Q     Yes, sir.

10       A     I am not sure.

11       Q     Let's turn to the body of the settlement

12   agreement.  On the first page under the heading

13   "settlement agreement" does it not say in full and

14   complete resolution of the appeal cited herein the

15   undersigned parties agree as follows", it says that,

16   right?

17       A     That is what it says.

18       Q     Let's flip over to the second page beginning

19   at the first paragraph.  It is understood by the

20   undersigned that this agreement is in full and complete

21   settlement of all issues related to Appellant's Merit

22   Systems Protection Board appeal number

23   AT-0752-97-0767-1-1, does it not?

24       A     That is what it says.

25       Q     And it continues, Administrative EEO

1    complaints or appeals relative to the issues referenced

2    in this complaint, in this or any other forum, filed by

3    the below named appellant Thomas Butler.

4         A    I'm sorry, you lost me.  I was still in that

5    first paragraph that you were reading.

6         Q    Got you.  We are looking at the first

7    paragraph?

8         A    You said something about Thomas Butler and

9    that is in the fourth paragraph.

10        Q    Okay.  Let me ask you, you were the

11   appellant in this, weren't you?

12        A    Yes.

13        Q    Let's pick up with the case number.  Well,

14   we just finished the case number.

15             It continues," administrative EEO complaints

16   or appeals relative to the issues referenced in this

17   complaint, in this or any other forum filed by the below

18   named appellant or on his behalf relating to any matters

19   that occurred prior to the execution of this settlement

20   agreement", is that right?

21             That is what it says, correct?

22        A    Yes.

23        Q    It continues, "the appellant agrees to

24   voluntarily withdraw any outstanding administrative

25   complaints or appeals including this Merit Systems

1    Protection Board case and EEOC of all issues related to

2    this appeal".

3            It says that, does it not?

4        A    Yes.

5        Q    It continues, "it is understood that in

6    withdrawing all appeals or complaints related to this

7    issue, appellant waives his rights to an oral hearing or

8    further appeal on the matters raised", does it not?

9        A    Yes.

10       Q    And let me continue.  In exchange for your

11   actions to forego--

12       A    Are you reading something?

13       Q    No, I am going to frame the question.  We

14   are going to skip down to the fourth paragraph on this

15   second page.  But before we do, in exchange for your

16   giving up all of these rights that we have just read,

17   you are not going to proceed any further in the appeal

18   on the MSPB, you are going to give up all your EEO

19   actions in any form.

20           MR. KARLIN:  I am going to object to that.

21   It doesn't quite say that.  It says as it relates to

22   this appeal.

23   BY MR. WHITE:

24       Q    As it relates to this appeal, does it not

25   say at the bottom of this is what you get?

```
 1              "The appellant, Thomas Butler, will be

 2    reassigned to the position of supervisor Distribution

 3    Operations.  The appellant's hours will be variable on

 4    Tour 3, and days off will be Thursday and Friday".

 5              That is what you got out of this deal,

 6    right?

 7         A    I need to speak to my attorney.

 8         Q    Okay.

 9              (Conference had off the record.)

10              THE WITNESS:  That paragraph 4 is something

11    that I got out of this.

12    BY MR. WHITE:

13         Q    I don't want to pierce any secret agreement

14    but I would want to know did you have some agreement

15    other than that which is contained here in Defendant's

16    Exhibit 17?

17         A    It was explained to me differently than the

18    way that you are interpreting.

19         Q    Well just to be clear, is there any other

20    written document that would manifest a settlement

21    agreement that you had other than this one that we are

22    looking at?

23         A    I am not sure.

24         Q    Have you given some other document to your

25    lawyer?
```

```
 1         A     I don't believe so.

 2         Q     Does any such document exists\?

 3         A     I am not sure.

 4               MR. WHITE:  Well, counsel, I would like to

 5   have any other settlement agreement.

 6               THE WITNESS:   It wouldn't be through him,

 7   it would be through Roscoe.

 8               MR. WHITE:  Counsel, you are representing

 9   this man in these proceedings and I am making a demand

10   right now for any and all other settlement agreements.

11               MR. KARLIN:  I don't think there is anything

12   but we will double check.

13               MR. WHITE:  We will resume this portion of

14   it at the next stage of the deposition and I would

15   appreciate having whatever other documents there are.

16               MR. KARLIN:  That is what I am saying.

17   BY MR. WHITE:

18         Q     Is it fair to say at least in part what you

19   got out of this deal is that you got transferred over to

20   Tour 3?

21         A     Reassigned.

22         Q     Without stating any specific amount, were

23   you financially compensated as well?

24         A     Financially compensated in what way?

25         Q     Did you get any money in exchange for your
```

1  agreement to enter into this settlement agreement?

2      A    In exchange for it?  That is a difficult

3  question.  There was some backpay.  Is that what he was

4  referring to?

5      Q    Did you get back pay?

6      A    Some but not all.

7      Q    It also continues,  "the agency will purge

8  the appellant's official personnel file of any reference

9  to the notice of proposed placement on enforced leave

10  dated May 2nd and letter of decision placement on

11  enforced leave dated May 27, 1997".

12          Those were deleted from your file in

13  exchange for entering into this settlement agreement,

14  correct?

15      A    Apparently not because you have copies of

16  it.

17      Q    What I am asking is whether or not your

18  settlement agreement that this is what you would get,

19  you would get the Postal Service's agreement to take the

20  notice of proposed placement on enforced leave from May

21  the 2nd and letter of decision of May the 22nd would be

22  taken out of your official personnel file.

23          That's what the Postal Service agreed to do

24  for you, is that right?  I am not asking you if they did

25  it; I am asking you if they agreed to do it.  That is

```
 1    what they agreed to do, isn't that right?

 2         A    Yes.

 3         Q    In addition on the last page first

 4    paragraph, is it fair to say that you agreed as follows:

 5    It is understood that the appellant, that being you,

 6    shall not litigate or relitigate in any forum, judicial

 7    or administrative, any claims arising from the actions

 8    involved in this appeal.

 9              That is what you agreed also to do for the

10    Postal Service; is that correct?

11         A    That's correct.

12         Q    As it relates to where these documents may

13    have been maintained, do you know of any other files

14    that the Postal Service maintained beyond the official

15    personnel file?

16         A    Yes.

17         Q    What other files does the Postal Service

18    maintain?

19         A    They have EEO files, they have medical

20    files, they have labor files, they have personnel files.

21         Q    What is contained in the EEO files?

22         A    And they have files that I do not have

23    access file.

24         Q    What is contained in an employee's EEO file?

25         A    Actually they forwarded it out of the
```

1          A    Which was on 8-1-97, correct.

2          Q    And the question is you are suggesting that

3    Jack Watson retaliated against you when he wrote the

4    letter of warning in February of '97.

5               I am saying how could that be if the EEO

6    activity that you are suggesting was the subject of

7    retaliation didn't take place until the next month?

8          A    I am basing it on retaliation.  I am not

9    saying it was Jack Watson' retaliation.  It is just

10   retaliation.

11         Q    Who?

12         A    Sergio.

13         Q    On what basis do you say that?

14         A    On the basis that they worked together; they

15   do just about everything together.

16         Q    Did you ever talk with Jack Watson about

17   that letter?

18         A    The one that was found in the file?

19         Q    Yes sir.

20         A    No.

21         Q    Going back to the last Defendant's exhibit

22   and I will finish up for today, did you ever object to

23   the issues as defined by the agency in their letter

24   dated February 19, 1998?

25         A    I don't remember.

```
 1          Q    Do you have anything in writing that would

 2   indicate that you did notify the agency that you had an

 3   objection?

 4          A    I don't remember.

 5          Q    Is there anything that would refresh your

 6   recollection?

 7          A    I am not sure.

 8          MR. WHITE:  At this point we will conclude

 9   the deposition to be resumed on the date and time agreed

10   upon by the parties.

11          MR. KARLIN:  I think March 4th.

12          (Thereupon the deposition was continued, to

13   be resumed March 4th 10:00 a.m., per agreement of

14   parties.

15

16

17

18

19

20

21

22

23

24

25
```

1        CERTIFICATE OF REPORTER

2     STATE OF FLORIDA:
                    SS.
3     COUNTY OF DADE:

4             I, Elaine Somma, a Certified Shorthand
      Reporter and Notary Public for the State of Florida at
5     Large, do hereby certify that I reported the deposition
      of THOMAS BUTLER, called as a witness by the Defendant
6     in the above-styled cause; that the said witness was
      duly sworn by me; that the foregoing pages, numbered
7     from 1 to 115, inclusive, constitute a true and correct
      transcription of my shorthand report of the deposition
8     by said witness on this date.

9             I further certify that I am not an attorney
      or counsel of any of the parties, nor a relative or
10    employee of any attorney or counsel connected with the
      action, nor financially interested in the event of the
11    cause.

12            I further certify that I have delivered the
      original transcript of said deposition to CHARLES WHITE,
13    ESQUIRE, to be retained by him pending further order of
      the Court.

14
              WITNESS MY HAND AND OFFICIAL SEAL OF
15    OFFICE, on this 24th day of February, 2003 in the City
      of Miami, County of Dade, State of Florida.

16

17

18

19                     ELAINE SOMMA, Notary
                       Public, State of Florida at Large
20                     My Commission Expires:

21

22                 ELAINE SOMMA
             Notary Public - State of Florida
23           My Commission Expires May 25, 2003
                Commission # CC 860110

24

25

| EFFECTIVE DATE | SEQUENCE NO. | | U.S. POSTAL SERVICE | SOCAL SECURITY NO. |
|---|---|---|---|---|
| 08/03/87 | 1 | | NOTIFICATION OF PERSONNEL ACTION | 590 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 |

**EMPLOYEE INFORMATION**

| LAST NAME | FIRST NAME | INIT. | DATE OF BIRTH | VET PREF | | | | LIFE INS. | RET/FICA |
|---|---|---|---|---|---|---|---|---|---|
| BUTLER | THOMAS | P | 01/24/54 | 1 | | | I | C | 9 |

| LEAVE COMP | SERVICE DATES ENTER ON DUTY | RETIREMENT COMP | | NEXT STEP PP-YR | | | PROBATION EXPIR | EMP STATUS |
|---|---|---|---|---|---|---|---|---|
| 03/03/87 | 08/03/87 | 08/03/87 | 01/01/84 | 13-89 | | | 1 23-87 | |

| CAT | LEAVE DATA CHANGE PP/YR | TYPE | RSC | GRADE/STEP | SAVED PROTECTED DATA PP - YR | HOURS | MILES | 3P CODE | POE LOC | EVAL TYPE | SEX | MINORITY | HANDI CAP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 18-90 | 2 | | | | | | | | | I | | |

| CAREER CONDITIONAL DATE | SVS ANNIV PP-YR | SENIORITY DATE | SEQ NO | ACADEMIC DATA CODE | LEVEL | YEAR | DISCIPLINE | POSTAL LIFE | RETIRED MILITARY | C.O.L.A. | RRS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/03/87 | 17-87 | 00-00-00 | | 2 | 13 | 76 | 4901 | Y | | 1.21 | |

| MAILING ADDRESS — STREET/BOX/APT. NO. | CITY | ST. | ZIP + 4 | DUTY STATION NAME |
|---|---|---|---|---|
| 7840 CAMINO REAL APT P 105 | MIAMI | FL | 33143-5423 | MANAGER/POSTMASTER MIAMI FL |

**POSITION INFORMATION**

| FINANCE NO. | EMPLOYING OFFICE NAME | | ZIP + 4 | PAY LOC. |
|---|---|---|---|---|
| 11-5850 | MANAGER/POSTMASTER | | | 080 |
| | MIAMI | FL | 33152 9998 | |

| DUTY STATION FINANCE NO. | LABOR DISTR. | DES/ACT | POS TYPE | LIMIT TOUR | RATE CODE | ALLOW CODE | ORG. COVER | RED CIRCLE | ROUTE NO. | L-RTE ID | PAY TYPE | TR HRLY | FLSA | COMMIT | GUARANTEED SALARY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11-5850 | 14 | 42 0 | 3 | | H | | | 0 | | | | | | | |

**NATURE OF PERSONNEL ACTION**                     RURAL CARRIER DATA

| NOA | NATURE OF ACTION DESCRIPTION | AUTHORITY |
|---|---|---|
| 130 | CAREER APPOINTMENT | 39-USC SECT. 1001 MERIT ANNIV. |

| REMARKS | CODE | 525 | CODE | | CODE | | CODE |
|---|---|---|---|---|---|---|---|

DELETED FROM HIRING WORKSHEET DATED 05/11/87 CORRECTING DUPLICATE NOA 120-CANCEL APPT element 17 should read 8/03/87.

DEFENDANT'S EXHIBIT 026
00-6193-CV-AS

**SERVICE HISTORY INFORMATION**

| | NOA | NOA DESCRIPTION | EFF DATE | OCCUPATION CODE | POSITION TITLE | RSC | GRADE/STEP | SALARY |
|---|---|---|---|---|---|---|---|---|
| 1st. | | | | | | | | |
| -6 | | | | | | | | |
| -5 | | | | | | | | |
| -4 | | | | | | | | |
| -3 | | | | | | | | |
| -2 | | | | | | | | |
| -1 | | | | | | | | |
| CUR | 100 | CAREER APPT | 08/03/87 | 231501XX | MAIL HANDLER | M | 04/ 6 | 9.52 |

| AUTHORIZATION HA398 PENTTALA REGIONAL POSTMASTER GENERAL | DATE 08/14/87 | OPF FINANCE NO. 330/11-5850 |
|---|---|---|

MIAMI, FLORIDA 33152-9998

September 20, 1990



Thomas P. Butler
7840 Camino Real P-105
Miami, FL 33143-5423

Dear Mr. Butler:

It is my pleasure to officially notify you of your selection for the position of Supervisor, Mails Relief, EAS-15, at the General Mail Facility, Miami, FL, effective September 22, 1990.

I am confident that your new appointment in this capacity will prove challenging and enjoyable.  I congratulate you on this accomplishment and wish you every success in your new position.

Sincerely,

Clyde Young
Manager, Employment & Development

SND09:THernandez:bgm:3796:33152-9421

cc:  D/CO
     Vacancy File
     OPF

| | | | | |
|---|---|---|---|---|
| 01| Effective Date | | NOTIFICATION of PERSONNEL   ION | 02| Social Security Number |

U. S. Postal Service

01| Effective Date: 02-20-93
02| Social Security Number: 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

## EMPLOYEE INFORMATION

| # | Field | Value |
|---|---|---|
| 03| Employee Name-Last | BUTLER |
| 04| Employee Name-First | THOMAS |
| 05| Employee Name-Middle | P |
| 06| Mailing Address Street/Box/Apts | 7840 CAMINO REAL # 105P |
| 07| Mailing Address-City | MIAMI |
| 08| Mailing Address-State | FL |
| 09| Mailing Address-Zip+4 | 33143-6871 |
| 10| Date of Birth | 01-24-54 |
| 11| Veterans Preference | 1 - NO PREFERENCE |
| 12| Sex | |
| 13| Minority | |
| 14| Disability | |
| 15| Leave Comp Date | 08-03-87 |
| 16| Enter on Duty Date | 08-03-87 |
| 17| Retirement- Comp Date | 08-03-87 |
| 18| Serv Anniversary PPYR | |
| 19| TSP Eligibility | Y - ELIGIBLE WITH DEDUCT |
| 20| TSP Service Comp Date | 08-03-87 |
| 21| Prior CSRS Service | |
| 22| Frozen Csrs Time | |
| 23| Leave Data-Category | 6 - HOURS/PP |
| 24| Leave Data-Chg PPYR | 18-02 |
| 25| Leave Data-Type | 1 - ADVANCED AT BEGINNING |
| 26| Credit Military Serv | |
| 27| Retired Military | |
| 28| Retirement Plan | 8 - FERS |
| 29| Employee Status | |
| 30| Life Insurance | C - BASIC COVERAGE ONLY |
| 31| Special Benefits | |

## POSITION INFORMATION

| # | Field | Value |
|---|---|---|
| 32| Employ Office-Fin No | 11-5851 |
| 33| Employ Office-Name | MIAMI PROC/DIST CTR |
| 34| Employ Office-Address | MIAMI FL 33152-9994 |
| 35| Duty Station-Fin No | 11-5851 |
| 36| Duty-Station-Name | MIAMI PROC/DIST CTR |
| 37| Appt Expiration Date | |
| 38| Probation Expir Date | |

| # | Field | Value |
|---|---|---|
| 39| FLSA Status | N - NON-EXEMPT |
| 40| Pay Location | 091 |
| 41| Rural Carrier-Route | |
| 42| Rural Carr-L-Rte ID | |
| 43| Rural Carr-Pay Type | |
| 44| Rural Carr-Tri-Weekly | |
| 45| Rural Carr-FLSA | |
| 46| Rural Carr-Commit | |
| 47| Rural Carr-EMA | |
| 48| Rural Carr-Hours | |
| 49| Rural Carr-Miles | |
| 50| Job Sequence | 1 |
| 51| Occupation Code | 2315-6076 |
| 52| Position Title | SUPV DISTRIBUTN OPR |
| 53| Functional Oper Nbr | 1000 |
| 54| Designation/Activity | 09/0 |
| 55| Position Type | 1 - FULL TIME |
| 56| Limit Hours | |
| 57| Allowance Code | |
| 58| Employment Type | |

## SALARY INFORMATION

| # | Field | Value |
|---|---|---|
| 59| Pay Rate Code | A - ANNUAL RATE |
| 60| Rate Schedule Code | E - EAS |
| 61| Grade/Step | 16/02 |
| 62| Salary | 37,275 |
| 63| Cola | 3,495 |
| 64| Cola Roll-In Ind | N - DECLINED COLA-ROLL-I |
| 65| Next Step PPYR | 20-93 |
| 66| Merit Anniv Date | 20-93 |
| 67| Merit Lump Sum | |
| 68| Special Salary Code | |
| 69| Protected RSC | |
| 70| Protected Grade/Step | |
| 71| Expiration PP/YR | |
| 72| Protected RC Hours | |
| 73| Protected RC Miles | |
| 74| RC Guaranteed Salary | |
| 75| Annuity Amount | |
| 76| Red Circle Code | 0 |

## NATURE OF PERSONNEL ACTION

| # | Field | Value |
|---|---|---|
| 77| Nature of Action Code | 702 |
| 78| Authority | 39-USC SECT. 1001 |
| 79| Description | PROMOTION |
| 80| Code 511 | |
| 81| Code | |
| 82| Code | |
| 83| Code | |

84| Remarks

THIS ACTION DOES NOT CHANGE DUE DATE FOR ADVANCEMENT TO THE NEXT HIG
HER STEP.
PLACED IAW STRUCTURE PLACEMENT POLICY DATED 11/13/92.
BGM 02/25/93


DEFENDANT'S
EXHIBIT
3
00-6193-CV-SIMONTON

| | | |
|---|---|---|
| 85 Authorization | 86| Processed Date | 02-25-93 |
| DON M. SPATOLA, MANAGER | 87| Personnel Office ID | TB10 |
| SOUTHEAST AREA PROC & DIST | 88| OPF Location | MIAMI PROC/DIST CTR |

PS Form 50, March 1990 (Exception to Standard Form 50)     2 - OPF COPY

# UNITED STATES POST OFFICE

DATE:        September 26, 1994

OUR REF:     SE09:THernandez:bgm:3396:33152-9421

SUBJECT:     Excess Supv., Dist Oprns, Miami, FL

TO:     THOMAS P BUTLER                    CERTIFIED P 631 267 891
        7840 CAMINO REAL #105P             RETURN RECEIPT REQUESTED
        MIAMI FL 33143-6871

The Miami Plant has been identified as having excess Supervisor, Distribution Operations (SDO) positions. The South Florida Plant currently has vacant SDO positions which must be filled.

We recently advertised a solicitation requesting volunteers to reassign into these vacancies. After these placements were transacted, we still have vacancies to fill.

Consequently, we have begun a process to reassign SDOs in Miami into these South Florida vacancies. You have been identified as one of these supervisors. Your reassignment will be effective October 1, 1994. Please contact Sergio Fernandez, Manager, Distribution Operations at (305) 436-4359 between 12:30 am to 09:30 am. Mr. Fernandez will then provide you with your assigned reporting schedule.

_Alan S. Bame_
Alan S. Bame
Manager, Human Resources
South Florida Division

cc: Plant Mgr., Dist Oprns, South Fl
    Plant Mgr., Dist Oprns, Miami
    First Class Mail
    OPF

DEFENDANT'S
EXHIBIT
4
00-6193-CV-SIMONTON

| U. S. Postal Service<br>**ROUTING SLIP** | Dept., Office or<br>Room No. | |
|---|---|---|
| **To:**<br>1   JOANN | | ☐ Approval<br>☐ Signature<br>☐ Comment |
| 2   SERGIO | | ☐ See Me<br>☐ As Requested<br>☐ Information |
| 3   ROSIE | | ☐ Read and Return<br>☐ Read and File<br>☐ Necessary Action |
| 4 | | ☐ Investigate<br>☐ Recommendation |
| 5 | | ☐ Prepare Reply<br>☐ |
| **From:**<br>Tom Butler | Extension | |
| Date  2-23-97 | Room No. | |

**Remarks:**

I WANT TO BE CONSIDERED FOR THE LEVEL 16, SDO POSITION THAT IS OPEN ON TOUR 3 AT SFMPC.

I HAVE SUBMITTED PAGES 1-2 OF THE 991 FOR CONSIDERATION AS A NON COMPETITIVE APPLICANT.

I FEEL IT WOULD BE A VERY GOOD CAREER MOVE TO MAKE ALLOWING ME THE OPPORTUNITY TO LEARN ABOUT THE PROCESSING OF OUTGOING MAIL IN THE OPERATIONS OF 030, PLATFORM, FSM AND OCCASIONALLY AUTOMATION AND THE SPBS.

THIS OPPORTUNITY WOULD AFFORD ME THE CHANCE OF EXPERIENCING WORK ON A DIFFERENT TOUR (TEN YEARS T-1).

THANK YOU FOR YOUR CONSIDERATION.

Tom Butler

ITEM 0-13, Aug. 1976    (Additional Remarks on Reverse)

DEFENDANT'S EXHIBIT 5<br>00-6193-CV-SIMONTON

EXHIBIT 1

*33 00 18-97*



*97-375*

**UNITED STATES POSTAL SERVICE**

**Information for Precomplaint Counseling**

**Important:** Please Read Carefully. This is the only notification that you will receive regarding the necessity for you to complete this form. This form should be completed and returned to the EEO Office within 10 calendar days.

On: **3-7-97**    you requested an appointment with an EEO Counselor.

**A.  Requester Information**

| Name (Last, First, MI) **Butler, Tom.** | Social Security No. **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** | Home Telephone No. **(305) 271-1898** |
|---|---|---|

Mailing Address: **7840 (Anwin) Real P105 Miami, Fl 33143-6871**

| Postal Facility Where You Work: **SFMPC** | Position Title: **SDO** | Grade Level **16** | Office Telephone No. **(954) 436-4359** |
|---|---|---|---|

| Pay Location **101** | Tour **1** | Off Days (If Tour 1, Show Nights Off) **WED THUR** | Duty Hours **2250 - 0700 AM** |
|---|---|---|---|

Employment Status (Check One)    Applicant    Casual    TE    (Career) **X**

Time in Current Position    Years **9**    Months **8**

Discrimination Factors **COLOR-WHITE, RELIGION-QUAKER, AGE-OVER 40, RACE-CAUCASIAN (NON HISPANIC), NATIONAL ORIGIN (USA), SEX-MALE**

In the Postal Service prohibited discrimination includes actions taken based on your Race, Color, Religion, Sex, Age (+40), National Origin, Physical and/or Mental Disability, or Retaliation (actions based on your participation in prior EEO activity). These categories are referred to on this form as factors.

What Factor(s) of Discrimination Are You Alleging (Be Specific. Describe, i.e. Race-Black; Sex-Female

**ONLY WHITE MALE NON HISPANIC ON TOUR 1, AGE OVER 40, RELIGION-QUAKER, CONTINUED HARRASSMENT AND INTIMIDATION**

**For Retaliation Allegations Only:** If you are alleging retaliation discrimination, provide the date(s) and specifics of the EEO activity which you feel caused you to be retaliated against.

| 1. On | I engaged in EEO Activity | Case Number: |
|---|---|---|
| 2. On | I engaged in EEO Activity | Case Number: |

**C.  Description of Incident/Activity**

Please use the space below to briefly describe the incident or activity which prompted you to seek EEO counseling at this time.

On **3-5-97**, the following occurred: AFTER A 30 minute MEETING IN THE MDO OFFICE (Bogota Tom Rosio Serps) I WAS COUNSELING EMPLOYEE Julio Burgos. Mr Fernandez Broke up The counseling AND BEGAN HARRASSING ME ABOUT MY OPERATION (THAT HE PULLED ME AWAY FOR A HOUR), Mr FERNANDEZ HAS BEEN HARRASSING ME AND CREATING A STRESSED ENVIRONMENT FOR ME SINCE I FIRST CAME TO THE SFMPC. HE HAS MADE ME HAVE LUNCH DURING A MEETING THAT WAS SCHEDULED AT MY LUNCH TIME. ON 2/4 HE WAS VIDICTIVE TOWARD ME CONCERNING A STAFFING PROBLEM HE STATED "I'LL TAKE CARE OF THAT, I'LL PUT YOU IN CHARGE OF THE FSM." ON 2/25 HE Threatened ME STATING "THIS IS YOUR TRAINING WEEK. WAIT TIL NEXT WEEK." ON 4-12-96 HE CHANGED MY HOURS WORKED. I HAD JOANN FRIONT CORRECT HIS VIOLATION # FLSA. ON 3/4/97 7 EMPLOYEES MET WITH JOANN CONCERNING EMPLOYEE COMPLAINTS OF SERGIO FERNANDEZ. I FEEL MY OPERATION AND SELF HAVE SUFFERED CORRESPONDING REPRISAL. ON NUMEROUS OCCASIONS MR FERNANDEZ HAS HUMILIATED AND EMBARRASSED ME IN FRONT OF MY EMPLOYEES AND PEERS. HE INTIMIDATES EMPLOYEES AND SUPERVISORS ON THE

PS Form 2564-A, May 1993 (Page 1 of 3)

WORKROOM FLOOR. ON 3/5/97 I WENT HOME STRESSED OUT.

DEFENDANT'S EXHIBIT
6
00-6193-CV-SIMONTON

Explain why you believe based on the factors you cited in Section B that you were treated differently than other employees in similar situations.

| 1. Name of Employee: | (Factor(s) describing employee i.e., Race-Black, Sex-Female) |
|---|---|

ROBERT BRACE  BLACK MALE UNDER 40

was treated differently than I when: HE WAS NEVER EMBARRASSED, HUMILIATED, THREATENED OR INTIMIDATED BY SERGIO FERNANDEZ

| 2. Name of Employee: | (Factor(s) describing employee, i.e., Race-Black, Sex-Female) |
|---|---|

was treated differently than I when:

| 3. Name of Employee : | (Factor(s) describing employee, i.e., Race-Black, Sex-Female) |
|---|---|

was treated differently than I when:

**D. Official(s) Responsible for Action:**

Provide the name(s) of the official(s) who took the action which prompted you to seek counseling at this time.

| 1.a. Name: | b. Title |
|---|---|
| SERGIO  FERNANDEZ | MDO - TOUR 1 |
| c. Office: | d. Grade level |
| SOUTH FLORIDA  P & D | EAS 20 |
| 2a. Name | b. Title |
| | |
| c. Office | d. Grade Level |
| | |

Retaliation Allegations Only: Was/were the official(s) listed in Section D above aware of your prior EEO activity (Explain)? Yes        No

**E. Resolution Sought**

What are you seeking as a resolution to your complaint?

1 ATTORNEY COST AND FEES

2 MEDICAL COST AND FEES

3 COMPENSTORY AND PUNATIVE DAMAGES/AWARD

4 RETURN OF SICK LEAVE, NIGHT DIFFERENTIAL AND PAY

**F. Grievance/MSPB Appeal**

On the incident which prompted you to seek EEO counseling, have you:

| | | Yes? | No? | If yes, | Date | Step |
|---|---|---|---|---|---|---|
| 1. | File a grievance on the issue? | | X | | | |
| 2. | Filed an MSPB appeal on this issue? | | X | If yes, | Date | |
| 3. | Veteran's Preference? | | X | If yes, , number of points: | | |

PS Form 2564-A, May 1993 (Page 2 of 3)

**G. Anonymity**

You have the right to remain anonymous at the counseling stage of the EEO complaints processing.

Do you desire anonymity: ☒ Yes ☐ No

You have the right to retain representation of your choice. (Check One)

I authorize the person listed below to represent me.

| | |
|---|---|
| Name of Representative: ALLAN DONELAN | Title: VICE PRESIDENT NAPS |
| Organization: NAPS | |
| Mailing Address: 1800 CORAL WAY | |
| City /State/Zip + 4: MIAMI FL | Telephone No. (305) 869-5109 |

I waive the right to representation at this time    Yes    No X

**I. Privacy Act Statement**

The collection of this information is authorized by Public Law 92-261, Equal Employment Act of 1972, 29 U.S.C., sections 621 et seq. and 701 et.seq.; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the

Office of Management and Budget for review of private relief legislation, to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Provision of the information requested is mandatory for the complainant, and for the Postal Service and other Federal employee witnesses. Failure of the complainant to provide requested information could result in the complaint being dismissed. Failure of Postal Service and other Federal employees to provide requested information could result in disciplinary action. Provision of the information requested by other persons is voluntary and failure to provide such information will result in no adverse effect.

**J. Documentation**

Please attach any documentation you wish to submit to support your allegation(s. Include a copy of any written action(s) which caused you to seek counseling at this time.

Note: If you are alleging mental and/or physical disability, you MUST submit medical documentation of your disability at this time or during counseling.

**K. Authorization**

| Your signature | Date |
|---|---|
| Thomas P Butler | 3-12-97 |

Return to:

EEO COMPLAINTS PROCESSING
SOUTH FL DISTRICT
U.S. POSTAL SERVICE
MIAMI FL 33152 9411

**NOTICE: COMPLETE THIS SECTION ONLY IF YOU NO LONGER SEEK EEO COUNSELING**

I hereby request that you close this file from processing. I fully understand that this complaint file will not be reopened once closed, and I waive my right to any further EEO Appeal on this matter. I stipulate that my decision not to pursue counseling is voluntary and did not result from threat, coercion, intimidation, promise or inducement.

| Signature | Date |
|---|---|
| | |

P.S. Form 2564-A, May 1993 (Page 3 of 3)

Evelyn Lopez-Brignoni, M.L

(305) 670-1411
Fax (305) 670-2811

1031 Ives Dairy Road
Suite 234 · Bldg. #4
N. Miami Beach, FL 33179

9400 S. Dadeland Blvd.
PH - 7
Miami, FL 33156

April 14, 1997

Joann Feindt
Plant Manager
South Florida
Mail Processing Center

Re:    Thomas Butler
       SS #:  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

Dear Ms. Feindt:

I have been following Mr. Butler since March 10, 1997.   At that time he was severely
anxious and depressed as a result of ongoing problems with a supervisor, Mr. Sergio
Fernandez.

Mr. Butler developed multiple somatic and stress related symptoms which appear to be
directly related to his conflicts with this supervisor.

At the present time, Mr. Butler is ready to return to work on a part-time basis (20 hrs.),
gradually increasing his time over the next two weeks until he is back to his work detail on
a full-time basis.  It is imperative that he not return to work under Mr. Fernandez, as this
will aggravate a recovering problem.

Please feel free to contact me for any further questions.

Sincerely,

Evelyn Lopez-Brignoni, M.D.

DEFENDANT'S
EXHIBIT
7
00-6193-CV-SIMMON

EXHIBIT 2


**UNITED STATES
POSTAL SERVICE**

DATE:        May 2, 1997

OUR REF:    SE09:JFeindt:LC:cnbl

SUBJECT:    Notice of Proposed Placement on Enforced Leave

TO:          Thomas Butler            **CERTIFIED NO: P 597 643 874**
             Supervisor, SFMPC        **RETURN RECEIPT REQUESTED**
             7840 Camino Real #105P
             Miami FL  33143-6871

**DEFENDANT'S
EXHIBIT
8
00-6193-CV-SIMONTON**

This is advance written notice that it is proposed to place you on enforced leave no sooner than thirty (30) calendar days from the date of your receipt of this notice.

This action is necessitated by your current medical condition:

On April 14, 1997, you submitted documentation regarding your current medical condition. According to your doctor, you have been under treatment since March 10, 1997, diagnosed with "Multiple Somatic and Stress Related Symptoms."

Your documentation indicates that you are not able to return to work and perform the full duties of your position. Specifically, your doctor advises that you can only work on a part-time bases and has limited you to no more than 20 hours. Additionally, your documentation indicates that if you do return to duty, you could not work under my supervision.

You will remain on enforced leave until you are able to furnish medical documentation demonstrating to the satisfaction of management that you are able to perform the duties of your position.

You and your representative may review the material, if any, relied on to support the reasons for this notice at the office of Labor Relations, 2200 NW 72 Avenue, Miami, FL 33152-9401, from 8 a.m.–4 p.m., Monday through Friday. If you do not understand the reasons for this notice, contact Stephen H. Murray, Sr. Labor Relations Specialist, at (305) 470-0298, for further explanation.

*EXHIBIT 3*

Thomas Butler
Page 2
May 2, 1997


You and/or your representative may answer this notice within (10) calendar days from receipt of this letter, either in person or in writing, or both, to Robert Dillon, MDO, South Florida Processing and Distribution Center. You can contact Mr. Dillon at (954) 436-4356, between the hours of 6:00 p.m. to 2:30 a.m., to make an appointment. You may also furnish affidavits or other written material to Mr. Dillon within the same time limits. After the expiration of the time limit for reply, all of the facts in your case, including any reply you submit, will be given full consideration before a decision is rendered. You will receive a written decision from Mr. Dillon.


Sergio Fernandez
Manager, Distribution Operations
SFMPC, Tour 1

Evelyn Lopez-Brignoni, M.D.

(305) 670-1411
Fax (305) 670-2811

1031 Ives Dairy Road
Suite 234 - Bldg. #4
N. Miami Beach, FL 33179

9400 S. Dadeland Blvd.
PH - 7
Miami, FL 33156

May 8, 1997

Joann Feindt
Plant Manager
South Florida
Mail Processing Center



Re:    Thomas Butler
       SS #:  314/62/0751

Dear Ms. Feindt:

As a follow-up to my letter of April 14, 1997, M . Butler is cleared to return to full-time duties on May 12, 1997.

As stated before, he should not work under the su pervision of Sergio Fernandez, at least for the time being.

Please feel free to contact me for any further que tions.

Sincerely,

Evelyn Lopez-Brignoni, M.D.

EXHIBIT 4



**UNITED STATES**
**POSTAL SERVICE**

May 27, 1997

SE09:RDillion:LC:cnbl:Supv: TButler

Letter of Decision - Placement on Enforced Leave

**DEFENDANT'S EXHIBIT**
_10_
00-6193-CV-SIMTON

Thomas Butler
Supervisor, South FL MPC
7480 Camno Real #105P
Miami FL 33143-6871

CERTIFIED NO. P597 643 904
RETURN RECEIPT REQUESTED

On May 2, 1997, you were issued a notice proposing to place you on enforced leave from the U.S. Postal Service based on your current medical condition.

I have given full consideration to your personal answer of May 15, 1997, and to your written answer of May 13, 1997, and all other evidence of record. I find, however, that the evidence warrants your placement on enforced leave until such time as you are able to furnish medical documentation demonstrating to the satisfaction of management that you are able to perform the duties of your position.

You will be carried in a leave without pay status but you may request to use available sick leave or annual leave in lieu of leave without pay. In your response you indicated that your doctor has released you to work forty (40) hours per week as of May 12, 1997, however, you must still not work with Sergio Fernandez as a Supervisor. You further indicated that you believe this action violates the Family and Medical Leave Act.

First, I must decide if the limitations presented are too restrictive to allow you to perform your duties. Prior to May 12, 1997, you were limited to work only twenty (20) hours per week. Since there are no part-time Supervisors in this facility, it would be impossible to provide work within those limitations and still be an efficient organization. However, that was not the only restriction. You are not able to work under the Supervision of Mr. Fernandez. That restriction has not changed. The South Florida Processing and Distribution Center presently has twenty three (23) Mail Processing Supervisory positions. In light of our recent service performance, it would adversely affect the efficiency of the operation to move you to other duties when you have been trained and is experienced in your current operation. It is not practical to "fit" the Postal Service to employees. Rather, employees must "fit" the needs of the Postal Service. This office cannot afford to

*EXHIBIT S*

Thomas Butler
Page 2
May 27, 1997

retrain you in a new position. Therefore, I find that the limitation placed on you by your physician are too restrictive to allow you to continue working.

This office simply cannot afford to move Supervisors around and retrain them to allow them to work at another assignment for a short period of time. Since your doctor indicates that this restriction is for "the time being", it would be beneficial to allow you to fully recuperate and return to your position.

Additionally, I have considered the claim that is action may be in violation of the FMLA. You will be afforded the full protection under the Act. Your absence up to 480 hours, provided it is supported by medical documentation, will be approved and designated as Family and Medical Leave. For the forgoing reasons, I find that the placement on enforced leave is for such cause as to promote the efficiency of the Service. This action will be effective June 6, 1997.

As a preference eligible, you have the right to appeal this decision in writing to the Merit Systems Protection Board (MSPB), Atlanta Regional Office, 401 W. Peachtree Street, N.W., 10th Floor, Atlanta GA  30308-3228 within thirty (30) calendar days from the effective date of this decision. If you appeal to the MSPB, you should state whether you do or do not wish a hearing and you should furnish me a copy of your appeal.

For further information on appeals procedures, contact, Stephen H. Murray, Sr. Labor Relations Specialist, Labor Relations, 2200 NW 72 Avenue, Miami, Florida, 33152-9401. Attached for your reference are a copy of the MSPB Regulations and a copy of the Appeal Form.

Robert Dillhon
Senior Manager, Distribution Operations
South Florica Processing and Distributions Center

**EMPLOYEE REGULAR MAIL**

**UNITED STATES POSTAL SERVICE**™

**EEO Complaint of Discrimination in the Postal Service**
(See Instructions and Privacy Act Statement on Reverse)

| 1. Name | 2. SSN | Case No. |
|---|---|---|
| TOM BUTLER | 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 | 1-H-333-0018-97 |

| 3. Mailing Address | 4. Home Phone | 5. Work Phone |
|---|---|---|
| 7840 CAMINO REAL D.105 MIAMI FL 33143-6871 | (305) 271-1898 | (954) 436-4356 |

| 6. Position Title (USPS Employees Only) | 7. Grade Level (USPS Employees Only) |
|---|---|
| SDO | 16 |

| 8. Installation Where You Believe Discrimination Occurred (Identify Installation, City, State, and ZIP+4) | 9. Name & Title of Person(s) Who Took the Action(s) You Allege Was Discriminatory |
|---|---|
| SFMPC PEMBROKE PINES FL 33082 | SERGIO FERNANDEZ MDO |

**10. I designate this person to be my representative.**

| a. Name | Title |
|---|---|
| ALLEN DONELAW | VICE PRESIDENT NAPS |
| Mailing Address | 13357 SW 151 TER MIAMI FL 33186 |

| b. Home Phone | c. Work Phone |
|---|---|
| (305) 232-5813 | (305) 869-5109 |

**11. Type of Discrimination Alleged**

☒ Race (Specify): CAUCASIAN (NON HISPANIC)
☒ Color (Specify): WHITE
☒ Religion (Specify): QUAKER
☒ National Origin (Specify): AMERICAN
☒ Sex (Specify): MALE
☒ Age (Specify): OVER 40
☒ Retaliation (Specify Prior EEO Activity):
☒ Disability (Specify): Family and Medical Leave Act

**12. Date on Which Alleged Act of Discrimination Took Place**

03-05-97

**13.** Explain the specific actions or situation that resulted in your allegation(s) as to how you believe you were discriminated against (treated differently from other employees or applicants) because of race, color, religion, national origin, sex, age, or disability.

See previously submitted attached info plus info attached dated June 6, 1997. I no longer desire or request anonymity.

**14. I have discussed my complaint with an EEO counselor**

☐ Yes (Date of final interview): date of receipt (3811)
☒ No NO DISCUSSION HAS TAKEN PLACE

**15. Name and Signature of EEO Counselor**

**16. Corrective Action Sought**

DEFENDANT'S EXHIBIT 11 00-6193-CV-SIMONTON

EEO SERVICE SOUTH FL. DISTRICT 97 JUN -6 AM 11:58 RECEIVED

| 17. Signature of Complainant | 18. Date of This Complaint |
|---|---|
| | |

ADDITIONAL INFO                          JUNE 6, 1997

I NO LONGER REQUEST OR DESIRE ARAMITY. MR SERGIO FERNANDEZ HAS DELIBERATELY CREATED A HOSTILE WORK ENVIRONMENT FOR ME. ON 2/23/97, I REQUESTED TO BE CONSIDERED FOR ANOTHER POSITION (EXHIBIT 1). MR FERNANDEZ TOOK THIS TO BE MY PLANNED "ESCAPE" FROM HIS "GRIP" AND INCREASED HIS HARASSMENT AGAINST ME PLUS CREATED A MASSIVE HOSTILE ENVIRONMENT – SUBSEQUENTLY CAUSING ME TO BECOME ILL AND STRESSED (EXHIBIT DATED APRIL 14, 1997). MR FERNANDEZ'S RESPONSE CAME IN THE FORM OF EXHIBIT 3 DATED MAY 2, 1997, THREATENING TO PLACE ME ON ENFORCED LEAVE UNTIL I CAN PERFORM THE DUTIES OF MY POSITION. EXHIBIT 4, DATED MAY 8, 1997, RETURNS ME TO WORK FULL TIME EFFECTIVE MAY 12, 1997 AS STIPULATED BY MR FERNANDEZ IN EXHIBIT 3. INSTEAD THE USPS REFUSED TO ALLOW ME TO RETURN TO WORK BUT PLACED ME ON ENFORCED LEAVE EFFECTIVE JUNE 6, 1997 (EXHIBIT 5 dated May 27, 1997).

Thomas P Butler

| UNITED STATES MERIT SYSTEMS PROTECTION BOARD | AGENCY USE ONLY |
|---|---|
| **APPEAL** | |

## INSTRUCTIONS

The purpose of this form is to help you provide important information to the U.S. Merit Systems Protection Board ("the Board") when you file an appeal. You are not required to use this form, and you are not limited to answering the questions on the form if you feel there is other information you wish to provide. However, if you do not use the form, your appeal documents must comply with the Board's regulations. Your agency's personnel office will provide you with a copy of these regulations and the Board advises you to review them.

All appeals filed before agency action has been taken will be considered premature and will be returned without action.

All appellants who elect to use this form should complete Parts I through V. Only those who are appealing reduction-in-force (RIF) actions are required to complete Part VI. The information must be typed or printed clearly. Answer all questions and use "N/A" when the question is not applicable to your appeal.

You may supplement your response to any question in the space provided on page 4, or if needed, on separate sheets of paper. If separate sheets are used, please put your name and Social Security number at the top of each page. Indicate by number which question you are answering, and attach the extra pages to the form.

In addition to the formal appeals process, appellant may elect to use the Board's Voluntary Expedited Appeals Procedure (VEAP) by marking the appropriate box in Part II below. A detailed explanation of the expedited process is presented on the last page of this form.

Where to file—You or your representative are required to file one original and one copy of this form, together with its attachments, with the Board's regional office identified in the decision notice provided by the agency. Filing must be made either by personal delivery during normal business hours to the appropriate Board regional office or by mail addressed to that office. The Board recommends but does not require that you use certified mail.

**IMPORTANT**
All appellants must sign and date the form in the space provided at the end of page 4 for it to be accepted by the Board, and to indicate approval of the contents of the entire form.

## PRIVACY ACT STATEMENT

This form requires personal information which is relevant and necessary to reach a decision in your appeal. The U.S. Merit Systems Protection Board collects this information in order to process appeals under its statutory and regulatory authority. Since your appeal is a voluntary action you are not required to provide any personal information in connection with it. However, failure to supply the U.S. Merit Systems Protection Board with all the information essential to reach a decision in your case could result in the rejection of your appeal.

You should know that the disclosure of the U.S. Merit Systems Protection Board on appeals are final administrative decisions and, as such, are available to the public under the provisions of the Freedom of Information Act. Additionally, it is possible that information contained in your appeal file may be released as required by the Freedom of Information Act. Some information about your appeal will also be used in experimental form as a data base for program statistics.

### PART I. APPELLANT IDENTIFICATION

**1. NAME** *(Last, first, middle)*
BUTLER THOMAS PHILIP

**2. SOCIAL SECURITY NUMBER**
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

**3. PRESENT ADDRESS** *(Number and street, city, state, and ZIP code)*. YOU ARE REQUIRED TO NOTIFY THE BOARD OF ANY ADDRESS CHANGE IN ORDER TO INSURE THE CORRECT DELIVERY OF A DECISION.
7840 CAMINO REAL P-105
MIAMI FL 33143-6871

**4. HOME PHONE** *(Include area code)*
(305) 271-1898

**5. OFFICE PHONE** *(Include area code)*
(954) 436-4359

### PART II. EXPEDITED APPEALS

**6. VOLUNTARY EXPEDITED APPEALS PROCEDURE.** *For a matter appealable to the Board, any appellant may elect the Voluntary Expedited Appeals Procedure as an alternative to the formal MSPB appeal process. For a detailed explanation of the Voluntary Expedited Appeals Procedure, see p. 4.*

☐ Yes, I elect the Voluntary Expedited Appeals Procedure
☒ No, I do not elect the Voluntary Expedited Appeals Procedure

### PART III. APPEALED ACTION

**7.** BRIEFLY DESCRIBE THE *AGENCY ACTION* YOU WISH TO APPEAL AND ATTACH ANY RELEVANT DOCUMENTS INCLUDING THE PROPOSAL LETTER, THE DECISION LETTER, AND THE RELEVANT SF 50 OR ITS EQUIVALENT.

Forced Furlough

**8.** NAME AND ADDRESS OF AGENCY *(including Bureau, or other Division as well as street address, city, state, and ZIP code)*
SFMPC
16000 PINES BLVD
PEMBROKE PINES FL 33082

**9.** APPELLANT'S POSITION TITLE AND DUTY STATION AT TIME OF ACTION
SDO SFMAC

**10A. GRADE AT TIME OF ACTION**
16

**10B. SALARY AT TIME OF ACTION**
43 OTHER

NSN 7540-01-491-1230
Previous Edition Usable

SOED-103

Optional Form 283 *(Rev 1-81)*
Merit Systems Protection Board
5 CFR 1201

**DEFENDANT'S EXHIBIT**
12

Figure 6—5, MSPB Appeal Form 283, Page 1

| 11. ARE YOU A VETERAN OR ENTITLED TO THE EMPLOYMENT RIGHTS OF A VETERAN? ☐ YES ☒ NO | 12. EMPLOYMENT STATUS ☒ Temporary ☐ Applicant ☐ Retired ☐ Permanent ☐ Term | 13. IF RETIRED, DATE OF RETIREMENT (Month, day, year) |
|---|---|---|
| 14. TYPE OF SERVICE ☒ Competitive ☐ Excepted | 15. LENGTH OF GOVERNMENT SERVICE  10 years | 16. LENGTH OF SERVICE WITH ACTING AGENCY  3 | 17. WERE YOU SERVING A PROBATIONARY OR TRIAL PERIOD AT THE TIME ACTION WAS TAKEN BY THE AGENCY? ☐ YES ☒ NO |
| 18. DATE WRITTEN PROPOSED ACTION NOTICE RECEIVED (Month, day, year) (Attach copy)  5/2/97 | 19. DATE FINAL DECISION NOTICE RECEIVED (Month, day, year) (Attach Copy)  5/22/97 | 20. EFFECTIVE DATE OF ACTION (Month, day, year)  6/7/97 |

**21. WHY DO YOU THINK THE AGENCY WAS WRONG IN TAKING THIS ACTION? (Explain briefly)**

Agency Refuses to accept Medical Documentation

**22. WHAT ACTION WOULD YOU LIKE THE BOARD TO TAKE ON THIS CASE?**

To be Restored to position and be placed back at work with all benefits

**23. IF YOU BELIEVE YOU WERE DISCRIMINATED AGAINST BY THE AGENCY, IN CONNECTION WITH THE MATTER APPEALED, BECAUSE OF EITHER YOUR RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, MARITAL STATUS, POLITICAL AFFILIATION, HANDICAPPING CONDITION, OR AGE, INDICATE SO AND EXPLAIN WHY YOU BELIEVE IT TO BE TRUE. YOU MUST INDICATE, BY EXAMPLES, HOW YOU WERE DISCRIMINATED AGAINST.**

**24. HAVE YOU FILED A FORMAL DISCRIMINATION COMPLAINT CONCERNING THE MATTER WHICH YOU ARE SEEKING TO APPEAL WITH YOUR AGENCY OR ANY OTHER AGENCY?** ☐ YES (Attach copy) ☒ NO

| 24A. IF YES, DATE FILED (Month, day, year) | 24B. PLACE FILED (Agency and location) | 24C. HAS THERE BEEN A DECISION? ☐ YES (Attach copy) ☐ NO |
|---|---|---|

Optional Form 283 (Rev. 8-88)
Page 2

Figure 6–6, MSPB Appeal Form 283, Page 2

25  HAVE YOU, OR ANYONE IN YOUR BEHALF, FILED A FORMAL GRIEVANCE WITH YOUR AGENCY CONCERNING THIS MATTER, UNDER A NEGOTIATED GRIEVANCE PROCEDURE PROVIDED BY A COLLECTIVE BARGAINING AGREEMENT?

☐ YES (Attach copy)    ☒ NO

| 25A. IF YES, DATE FILED (Month, day, year) | 25B  PLACE FILED (Agency and location) | 25C. HAS DECISION BEEN ISSUED?  ☐ YES (Attach copy)  ☐ NO |
|---|---|---|
| 25D. IF YES, DATE FILED (Month, day, year) | 25E. NAME OF ISSUING OFFICIAL | 25F. TITLE OF ISSUING OFFICIAL |

### PART IV. HEARING

26. YOU MAY HAVE A RIGHT TO A HEARING ON THIS APPEAL. IF YOU DO NOT WANT A HEARING, THE BOARD WILL MAKE ITS DECISION ON THE BASIS OF THE DOCUMENTS YOU AND THE AGENCY SUBMIT. WHEN A SQUARE IS CHECKED, THE BOARD WILL PRESUME YOU ARE WAIVING A HEARING. *DO YOU WANT A HEARING?*

☒ YES    ☐ NO

IF YOU CHOOSE TO HAVE A HEARING THE BOARD WILL NOTIFY YOU WHEN AND WHERE IT IS TO BE HELD.

### PART V. DESIGNATION OF REPRESENTATIVE

27. YOU HAVE THE RIGHT TO DESIGNATE SOMEONE TO REPRESENT YOU ON THIS APPEAL. IF HE/SHE AGREES TO DO SO, THIS PERSON DOES NOT HAVE TO BE AN ATTORNEY. THE AGENCY HAS A RIGHT TO CHALLENGE YOUR CHOICE OF A REPRESENTATIVE IF THERE IS A CONFLICT OF INTEREST OR POSITION. YOU MAY CHANGE YOUR DESIGNATION OF A REPRESENTATIVE AT A LATER DATE, IF YOU SO DESIRE, BUT MUST NOTIFY THE BOARD PROMPTLY OF ANY CHANGE.

27A.  "I HEREBY DESIGNATE _CHARLES SCIALA & ASS_ TO SERVE AS MY REPRESENTATIVE DURING THE COURSE OF THIS APPEAL. I UNDERSTAND THAT MY REPRESENTATIVE IS AUTHORIZED TO ACT ON MY BEHALF."

| 27B. REPRESENTATIVE'S ADDRESS AND PHONE NUMBER | 27C. REPRESENTATIVE'S SIGNATURE | 27D. DATE |
|---|---|---|
| MR. ROSLONG AHNY P.O. BOX 433 DuNedin FL. 34697 Tel.No. 813-736-5800 | 27E. REPRESENTATIVE'S EMPLOYER  Sciala Associates Inc | |

### PART VI. REDUCTION-IN-FORCE (RIF)

INSTRUCTIONS. FILL OUT THIS PART ONLY IF YOU ARE APPEALING FROM A REDUCTION-IN-FORCE (RIF). YOUR AGENCY'S PERSONNEL OFFICE CAN FURNISH YOU MOST OF THE INFORMATION REQUESTED BELOW.

| 28  RETENTION GROUP AND SUB-GROUP | 29. SERVICE COMPUTATION DATE | 30. HAS YOUR AGENCY OFFERED YOU ANOTHER POSITION RATHER THAN SEPARATING YOU?  ☐ YES  ☐ NO |
|---|---|---|
| 31. TITLE OF POSITION OFFERED | 32. GRADE OF POSITION OFFERED | 33. SALARY OF POSITION OFFERED  $      PER |
| 34. LOCATION OF POSITION OFFERED | 35. DID YOU ACCEPT THIS POSITION?  ☐ YES  ☐ NO | |

36  EXPLAIN WHY YOU BELIEVE YOU SHOULD NOT HAVE BEEN AFFECTED BY THE REDUCTION-IN-FORCE (*Explanations could include: You were placed in the wrong retention group or subgroup; an error was made in the computation of your service computation date; competitive area was too narrow; improperly reached for separation from competitive level; an exception was made to the regular order of selection; full 30-day notice was not given; you believe you have assignment rights (bump or retreat rights) or any other reasons. Please provide as much information as possible regarding each reason.*)

Optional Form 283 (Rev. 5-89)
Page 3

Figure 6—7, MSPB Appeal Form 283, Page 3

37. SUPPLEMENTAL ANSWER SPACE

---

**EXPLANATION OF VOLUNTARY EXPEDITED APPEALS PROCEDURE (See Part II)**

a. *ELECTION BY APPELLANT.* Employees or applicants for employment who are entitled to file an appeal before the Board may elect the voluntary expedited procedure as an alternative to the formal Board procedures. The goal of this expedited process is the issuance of a nonprecedential decision in routine cases within 60 days of the election of the voluntary expedited appeals procedure.

b. *CONSENT BY AGENCY.* If an employee or an applicant for employment elects to use this alternative procedure, the employing agency will be allowed to consent to or decline the procedure as well. In the event the employing agency does not wish to use the expedited procedure, the appeal will be processed in accordance with the formal Board procedures.

c. *REVIEW BY MSPB REGIONAL DIRECTOR.* If the agency consents to the voluntary expedited appeals procedure, the MSPB regional director will review the summary of the case filed by the agency and determine whether the case is appropriate for the expedited procedure. The standards used in making this determination will be the routine, nonprecedential nature of the appeal as well as workload requirements and availability of resources in the MSPB regional office.

d. *PROCESSING OF APPEAL.* If the case is processed under this expedited process, the parties will be notified by an Order of Acknowledgment of their obligation to file a Joint Appeals Record containing statements of issues and positions with respect to those issues, requests for hearing, witness lists, the agency's file and two dates agreed upon by the parties for the hearing. A presiding official specifically trained in informal dispute resolution will contact the parties during this time to ensure that the parties understand their obligations and to help promote an environment conducive to informal settlement.

e. *HEARING AND ISSUANCE OF EXPEDITED DECISION.* In the event settlement is not achieved, a hearing, if requested, will be held at *the employment site* within 15 days from the date the Joint Appeals Record is due. The presiding official will then issue an expedited initial decision no later than 15 days from the close of the hearing. If no hearing is requested, a decision on the record will be issued no later than 60 days from the date of the Board's acknowledgment order.

f. *PETITION FOR REVIEW.* Any party may file a petition for Board review of the expedited initial decision 35 days from the date of the decision. The criteria for review are the same under both the voluntary expedited appeals procedure and the formal appeals procedure.

---

**ATTENTION—THIS APPEAL MUST BE SIGNED**

| I CERTIFY that all of the statements made in this Appeal are true, complete, and correct to the best of my knowledge and belief. | SIGNATURE OF APPELLANT  *Thomas P Butler* | DATE SIGNED  6·6·97 |

U.S. GPO: 1987-181-347/60363

Optional Form 283 (Rev. 1-88)
Page 4

Figure 6 − 8, MSPB Appeal Form 283, Page 4



UNITED STATES OF AMERICA

MERIT SYSTEMS PROTECTION BOARD

ATLANTA REGIONAL OFFICE

THOMAS P. BUTLER,                         AT-0752-97-0767-I-1

    Appellant,

    vs.                                    APPELLANT'S PREHEARING

UNITED STATES POSTAL SERVICE,             SUBMISSION

    Agency

    Comes now the above named appellant, Thomas P. Butler, by and through his attorney and files this prehearing submission in the above entitled cause.

1. By notice of proposed adverse action dated May 2, 1997, appellant was notified by Sergio Fernandez, Manager. Distribution Operations. SFMPC, Tour 1. Pembroke Pines. Florida, that he was proposing that appellant be Placed on Enforced Leave. This proposal was based upon the following charge(s): (1) Appellant's medical condition.

2. By letter of decision dated May 27, 1997. Robert Dillion. Senior Manager, Distribution Operations. SFPDC, Pembroke Pines. Florida, concluded that the evidence warranted appellant's placement on Enforced Leave.   The action was effective June 6, 1997.

3. At the time of the agency's action against him the appellant was employed as Supervisor. Distribution Operations, Pembroke Pines. Florida, (EAS-16) and had 10 years of Government service.

4. The appellant filed a timely appeal with the Board's Atlanta Regional Office..



DEFENDANT'S
EXHIBIT
13
00-6193-CV-SIMONTON

## ISSUES

1. Has the agency shown, by the requisite burden of proof, that appellant should have been placed on Enforced Leave, as alleged in the notice of proposed adverse action?

2. Has the agency violated the provisions of the Family Medical Leave Act?

3. Has the agency discriminated against the appellant in violation of the Rehabilitation Act of 1973, as amended?

4. Was the agency's action against appellant retaliation for his being placed on Family Medical Leave?

5. Has the agency sustained its burden, by the requisite burden of proof, that the penalty imposed was reasonable and appropriate under all facts and circumstances?

## STATEMENT OF ALL AGREED UPON MATERIAL FACTS

There are no agreed upon facts at this time.

## WITNESSES

### Appellant

Appellant will testify concerning all facts and circumstances surrounding his appeal from the agency's action.

### Robert Quinlan, President, NAPS Branch 599, South Florida

Mr. Quinlan would testify concerning appellant's responses to the deciding official and with regard to the appellant's seeking and being placed on Family Medical Leave.

Evelyn Lopez-Brignoni, M.D.

Dr. Brignoni would testify concerning appellant's ability to return

to work with the Postal Service.

## EXHIBITS

The following is a list of exhibits which may be offered by appellant at the time of

the hearing.

Appellant's Hearing Exhibit A:    Statement from Sharon Ricci (2 pages).

Appellant's Hearing Exhibit B:    Statement from Katherine Radinoni (2

pages) dated July 19, 1997.

Appellant's Hearing Exhibit C:    Statement from Ruth Murray (1 page)

dated June 4, 1997.

Appellant's Hearing Exhibit D:    Letter from Evelyn Lopez-Brignoni,

M.D., dated April 14, 1997 (1 page).

Appellant's Hearing Exhibit E:    Authorization to return to limited duty

dated May 12, 1997 by U. S. Postal Service.

Appellant's Hearing Exhibit F:    Letter from appellant to Marvin Runyon,

Postmaster General, dated May 27, 1997 (2 pages).

Appellant's Hearing Exhibit G:    PS Form 991 dated August 11, 1997 (3

pages).

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent by First Class Mail, postage prepaid, unless otherwise indicated below, this day to each of the following:

**Merit Systems Protection Board**

Richard W. Vitaris
Administrative Judge
Merit Systems Protection Board
Atlanta Regional Office
401 W. Peachtree Street, NW
Atlanta, GA  30308-3519
**FAX (404) 730-2767**

**Appellant**

Mr. Thomas P. Butler
7840 Camino Real
P-105
Miami, FL 33143-6871

**Agency's Representative(s)**

Ms. Toby L. Lowe
Labor Relations Specialist
United States Postal Service
2200 NW 72nd Avenue, Room 212
Miami, FL 33152-9401

September 8, 1997
(Date)

Roscoe E. Long, Esq.



APPEALS PROCESSING CENTER

**UNITED STATES
POSTAL SERVICE**

SEP 1 9 1997

Mr. Tom Butler
7840 Camino Real P105
Miami, FL 33143-6871



**DEFENDANT'S
EXHIBIT**
_14_
00-6193-CV-SIMONTON

CERTIFIED MAIL NO. <u>P 591 237 188</u>
RETURN RECEIPT REQUESTED

RE: Tom Butler v. Marvin T. Runyon,
Postmaster General
Agency Case No. 1-H-333-0018-97

Dear Mr. Butler:

We have received the above-referenced complaint of discrimination filed on
June 6, 1997. Your complaint has been accepted for investigation. The scope
of the investigation will include the following issue(s) only:

| Specific Issue(s): | You were harassed by your supervisor about your job performance and subsequently placed on enforced leave. |
| --- | --- |
| Date(s) of Incident: | March 5, 1997 |
| Type(s) of Discrimination: | Race (Caucasian Non-Hispanic), Color (white), Religion (Quaker), Sex (male), National Origin (American), and Age (42) |

If you disagree with the defined issue(s), you must provide us with sufficient
reasons to substantiate your objections, in writing, within seven (7) calendar
days of receipt of this letter.

Under the Older Workers Benefit Protection Act, the Postal Service is required
to advise you to consult with an attorney should you so desire, prior to the
signing of any agreement resolving your complaint. If you do not wish to
proceed with this complaint, you may withdraw your complaint by signing the
enclosed PS Form 2565-E and returning it to the office where you filed your
formal complaint.

Your case has been assigned for investigation. Please be prepared to go
forward with your case when the EEO Counselor/Investigator contacts you.

225 N HUMPHREYS BOULEVARD
MEMPHIS TN 38166-0978
FAX 901-747-7239

Mr. Tom Butler                                                                              2

The investigation will be completed within 180 calendar days of the date of your filing of the complaint, except that the complainant and the Postal Service may voluntarily agree, in writing, to extend the time period up to an additional 90 calendar days.

If a grievance is pending on the same issue(s) as those addressed in your EEO complaint, the agency may, in its discretion, defer the processing of your EEO complaint until the grievance procedure is terminated. When an EEO complaint is deferred, the 180-day time-in-process clock stops temporarily, pending the outcome of the grievance procedure. If your complaint is deferred, you will be notified of the options which may be available to you, and of the further disposition of the complaint.

When the investigation is completed, you will receive a copy of the investigative file, and you will be notified of your right to a hearing before an Equal Employment Opportunity Commission Administrative Judge or of your right to a final decision by the agency head or designee without a hearing.

You may request a hearing by an EEOC Administrative Judge by notifying the Senior EEO Complaints Processing Specialist within 30 calendar days of your receipt of the investigative file and notice of right to file. If you do not receive your investigative file and notice of right to file within 180 calendar days from the filing date, you may request a hearing.

If you are dissatisfied with the final decision of the Postal Service, after a hearing or without a hearing, you may exercise your appeal rights. You may appeal to the Office of Federal Operations, Equal Employment Opportunity Commission (EEOC), or you may file a civil action in an appropriate U.S. District Court within 90 calendar days of your receipt of the decision.

Any appeal to the EEOC must be in writing and filed with the Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, DC 20036-0848, utilizing Form 573, Notice of Appeal/Petition to the Equal Employment Opportunity Commission, Office of Federal Operations. Along with your appeal, you must submit proof to the EEOC that a copy of the appeal and any supporting documentation were also submitted to the EEO Compliance and Appeals Coordinator, Appeals Processing Center.

After 180 calendar days from the date of filing your formal complaint, you may file a civil action in an appropriate U.S. District Court if the Postal Service has not issued a final decision on your complaint.

Mr. Tom Butler                                                                3

*If* you decide to appeal to the Office of Federal Operations, EEOC, you may file a civil action in an appropriate U.S. District Court within 90 calendar days after your receipt of the EEOC's decision. If you do not receive a decision on your appeal within 180 calendar days from the date of your appeal, you may file a civil action.

Sincerely,

Otis Maclin, Jr.
EEO Compliance and Appeals Coordinator

Enclosure

cc:  Sr. EEO CP Specialist, South Florida District
     Allan Donelan, 1800 Coral Way, Miami, FL  33245-9998

HRC42:ZCox:je:38166-0978

BOB DILLION                                                             8/1/97

On 7/25/97 I recieved a package from Labor Relations (Tobe Lowe). In the package Tobe Lowe had included a copy of a L.O.W. from Jack Watson dated in Feb of 1997. I had never seen said LOW. I was unaware that I was even going to get the This letter let alone Discover it by accident in the package from Tobe Lowe on 7-25-97 (nearly five months after the alledged letter was dated.)

I wish to appeal the fact that this LOW was never shown, given, or mailed to me and therefore is inappropriate and unacceptable. I believe it to be an unethical procedure.

Furthermore, I contend it was designed to be retaliatory and discriminatory and I am pursueing legal action thru the EEO process, to rectify this unjust action.

I will contact Roscoe Long representing me in an MSPB Proceding to notify him of this situation.

My NAPS Representation Robert Quinlan has been on vacation, so I must write this appeal request on behalf of myself. Please consider this step A of the process. unless you plan to Destroy said LOW which I feel would be appropriate and the right thing to do.


DEFENDANT'S
EXHIBIT
15
00-6193-CV-SIMONTON

August 6, 1997

Tom Butler
7840 Camino Real P-105
Miami FL 33143

Dear Mr. Butler,

This is to inform you that the Letter of Warning, dated in February of 1997, and included in a package presented to you on 7/25/97, was there in error. You were correct in saying that this was a letter that you had never seen before. You were never issued this action. It was requested, but was deemed to be untimely by the time it was available to be issued. Without prejudice to its contents, the letter was not issued, and therefore should not appear in any records of the U.S. Postal Service. By copy of this letter, I have notified Ms. Lowe of this fact. Any copies or records of this action will be destroyed.

If you have any other questions regarding this subject, please contact me.

Sincerely,

Robert J. Dillon
Sr. Manager, Distribution Operations
South Florida P&DC

DEFENDANT'S
EXHIBIT
16
00-6193-CV-SIMONTON

cc:  Joann Feindt, Plant Manager, SFP&DC
     Toby Lowe, Labor Relations Specialist
     Robert Quinlan, NAPS
     Sergio Fernandez, MDO Tour 1

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### ATLANTA REGIONAL OFFICE

*I-H-33 3-0018-97*

THOMAS P. BUTLER,
    Complainant,

    v.

UNITED STATES POSTAL SERVICE,
    Agency.

)
)
)
)
)
)
)
)
)
)

AT-0752-97-0767-I-1

October 7, 1997

DEFENDANT'S
EXHIBIT
17
00-6193-CV-SII(NON)

## SETTLEMENT AGREEMENT

In full and complete resolution of the Appeal cited herein, the undersigned parties agree as follows:

All parties agree that is in the best interests of the parties to keep confidential the terms and conditions of this Settlement. Appellant, as a term and condition of the Settlement, agrees to keep confidential the information within and not to disclose said information to any third party other than legal counsel.

It is understood between the parties that the Settlement Agreement is reached on a non-precedent basis and may not be cited for any reason, including comparison, in any other proceeding in any forum.

By entry into this Settlement Agreement, the United States Postal Service, its officers, agents, and/or employees in no way admit to any wrongdoing, liability to or discrimination against Appellant, and Appellant agrees that this Agreement shall not be construed as any admission of wrongdoing, liability or discrimination by the United States Postal Service, its officers, agents and/or employees in this or any other proceeding or litigation.

It is understood by the undersigned that this Agreement is in full and complete settlement of all issues related to Appellant's Merit Systems Protection Board Appeal Number AT-0752-97-0767-I-1, administrative EEO complaints or appeals relative to the issues referenced in this complaint, in this or any other forum, filed by the below named appellant or on his behalf relating to any matters that occurred prior to the execution of this Settlement Agreement.    Appellant agrees to voluntarily withdraw any outstanding administrative complaint or appeal, including this Merit Systems Protection Board case, and EEOC of all issues related to this appeal. It is understood that in withdrawing all appeals or complaints related to this issue, Appellant waives his rights to an oral hearing or further appeal on the matters raised. It is further stipulated that the withdrawals are made without any threat, coercion, intimidation, promise, or inducement other than the terms set forth in the Agreement.

The Merit Systems Protection Board retains jurisdiction over this Settlement Agreement for enforcement.

Appellant agrees that this Agreement is in full settlement of the referenced matter, and agrees to withdraw this appeal, and in so doing, understands that he waives his right to an oral hearing or further appeal, except as pertains to enforcement of the agreement,. Appellant agrees that the withdrawal is made without any thereat, coercion, intimidation, promises, or inducement, other than the terms set forth in the Agreement.

The Appellant, Thomas Butler, will be reassigned to the position of Supervisor Distribution Operations. The Appellant's hours will be variable on Tour 3, and days off will be Thursday and Friday.

The Appellant will report to work one week after the signing of this agreement.

The agency will purge the appellant's Official Personnel File of any reference to the Notice of Proposed Placement on Enforced Leave dated May 2, 1997 and the Letter of Decision - Placement on Enforced Leave dated May 27, 1997.
There are no provisions for back pay.

The parties have agreed that no attorney's fees and costs will be paid.

It is understood that the Appellant shall not litigate or relitigate in any forum, judicial or administrative, any claims arising from the actions involved in this appeal.

The appellant has read and fully understands the provisions of this settlement, and fully agrees to its contents and provisions. The appellant is signing this agreement of his own free will and has not been coerced or forced into signing this settlement. He has not been promised anything above and beyond what is contained in the above settlement agreement.

The parties agree to make this settlement a part of the record.

_Thomas P Butler_ 10-15-97          _Roscoe E Long_ 10/7/97
Thomas P. Butler, Appellant   Date        Roscoe E. Long, Esquire   Date
                                          Appellant's Representative

_Toby Lowe_ 10/7/97
Toby L. Lowe                  Date
Agency Representative

| 01 | Effective Date | NOTIFICATION OF PERSONNEL ACT. | 02 | Social Security Number |
|---|---|---|---|---|
| | 11-22-1997 | U. S. Postal Service | | 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 |

**EMPLOYEE INFORMATION**

| # | Field | Value | # | Field | Value |
|---|---|---|---|---|---|
| 03 | Employee Name-Last | BUTLER | 39 | FLSA Status | S - EXEMPT |
| 04 | Employee Name-First | THOMAS | 40 | Pay Location | 301 |
| 05 | Employee Name-Middle | P | 41 | Rural Carrier-Route | |
| 06 | Mailing Address Street/Box/Apts | 7840 CAMINO REAL # 105P | 42 | Rural Carr-L-Rte ID | |
| | | | 43 | Rural Carr-Pay Type | |
| 07 | Mailing Address-City | MIAMI | 44 | Rural Carr-Tri-Weekly | |
| 08 | Mailing Address-State | FL | 45 | Rural Carr-FLSA | |
| 09 | Mailing Address-Zip+4 | 33143-6871 | 46 | Rural Carr-Commit | |
| 10 | Date of Birth | 01-24-1954 | 47 | Rural Carr-EMA | |
| 11 | Veterans Preference | 1 - NO PREFERENCE | 48 | Rural Carr-Hours | 00 |
| 12 | Sex | | 49 | Rural Carr-Miles | 000 |
| 13 | Minority | | 50 | Job Sequence | 1 |
| 14 | Disability | | 51 | Occupation Code | 2315-6076 |
| 15 | Leave Comp Date | 08-03-1987 | 52 | Position Title | SUPV DIST OPERTNS |
| 16 | Enter on Duty Date | 08-03-1987 | 53 | Functional Oper Nbr | 1000 |
| 17 | Retirement- Comp Date | 08-03-1987 | 54 | Designation/Activity | 09/0 |
| 18 | Serv Anniversary PPYR | | 55 | Position Type | 1 - FULL TIME |
| 19 | TSP Eligibility | Y - ELIGIBLE WITH DEDUCT | 56 | Limit Hours | 00 |
| 20 | TSP Service Comp Date | 08-03-1987 | 57 | Allowance Code | |
| 21 | Prior CSRS Service | N | 58 | Employment Type | |
| 22 | Frozen Csrs Time | | | **SALARY INFORMATION** | |
| 23 | Leave Data-Category | 6 - HOURS/PP | 59 | Pay Rate Code | A - ANNUAL RATE |
| 24 | Leave Data-Chg PPYR | 18-2002 | 60 | Rate Schedule Code | E - EAS |
| 25 | Leave Data-Type | 1 - ADVANCED AT BEGINNING | 61 | Grade/Step | 16/ |
| 26 | Credit Military Serv | | 62 | Base Salary | 43,293 |
| 27 | Retired Military | | 63 | Cola | |
| 28 | Retirement Plan | 8 - FERS | 64 | Cola Roll-In Ind | |
| 29 | Employee Status | | 65 | Next Step PPYR | |
| 30 | Life Insurance | C - BASIC COVERAGE ONLY | 66 | Merit Anniv Date | 02-1998 |
| 31 | Special Benefits | | 67 | Merit Lump Sum | |
| | **POSITION INFORMATION** | | 68 | Special Salary Code | |
| 32 | Employ Office-Fin No | 11-8675 | 69 | Protected RSC | |
| 33 | Employ Office-Name | SO FLORIDA PROC/DIST CTR | 70 | Protected Grade/Step | |
| | | | 71 | Expiration PP/YR | |
| 34 | Employ Office-Address | PEMBROKE PINES FL 33082-9998 | 72 | Protected RC Hours | |
| | | | 73 | Protected RC Miles | |
| 35 | Duty Station-Fin No | 11-8675 | 74 | RC Guaranteed Salary | |
| 36 | Duty-Station-Name | SO FLORIDA PROC/DIST CTR | 75 | Annuity Amount | |
| 37 | Appt Expiration Date | | 76 | Red Circle Code | 0 |
| 38 | Probation Expir Date | | | | |

**NATURE OF PERSONNEL ACTION**

| 77 | Nature of Action Code | 002 | 78 | Authority | 39-USC SECT. 1001 |
|---|---|---|---|---|---|
| 79 | Description | CORRECTION | 80 Code | 81 Code | 82 Code    83 Code |

| 84 | Remarks |
|---|---|
| | THIS ACTION SERVES TO CORRECT PAY LOC AND SCH IAW MSPB SETTLEMENT AGREEMENT DATED 10/7/97. BGM 12/01/97 |



DEFENDANT'S EXHIBIT
18
00-6193-CV-SIMONTON

| 85 | Authorization | 86 | Processed Date | 12-03-1997 |
|---|---|---|---|---|
| | DAVID C. BAKKE, VICE PRESIDENT AREA OPERATIONS-SOUTHEAST AREA | 87 | Personnel Office ID | TA11 |
| | | 88 | OPF Location | MIAMI POST OFFICE |

PS Form 50, March 1990 (Exception to Standard Form 50)     2 - OPF COPY

APPEALS PROCESSING CENTER


**UNITED STATES POSTAL SERVICE**

FEB 1 9 1998

Mr. Tom Butler
7840 Camino Rel P105
Miami, FL 33143-6878



CERTIFIED MAIL NO. <u>P 591 238 456</u>
RETURN RECEIPT REQUESTED

RE:  Tom Butler v. Marvin T. Runyon,
     Postmaster General
     Agency Case No. 1-H-333-0036-97

Dear Mr. Butler:

We have received the above-referenced complaint of discrimination filed on October 27, 1997.  Your complaint has been accepted for investigation.  The scope of the investigation will include the following issue(s) only:

| Specific Issue(s): | You were given a package from Labor Relations with a copy of a L.O.W. for which you had never received. |
|---|---|
| Date(s) of Incident: | July 25, 1997 |
| Type(s) of Discrimination: | Race (Caucasian), Color (White), Religion (Quaker), Sex (male), Age (43) and Retaliation (prior EEO activity) |

If you disagree with the defined issue(s), you must provide us with sufficient reasons to substantiate your objections, in writing, within seven (7) calendar days of receipt of this letter.

Under the Older Workers Benefit Protection Act, the Postal Service is required to advise you to consult with an attorney should you so desire, prior to the signing of any agreement resolving your complaint.  If you do not wish to proceed with this complaint, you may withdraw your complaint by signing the enclosed PS Form 2565-E and returning it to the office where you filed your formal complaint.

Your case has been assigned for investigation.  Please be prepared to go forward with your case when the EEO Counselor/Investigator contacts you.


Exhibit

Mr. Tom Butler                                                                                    2

The investigation will be completed within 180 calendar days of the date of your filing of the complaint, except that the complainant and the Postal Service may voluntarily agree, in writing, to extend the time period up to an additional 90 calendar days.

If a grievance is pending on the same issue(s) as those addressed in your EEO complaint, the agency may, in its discretion, defer the processing of your EEO complaint until the grievance procedure is terminated. When an EEO complaint is deferred, the 180-day time-in-process clock stops temporarily, pending the outcome of the grievance procedure. If your complaint is deferred, you will be notified of the options which may be available to you, and of the further disposition of the complaint.

When the investigation is completed, you will receive a copy of the investigative file, and you will be notified of your right to a hearing before an Equal Employment Opportunity Commission Administrative Judge or of your right to a final decision by the agency head or designee without a hearing.

You may request a hearing by an EEOC Administrative Judge by notifying the Senior EEO Complaints Processing Specialist within 30 calendar days of your receipt of the investigative file and notice of right to file. If you do not receive your investigative file and notice of right to file within 180 calendar days from the filing date, you may request a hearing.

If you are dissatisfied with the final decision of the Postal Service, after a hearing or without a hearing, you may exercise your appeal rights. You may appeal to the Office of Federal Operations, Equal Employment Opportunity Commission (EEOC), or you may file a civil action in an appropriate U.S. District Court within 90 calendar days of your receipt of the decision.

Any appeal to the EEOC must be in writing and filed with the Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, DC  20036-0848, utilizing Form 573, Notice of Appeal/Petition to the Equal Employment Opportunity Commission, Office of Federal Operations. Along with your appeal, you must submit proof to the EEOC that a copy of the appeal and any supporting documentation were also submitted to the EEO Compliance and Appeals Coordinator, Appeals Processing Center.

After 180 calendar days from the date of filing your formal complaint, you may file a civil action in an appropriate U.S. District Court if the Postal Service has not issued a final decision on your complaint.

PAGE NO. _36_

Mr. Tom Butler                                                                3

If you decide to appeal to the Office of Federal Operations, EEOC, you may file a civil action in an appropriate U.S. District Court within 90 calendar days after your receipt of the EEOC's decision. If you do not receive a decision on your appeal within 180 calendar days from the date of your appeal, you may file a civil action.

Sincerely,

Otis Maclin, Jr.
EEO Compliance and Appeals Coordinator

Enclosure

cc: Senior EEO Complaints Processing Specialist, South Florida District
    Allen Donelan, 1800 Coral Way, Miami, FL 33245-9998

HRC42:ZCox:gle:38166-0978

U.S. Postal Service

# EEO Complaint of Discrimination
## in the Postal Service

*IN Person*

See Instructions and Privacy Act Statement on Reverse

| 1. Name | 2. SSN | Case No. |
|---|---|---|
| Butler Tom | 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 | 1-H-333-0036-97 |

| 3. Mailing Address | 4. Home Phone | 5. Work Phone |
|---|---|---|
| 7840 CAMINO REAL A-105 MIAMI FL 33143-6871 | (305) 271-1898 | (594) 436-4356 |

| 6. Position Title (USPS Employees Only) | 7. Grade Level (USPS Employees Only) |
|---|---|
| S.D.O. | 16 |

| 8. Installation Where You Believe Discrimination Occurred (Identify Installation, City, State, and Zip+4) | 9. Name & Title of Person(s) Who Took the Action(s) You Allege Was Discriminatory |
|---|---|
| SFMPC PEMBROKE PINES FL 33082-9998 | I'm not sure who sent the Loc to Tobe Lowe. I suspect Bob Dillon, Sergio Fernan or Jack Watson may have. I need you to invest. This same. How could a Low show up in my Fle by Accident. |

10. I designate this person to be my representative.

| a. Name | Title |
|---|---|
| ALAN DONELAN | VICE PRESIDENT NAPS |

| Mailing Address | |
|---|---|
| 1800 CORAL WAY    MIAMI FL | |

| b. Home Phone | c. Work Phone |
|---|---|
| | (305) 869-5109 |

| 11. Type of Discrimination Alleged | 12. Date on Which Alleged Act of Discrimination Took Place |
|---|---|
| Race (Specify): WHITE NON HISPANIC    Sex (Specify): MALE Color (Specify): WHITE    Age (Specify): 43 Religion (Specify): QUAKER    Retaliation (Specify Prior EEO Activity 3-7-97 National Origin (Specify): USA    Disability (Specify): | 7/25/97 |

13. Explain the specific actions or situation that resulted in your allegation(s) as to how you believe you were discriminated against (treated differently from other employees or applicants) because of race, color, religion, national origin, sex, age, or disability.

On 7/25/97 I received a package from Labor Relations (Tobe Lowe) in the package was a Low from Jack Watson dated in Feb of 1992. I had never seen this Low. I was unaware that I was ever going to get the Letter (or along discover it by Accident in the package from Tobe Lowe on 7-25-97 (Nearly 5 months after the alledged Letter was dated I Believe it to be an unethical and discriminatory procedure. Furthermore, I contend it was designed to be retalitory and discriminatory to Prior EEO of 3-7-97. Only white Soo on Tour 1 that was Retaliated against with an unethical Low.

| 14. I have discussed my complaint with an EEO Counselor Yes (Date of final interview: Per Certified # 2 361 220 No   NO DISCUSSION HAS TAKEN PLACE   050 | 15. Name and Signature of EEO Counselor |
|---|---|

16. Corrective Action Sought  HAVE MR FERNANDEZ stop harrassing me = 10-25-97 Reassigned to T-3
2. USPS Pay MEDICAL COSTS AND FEES — OWCP accepted claim
3. USPS Return my Sk, All and monies for Holiday prop, night differential, ot
4. USPS Pay compensatory or punitive damage award of $75,000    7. Attorney cost & fees
5. USPS not affect my rights to EVA for this year    6. Low Destroyed - Tobe stated it would

| 17. Signature of Complainant | 18. Date of this Complaint |
|---|---|
| Thomas P Butler | 10-26-97 |

PS Form 2565, December 1995

DEFENDANT'S EXHIBIT 19 00-6193-CV-SIMONTON

*32B*