IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6193-CIV LENARD/Simonton

THOMAS BUTLER,

        Plaintiff,

v.                                 **CONSENT CASE**

JOHN POTTER, Postmaster,
United States Postal Service,

        Defendant.

_____/

**SUPPLEMENTAL NOTICE OF FILING
OF EXCERPTS OF PLAINTIFF'S DEPOSITION**

COMES NOW the Defendant, by and through the undersigned counsel, to provide this Supplemental Notice Of Filing Of Excerpts of Plaintiff's Deposition referred to in Defendant's Motion for Summary Judgment and incorporated Concise Statement of Material Facts As To Which There Exists No Genuine Issue To Be Tried (CSMF) including the following:

1.     Plaintiff's Deposition, Volume II, Pages 1-7;
2.     Plaintiff's Deposition, Volume II, Pages 9-14 and Defendant's Exhibit #20;
3.     Plaintiff's Deposition, Volume II, Pages 16-20;
4.     Plaintiff's Deposition, Volume II, Pages 21-37 and Defendant's Exhibit #21;
5.     Plaintiff's Deposition, Volume II, Pages 37-43 and Defendant's Exhibits #9, #10, and #12;
6.     Plaintiff's Deposition, Volume II, Pages 43-55 and Defendant's Exhibit #22;
7.     Plaintiff's Deposition, Volume II, Pages 55-57 and Defendant's Exhibit #23;
8.     Plaintiff's Deposition, Volume II, Pages 83-88 and Defendant's Exhibit #29;
9.     Plaintiff's Deposition, Volume II, Pages 89-93 and Defendant's Exhibits #30, #31, and #32;
10.    Plaintiff's Deposition, Volume II, Pages 93-133 and Defendant's Exhibits #32, #33, #34, #35, and #36;
11.    Plaintiff's Deposition, Volume II, Pages 124-125 and Defendant's Exhibit #37.

                       Respectfully submitted,

                       MARCOS DANIEL JIMENEZ
                       UNITED STATES ATTORNEY

By                  

                       CHARLES S. WHITE
                       Assistant United States Attorney
                       Fla. Bar No. 394981
                       99 N.E. 4th Street, Suite 322
                       Miami, Florida  33131
                       Tel. (305) 961-9286
                       Fax. (305) 530-7139

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing was furnished by U.S. Mail on March 17, 2003 to Stewart Lee Karlin, Esq., Attorney for Plaintiff, 315 S.E.7th Street, Suite 200 Ft. Lauderdale, Florida 33301.

By

2

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6193-CIV LENARD/SIMONTON

THOMAS BUTLER,                    )
                                  )
        Plaintiff,                )
                                  )
vs.                               )
                                  )
JOHN POTTER, Postmaster,          )
United States Postal Service,     )
                                  )
        Defendant.                )
_____)


                99 NE 4th Street, Suite 322
                Miami, Florida 33131
                March 4, 2003
                9:30 - 12:47 p.m.

                Volume II

            Deposition of Thomas Butler


        Taken before Suzanne Fernandez, Notary

Public in and for the State of Florida at

Large, pursuant to Notice of Taking

Deposition filed in the above cause.

                - - - - - - -

CERTIFIED COPY

2

```
 1    APPEARANCES:

 2

 3      ON BEHALF OF THE PLAINTIFF:

 4          STEWART LEE KARLIN, P.A.
            315 SE 7th Street, Suite 200
            Fort Lauderdale, Florida 33301
 5          BY:  STEWART LEE KARLIN, Esq.

 6      ON BEHALF OF THE DEFENDANT:

 7          UNITED STATES ATTORNEY
            99 NE 4th Street, Suite 322
 8          Miami, Florida 33131
            BY:  CHARLES S. WHITE, Esq.
 9
        ALSO PRESENT:
10
            LAURA TAYLOR-LAURY
11          UNITED STATES POSTAL SERVICE
                 - - - - - - -
12
                      I N D E X
13    Witness:  THOMAS BUTLER
            Direct  Cross  Redirect  Recross
14             4        -

15                    E X H I B I T S

16

17    Defendant's                    FOR I.D.

18    No. 20                            9

19    No. 21                           14

20    No. 22                           43

21    No. 23                           55

22    No. 24                           64

23    No. 25                           77

24    No. 26                           79

25    No. 27                           80
```

3

1                     E X H I B I T S

2                        (continued)

3

4        Defendant's                    FOR I.D.

5        No. 28                            82

6        No. 29                            84

7        No. 30                            90

8        No. 31                            92

9        No. 32                            93

10       No. 33                            94

11       No. 34                           115

12       No. 35                           117

13       No. 36                           120

14       No. 37                           124

15       No. 38                           133

16       No. 39                           136

17       No. 40                           137

18

19

20

21

22

23

24

25

4

1      Thereupon:

2                    THOMAS BUTLER,

3      was called as a witness by the Defendant and

4      after being first duly sworn, was examined

5      and testified under oath as follows:

6                    DIRECT EXAMINATION

7      BY MR. WHITE:

8        Q.  Mr. Butler, were here resuming the

9      deposition that we began back on February 6.

10       A.  Since we are resuming, can I go back on

11     the Record and correct a couple things?

12       Q.  I was going to start with that very

13     topic, so, yes, if you would, please, tell me

14     what areas you'd like to re-explore.

15       A.  One was when you brought up Dr.

16     Brignoni, the M.D. thing, I told you she was

17     a psychiatrist.  She's a psychologist.

18     Psychologist.  I looked in the phone book,

19     the Yellow Pages, and it was under

20     psychiatry, and it had M.D., PA.  I don't

21     know what those still stand for.

22                  Second thing was the emergency

23     treatment at the hospital I went to.  I

24     couldn't think of it at the time.  It's

25     Memorial West, the one that we had

5

1    established was on Flamingo up in Broward

2    County.

3        Q.   Okay.

4             Do you all have records from that

5    stay?

6        A.   Yes.

7        Q.   Can you produce those here today?  I

8    don't know if you have got them.  You did

9    bring some records.  We made a request of you

10   at the last deposition for production of

11   those records.

12       A.   Of the -- I don't remember that.

13       Q.   I believe I made it of your counsel at

14   the last deposition.

15            MR. KARLIN:   We'll have to get an

16   authorization to get those records.  I don't

17   think I have them in my possession.

18   BY MR. WHITE:

19       Q.   Do you have them?

20       A.   I don't know.

21            MR. KARLIN:   I have never seen

22   medical records.  I will re-examine them.

23            MR. WHITE:   Perhaps we can get a

24   release signed from you today.

25            THE WITNESS:  They would have been

6

1 in any of the folders that the post office

2 had.  I have mailed them copies.  They had

3 copies of all that.

4 BY MR. WHITE:

5  Q.  I will inquire of them as well.

6  A.  Should have been with the EEO files as

7 well.

8  Q.  I will inquire of them, but I will ask

9 that you all execute a consent and --

10    MR. KARLIN:    Sure.

11    MR. WHITE:    We will subpoena them

12 and I will expect you also to try to produce

13 copies also.  After that that will be

14 satisfactory.

15 BY MR. WHITE:

16  Q.  What else?

17  A.  The last thing I tried to describe to

18 you what outgoing was, and I was trying to

19 break it down to what we consider a local

20 mail, which was the Miami/Fort Lauderdale and

21 330 area.  And that's our -- what I'd like to

22 do is say outgoing is mail that's leaving the

23 facility outside of the 330 area.  That's

24 what I meant to say.

25  Q.  Okay.

1    A.  Okay.

2    Q.  Other than those corrections that you

3    have just made, were I to ask you the same

4    questions that we did on the earlier occasion

5    on February 6, would your answers be the

6    same?

7    A.  I'm not sure.

8    Q.  How would they change?

9    A.  (No verbal response.)

10   Q.  What would cause them to change?

11          I asked two questions 'cause there

12   was a pause there in your response.

13   A.  I'm not sure what would cause them to

14   change.

15   Q.  Do you have any reason to believe that

16   any of them would change?

17   A.  No.

18   Q.  All right.

19          When we last spoke, we'd also

20   discussed a settlement agreement.  Do you

21   remember those questions and those responses?

22          Let me hand you what we previously

23   marked as Defendant's Exhibit 17.

24   A.  What was your question?

25   Q.  Do you remember at the last meeting for

9

1          MR. KARLIN:    I think that question

2     is directed to me.

3          I don't oppose that request.  I

4     mean, it's --

5          MR. WHITE:    All right.

6     BY MR. WHITE:

7     Q.  In which case let's continue.  And I

8     think the last document that we had provided

9     to you at the time that we stopped our

10     proceedings was Defendant's Exhibit 20.  I'll

11     give the court reporter a copy, you and your

12     counsel have a copy.

13          (Thereupon the document referred to

14          was marked as Defendant's Exhibit

15          No. 20 for Identification, a copy

16          of which is attached hereto.)

17     BY MR. WHITE:

18     Q.  Take a few moments.  If you'd look at

19     what we have marked as Defendant's Exhibit 20

20     and let me know when you're ready to discuss

21     it.

22     A.  Yes.

23     Q.  All right.

24          And what is it you recognize

25     Defendant's Exhibit 20 to be?

1    A.   It's a -- came from the EEOC compliance

2    coordinator.   And it's basically talking

3    about an EEO discrimination filed on October

4    27, '97.

5             You want me to read this?

6    Q.   No, sir.   I'm just asking whether or

7    not you recognize the document.

8    A.   I already said yes to that question.

9    Q.   All right.

10             Do you recognize this to be a letter

11    drafted by the United States Postal Service

12    on their letterhead regarding the complaint

13    that you filed under EEOC case number

14    1-H-333-0036-97 concerning the issuance or

15    the drafting, rather, of a letter of warning

16    by -- is it Watson, Jack Watson?

17    A.   Yes.

18    Q.   All right.

19             And in this letter they frame the

20    issue that they are prepared to investigate

21    in accordance with what this letter says; is

22    that right?

23    A.   Repeat that question.

24    Q.   Did they in this letter define the

25    issue that they were willing to investigate

1    read as follows:  You were given a package

2    from Labor Relations with a copy of a L.O.W.

3    for which you had never received.  That

4    incident occurring July 25, 1997.

5         The agency by this letter is

6    advising you, as of February 19, 1998 that

7    they were going to investigate that

8    allegation; is that correct?

9         MR. KARLIN:   I will object.  The

10   letter speaks for itself.  But I will allow

11   him to answer.

12        THE WITNESS: What did you say?

13        MR. KARLIN:   Go ahead and answer.

14        THE WITNESS:  Go ahead and answer?

15        They are defining the issues.

16   BY MR. WHITE:

17     Q.  Did you ever receive a copy of this

18   letter on or about February of 1998?

19     A.  I believe so.

20     Q.  Did you respond in any way?

21     A.  Yes.

22     Q.  And how did you respond?

23     A.  In an EEO format; I let them know that

24   it was unethical to put a letter of warning

25   in my file that I have never received.

12

1    Q.  The response you just gave, does that

2    incorporate the initial complaint you made

3    about the Postal Service's conduct, or is

4    that the response you gave to receiving this

5    letter which is Defendant's Exhibit 20?

6    A.  I don't know the sequence.  I can't

7    recall the sequence of when it occurred, but

8    yes, I did see this thing.

9    Q.  Let me see if I understand your

10    response.

11            In response to receiving this letter

12    back in February of 1998, were you content

13    with the manner in which the agency had

14    framed the issue that they were going to

15    investigate?

16    A.  No.

17    Q.  Did you convey your objection to the

18    agency in accordance with the statements set

19    forth in the letter in the second full

20    paragraph?

21    A.  Which paragraph is that?

22    Q.  The one that follows the --

23    A.  If I disagree?

24    Q.  That's correct.

25    A.  I don't believe I responded within

13

1    seven days.

2        Q.  Did you ever respond?

3        A.  I mentioned to them that the letter of

4    warning should not have been in my file

5    because I had never been issued it.

6        Q.  Did you respond in any other way?

7        A.  I don't recall.

8        Q.  Did you provide any response in writing

9    to your receiving this letter?

10       A.  I don't recall.

11               I did have some responses in

12   writing.

13       Q.  Responses to what?

14       A.  Letter of warning being in my file

15   without being issued to me.

16       Q.  Do you know if it was in response to

17   this letter?

18       A.  I'm not sure.

19       Q.  Do you have copies of whatever written

20   response you have?

21       A.  I may have one that I can recall, that

22   was a letter to Dillion, Bob Dillion, and I

23   had a phone conversation.

24       Q.  Let's see if we don't cover that

25   written response in just a few moments, and

14

1    if you think there is some other one, I'm

2    going to ask that you produce it.

3         I have been provided certain letters

4    through the administrative process, nothing

5    through the plaintiff's discovery, so if

6    there is some other document, I'd like to

7    know what it is and have a copy of it.

8         . Let me move on now to Defendant's

9    Exhibit 21.

10         (Thereupon the document referred to

11         was marked as Defendant's Exhibit

12         No. 21 for Identification, a copy

13         of which is attached hereto.)

14    BY MR. WHITE:

15    Q.  And as I mark that, I'm going to ask

16    you if you're familiar with something called

17    the economic value-added program.

18    A.  Yes.

19    Q.  What is the economic value-added

20    program, according to you?

21    A.  Formerly known as EVA, E-V-A.

22         It was a system designed to reward

23    individuals for the company meeting its

24    goals.

25    Q.  The company being the post office?

16

1    Q.  How is it that an individual employee

2    who would qualify for -- this was an

3    incentive paid program; is that correct?

4    A.  It was.  We used to have a system where

5    they gave you bonuses.  And then they had

6    this new system, EVA, they stated that if the

7    company achieved their goals, then you would

8    get a bonus, and they divided it into -- they

9    had something called a bank and part of the

10   money was given to you and the rest of it was

11   left in a bank.  I'm not sure how exactly it

12   worked.

13   Q.  Is it fair to say the EVA or the

14   economic value program was implemented in

15   1996?

16   A.  I am not sure.

17   Q.  Do you think it was earlier or later?

18   A.  I'm not sure.

19   Q.  Do you know whether or not it was in

20   place at the time that -- well, during 1997,

21   fiscal year 1997 within the postal service?

22   A.  Yes.

23   Q.  Okay.

24       Let me provide you with a definition

25   and see if you agree or disagree with this

```
 1        with regard to the economic value-added

 2        program.

 3               Was it a variable pay program which

 4        provided cash awards for participating

 5        employees based on objective measures of

 6        organizational performance; is that right?

 7          A.  Sounds similar.

 8          Q.  Is it fair to say that the program was

 9        variable in the sense that the size of the

10        award might differ from year to year based on

11        the organizational performance in a

12        particular year?

13          A.  Yes.

14          Q.  And since awards are lump sum cash

15        awards, is it fair to say that the payments

16        must be earned each successive year by

17        achieving organizational objectives?

18          A.  That I'm not sure because of that bank

19        system they had.  I'm not sure how that

20        works.

21          Q.  In order to receive full credit in the

22        incentive program, did eligible employees in

23        the organizational unit have to meet

24        established targets?

25          A.  Yes.
```

18

1    Q.  If an employee did not meet an

2    established target, what would happen as it

3    relates to their eligibility for the EVA

4    credit?

5    A.  When you say established targets, were

6    you referring to the overall goals of the

7    company?

8    Q.  No, an individual's.

9    A.  Are not the goals of the company?

10    Q.  Well, I assume in one sense they are

11    because the employees are contributing to it.

12    But what would allow an employee to qualify,

13    to be considered to be a recipient or a

14    beneficiary of this program?

15        The company meets its objective, in

16    other words, but the individual doesn't do

17    anything in order to assist the agency in

18    achieving those goals.

19    A.  I don't see how that's possible.

20    Q.  Well, if an employee basically sits on

21    a stool and doesn't work at all, but the

22    company still meets its goal, does that

23    employee get a portion of the EVA?

24    A.  The company is allowing the employee to

25    sit on a stool, yes.

1    Q.  In other words, from your perspective,

2  there was no objective criteria that an

3  employee had to meet in order to be eligible

4  for this program, he simply had to be there

5  at the job?

6    A.  It would be an EAS employee.

7    Q.  EAS being?

8    A.  A supervisory position.

9    Q.  Other than that, there was no objective

10  criteria that he had to meet in order to

11  qualify for this program?

12    A.  I don't recall us having that

13  information.

14    Q.  Is there anything that you're aware of

15  that an employee who would otherwise be

16  eligible for the EVA -- is there anything he

17  could do to render himself ineligible for it

18  in a given year?

19    A.  No.  If a person had one or two letters

20  of warnings, they would -- they wouldn't give

21  him the EVA, but I'm not sure how that

22  affected the bank.

23    Q.  With regard to the EVA, did attendance

24  play any role in whether or not an otherwise

25  eligible employee might become disqualified

1    for an EVA credit?

2      A.   Yes.

3      Q.   And on what basis?

4      A.   I'm not sure of the exact quantity.

5      Q.   Let me give you an example and see if

6    you know whether this is right or not right.

7            First off, in order to be eligible

8    for an EVA credit, is it fair to say that an

9    employee would have to contribute fully to

10   the performance of the organization?  Do you

11   know whether or not that's a proper

12   statement?

13     A.   No.

14     Q.   Let me follow up and ask you whether or

15   not lack of contribution would be defined as

16   using --

17            MR. KARLIN:   I can't talk to you

18   when a question is pending.

19   BY MR. WHITE:

20     Q.   Lack of contribution would be defined

21   as either sick leave or leave without pay

22   exceeding 500 hours, do you know if that is

23   one of the objective criteria of the program,

24   and if you don't know, just say so.

25     A.   During this process I have discovered

21

1    that that was a criteria that they were

2    using, an hourly sick leave and leave without

3    pay.

4        Q.  Was it also a part of the definition of

5    lack of contribution for the EVA credit where

6    combined sick leave and leave without pay

7    exceeded 600 hours?

8        A.  I'm not sure.

9        Q.  Okay.

10            I've placed before you Defendant's

11   Exhibit 21.  Can you tell me whether or not

12   you recognize that exhibit?

13       A.  Appears to be an employee leave usage

14   for 26 pay periods.

15       Q.  And for what employee?

16       A.  For myself.

17       Q.  And for what year or what time period,

18   can you tell us?

19       A.  Looks like it's June 2nd through -- it

20   kind of jumps around a little bit.

21            I can't follow it.  It's hard for me

22   to follow what this is saying.

23       Q.  We are looking at the first of a

24   two-page document which makes up Defendant's

25   Exhibit 21.  And if we look at the far right

1   upper-hand corner, it says page 1, date

2   10/21/97, does it not?

3      A.  I see that.

4      Q.  Okay.

5           Underneath that it reflects in

6   handwritten notation various dates.

7   Beginning on the far right it appears to say

8   10/12/96 over 10/25/96, does it not?

9      A.  Yes.

10     Q.  As we move left, does it say 10/26 and

11  underneath that 11/8?

12     A.  Yes.

13     Q.  Underneath or to the left of that does

14  it say 11/9 over 11/22?

15     A.  Yes.

16     Q.  Do these dates appear to coincide with

17  pay periods that you would have served in the

18  United States Postal Service during fiscal

19  year 1997?

20     A.  I'm not sure.

21     Q.  Two-week increments of time before you

22  got paid; is that right?

23     A.  Yes.

24     Q.  You want to look at these for a second

25  more and see if it doesn't refresh your

23

1    recollection.

2       A.  No.

3       Q.  If we continue across the page, moving

4    right to left, do we see similar, assuming

5    they are dates, dates reflected in two-week

6    increments all the way over to the left-hand

7    side of the page?

8       A.  They appear to be two-week increments.

9       Q.  All right.

10          And below that in typewritten

11   language, I'm going to skip down to the line

12   that appears to have your name, Butler,

13   Thomas P.; is that right?

14      A.  Yes.

15      Q.  Your social security number; is that

16   right?

17      A.  Yes.

18      Q.  All right.

19          And then beneath that it's got what

20   appears to be a line for AL, does it not?

21      A.  Yes.

22      Q.  What does AL signify?

23      A.  Annual leave.

24      Q.  And there to the right of AL are

25   certain numbers.  The first one would be 4.0;

**FERNANDEZ & ASSOCIATES**
**444 Brickell Avenue, Suite 718, Miami  FL 33131**

24

1    is that correct?

2        A.   Correct.

3        Q.   That appears to follow along the far

4    left column, which assuming those handwritten

5    dates were dates, seems to be 9/13 over 9/26;

6    is that correct?  Or can you read it?

7        A.   I don't know if you can make that

8    assumption.

9        Q.   Can you read any numbers there, the

10   handwritten numbers on the left-hand side of

11   the page?

12       A.   No, they are scribbled out.

13       Q.   Moving to the handwritten numbers to

14   the right of those that you appear not to

15   read, can you make out those dates?  Do they

16   reflect 8/30 over 9/02 or 9/12, rather?

17       A.   It's not clear, but it's possible.

18   That's poorly handwritten.

19       Q.   If we move over to the immediate right

20   of that number that you say it's possible,

21   can you read dates that might be August 6th

22   through August 29?  Can you make that out?

23       A.   That's really stretching it.

24       Q.   If you move over to the immediate right

25   of that, do you see a date August 2nd over

1    August 15?

2      A.  Appears to be.

3      Q.  I'm going to go back to the third

4    listing, it would have been August 16 not

5    August 6th.

6      A.  See, I couldn't tell that either.

7      Q.  All right.

8           The next number would have been --

9    what appears to be July, what is it, 14 over

10   August 1st or can you tell?

11     A.  I can't tell.

12     Q.  All right.

13          Well, if we go down to the

14   corresponding annual leave entries down

15   where, again, in the typewritten area, do you

16   know whether or not you took 72 hours worth

17   of leave during the early portion of August

18   1997?

19     A.  Do you have the dates of that again?

20     Q.  Sure.  August 2nd through August 15.

21     A.  I don't recall.

22     Q.  Do you have any reason to doubt the

23   notations on this document, if they were to

24   reflect August 2nd through August 15, that

25   you took 72 hours worth of annual leave and

1    eight hours of sick leave?

2        A.  I don't have any reason to doubt it.

3        Q.  Let's cover the first three entries

4    apparently here.

5            In September of 1997 do you have any

6    reason to doubt the entry, assuming these

7    dates are accurate, that you took four hours

8    of annual leave in -- what is WK?

9        A.  Work, I guess.

10       Q.  Do you know what WK means?

11       A.  I think it's work.  If you look at the

12   bottom, go down a little further, WK says

13   equals work.

14       Q.  That's a schedule that explains what

15   those letters --

16       A.  Those abbreviations.

17       Q.  Okay.

18           Would you have taken four hours of

19   annual leave during September 13 through

20   September 26, '97?

21       A.  I don't recall.

22       Q.  Any reason to doubt it?

23       A.  I'm not sure.

24       Q.  Any reason to doubt that you would have

25   taken four hours of annual leave from August

27

1    30, '97 to September 12?

2    A.  I'm not sure.

3    Q.  Moving over to what appears to be the

4    fifth entry, moving left to right, it

5    reflects 80 hours of annual leave from what

6    appears to be July 19 through August 1st,

7    1997.

8         Any reason to doubt that entry?

9    A.  I'm not sure.

10    Q.  What was your status during July of

11    1997 with the post office?

12    A.  I'm not sure.

13    Q.  Do you know whether or not you were

14    working?

15    A.  I'm not sure.

16    Q.  Do you remember being placed on

17    enforced leave during June 6, 1997?

18    A.  I'm not sure of the dates.

19    Q.  Do you remember the questions that we

20    went over during the last deposition?

21    A.  If I saw them again, I probably would.

22    Q.  Let's start with Defendant's Exhibit 10

23    which is a letter dated May 27, 1997.

24         Take a minute and look through that.

25         MR. WHITE:  Off the Record.

28

1                    (Thereupon conversation was

2                    held off the record.)

3    BY MR. WHITE:

4        Q.  You have had a chance now to look over

5    Defendant's Exhibit 10, have you not?

6        A.  Yes.

7        Q.  What is it you recognize that to be?

8        A.  It's a letter from the senior manager

9    of distribution operations Robert Dillion.

10       Q.  Advising you of what?

11       A.  Enforced placement on enforced leave to

12   begin June 6, 1997.

13       Q.  Having now read through that letter, do

14   you now remember what your status was in

15   August of 1997 as it relates to your

16   employment with the post office?

17       A.  June 6 I was out.  August -- I'm not

18   sure.

19       Q.  When did you return to work at the post

20   office?

21       A.  I'm not sure of the date.

22       Q.  Do you remember the time that you

23   entered into a settlement agreement with the

24   post office with regard to the complaint that

25   you filed with the Merit System Protection

29

1    Board?

2      A.   Yes.

3      Q.   Were you working at the time that you

4    entered into that settlement agreement?

5      A.   Yes.

6      Q.   How long had you been working at the

7    time that you signed on the settlement

8    agreement?

9      A.   Are you referring to postal position

10   again?

11     Q.   Yes, sir.

12     A.   'Cause I told you before I worked at

13   some golf courses.

14     Q.   I'm only concerned, for purposes of

15   these questions, with your employment with

16   the postal service.

17     A.   Okay.  Repeat the question.

18     Q.   Sure.

19          At the time you entered into the

20   settlement agreement with the post office

21   before the Merit System Protection Board that

22   we discussed at the beginning of this

23   morning's proceedings, were you working for

24   the United States Postal Service?

25          Were you actually going to work?

**FERNANDEZ & ASSOCIATES**
**444 Brickell Avenue, Suite 718, Miami  FL 33131**

30

```
1       A.   Physically going to work?

2       Q.   Yes, sir.

3       A.   No, they would not allow me to.

4       Q.   Okay.

5            How long had you not been going

6       physically to work at the time that you

7       entered into that settlement agreement?

8       A.   The whole time they had allowed me to

9       go.

10      Q.   Would that have been from at least June

11      1997 up and until the date that you signed

12      off on that settlement agreement?

13      A.   Yes.

14      Q.   That settlement agreement was signed in

15      October of 1997, would that sound about

16      right?

17      A.   About right, yes.

18      Q.   Let me hand you what we have marked as

19      Defendant's Exhibit 17.

20           You, in fact, recognize this to be

21      the settlement agreement?

22      A.   Yes.

23      Q.   Looking at the last page, do you see

24      your signature?

25      A.   Yes.
```

31

1    Q.  And what date do you see by your

2    signature?

3    A.  10/15.

4    Q.  All right.

5         Is it fair to say that between June

6    the 6th, 1997, the date that you were placed

7    on enforced leave, through October 15, 1997,

8    you were not going to work at your job for

9    the postal service?

10   A.  I was not allowed to work.

11   Q.  Is it fair to say that between June the

12   6th, 1997, and October 15, 1997, you were on

13   enforced leave from your job with the postal

14   service?

15   A.  They forced me not to go to work.

16   Q.  Once again?

17        MR. KARLIN:   Just answer the

18   question.

19        THE WITNESS:  I have.

20        MR. KARLIN:   You were on forced

21   leave?

22        THE WITNESS:  That's truthful.  They

23   would not allow me to go to work.

24   BY MR. WHITE:

25   Q.  You were on enforced leave; is that

32

1  right?

2     A.   The doctor said I could go to work.

3  They told me I couldn't go to work.

4     Q.   During the time from June --

5     A.   It wasn't because I couldn't work.

6  They told me I couldn't go to work.

7     Q.   During the time between June the 6th,

8  1997 and October 15, 1997, is it fair to say

9  that you were on enforced leave from your job

10 at the United States Postal Service?

11    A.   Yes.

12    Q.   Going back then to Defendant's

13 Exhibit 21, I will ask you what was your

14 status during August of 1997 with regard to

15 your employment within the United States

16 Postal Service?

17    A.   Enforced leave.

18    Q.   How would that be reflected on your

19 time and attendance reports?

20    A.   How did they reflect it?

21         Help me -- I still have trouble

22 reading this.  Where does June 6 start and

23 where is June 15, according to this?

24    Q.   Assuming these dates begin with October

25 '96, and you have here -- I am going to move

33

1   my finger across and speak out loud so we

2   have a record of it.

3            Here we have October through

4   November of '96.  November through --

5   November 22nd, '97.  November 23rd to

6   December 6, '96.  I'm going to move all the

7   way across here until we ultimately come to

8   what appears to be June, where my finger is.

9            In fact, it says June the 6th.

10      A.  Hold on just a second, okay.

11      Q.  The document that is marked Defendant's

12   Exhibit 21, does this appear to accurately

13   reflect the hours that you would have taken

14   sick leave during June of 1997?

15            I think the entry says June the 6th.

16   May 24 through June the 6th.  It would have

17   been about 72 hours.

18      A.  So that was prior to and after the

19   enforced leave, correct?

20      Q.  Assuming those dates are accurate,

21   that's correct?

22      A.  What is the question once again?

23      Q.  All right.

24            This document which makes up

25   Defendant's Exhibit 21, does this appear to

34

1    accurately reflect the hours of sick leave

2    and hours of annual leave you would have used

3    during fiscal year 1997 with the postal

4    service?

5        A.  I'm not sure.

6        Q.  Do you have any reason to doubt it?

7        A.  I don't recall at this time.

8        Q.  All right.

9            You stopped going to work at your

10   job with the postal service back in March of

11   1997; is that correct?

12       A.  Yes.

13       Q.  All right.

14           And you didn't resume until after

15   you entered that settlement agreement that we

16   saw earlier; is that right?

17       A.  Correct.

18       Q.  Do you know the total number of hours

19   that you were out of work during that time

20   period?

21       A.  I don't recall.

22       Q.  Have you ever tallied it up?

23       A.  Yes.

24       Q.  And do you have any notes that might

25   assist you in refreshing your recollection

35

1    about what that tally is?

2        A.   Not with me.

3        Q.   Where are they?

4        A.   (No verbal response.)

5        Q.   On the second page of Defendant's

6    Exhibit 21 appears to be a summary of hours

7    missed by certain employees with the postal

8    service during fiscal year 1997, at least by

9    its own terms, that's what the document says;

10   is that correct?

11       A.   Says sick and LWOP usage over 500

12   hours.

13       Q.   The first line on the page 2 of

14   document 21 says fiscal year 1997, EAS

15   combined sick/LWOP.  What's LWOP?

16       A.   Leave without pay.

17       Q.   Leave usage over 500 hours.  Is that

18   what it says?

19       A.   That's what I read to you.

20       Q.   Are you listed on this page?

21       A.   Yes.

22       Q.   All right.

23            And can you tell us what the number

24   of hours of sick leave corresponds to your

25   name during fiscal year 1997?

36

1    A.  Well, there's sick leave hours that

2    says 737.  Then there is a family leave sick

3    leave that says 631.

4    Q.  Is there also a leave without pay

5    entry?

6    A.  That was just strictly sick leave,

7    leave without pay, and they have -- yes,

8    eight hours.

9    Q.  Do you have any reason to doubt the

10   accuracy of those numbers reflecting the time

11   that you missed in fiscal year 1997 for sick

12   leave?

13   A.  I'm not sure.

14   Q.  You're not sure whether you do or

15   you're not sure whether you don't?

16   A.  I don't recall if those are accurate.

17   Q.  Is there anything that might refresh

18   your recollection?

19   A.  Probably the time sheets.

20   Q.  Do you have copies of those time

21   sheets?

22   A.  No.

23   Q.  Where are they?

24   A.  Probably at -- management should have

25   them.

37

1    Q.   Okay.

2         Assuming that those times are

3    accurate, is it fair to say that your sick

4    leave and combined leave without pay exceeded

5    600 hours during fiscal year 1997?

6    A.   Yes.

7    Q.   Okay.

8         Would you also concede, then, that

9    if 600 hours were the cutoff and you had 737

10   hours of sick leave during fiscal year 1997,

11   by having that many hours over 600 you were

12   ineligible to receive the EVA credit for

13   fiscal year 1997?

14   A.   No, I wouldn't concede that.

15   Q.   On what basis?

16   A.   Because I was cleared to work and they

17   wouldn't allow me to work; therefore, I was

18   forced to make a living to get paid and so I

19   had to use sick leave.  They forced me to use

20   sick leave and annual leave.

21   Q.   With regard to the time that you were

22   on enforced leave, have you, other than the

23   letters that we discussed last time from your

24   doctor, which are previously marked as

25   Defendant's Exhibit 9 and Defendant's

38

1    Exhibit 7, have you provided the postal

2    service with any other medical documentation

3    to support your position?

4       A.  Yes.

5       Q.  Where is it?

6       A.  I submitted it to the post office.

7    There is probably a copy here with the

8    medical doctor, Vicente.  I gave them all --

9    a lot of medical documentation.

10      Q.  I ask you all to produce those

11   documents as well.

12      A.  They have those documents.  I gave them

13   to them.

14            MR. WHITE:  I ask counsel to produce

15   copies.

16            MR. KARLIN:   I will double-check.

17            MR. WHITE:   I received nothing from

18   the plaintiff in this case in terms of

19   discovery.  All I've received are copies from

20   the administrative proceeding.

21            MR. KARLIN:   All right.   I thought

22   we had produced -- that there was a

23   production.

24            MR. WHITE:   We will move on.

25   BY MR. WHITE:

39

1    Q.  Is it fair to say, then, that the issue

2    that you have with regard to the economic

3    value added credit is integrally related to

4    your placement on enforced leave?

5    A.  I'd say it goes even beyond that.  When

6    I was injured on the job, I should have been

7    on limited duty.  They needed to find me

8    work; they didn't.  The way they circumvented

9    that was to put me on enforced leave and take

10   me out of working.

11   Q.  You say it goes beyond it.  Then it

12   would include that issue; is that correct?

13   A.  I guess enforced leave was something

14   that they chose to keep me out of work.

15   Q.  Is it your testimony, then, that your

16   disqualification from the EVA program was

17   intimately related to your ineligibility to

18   work?

19   A.  It wasn't ineligibility.  They refused

20   to allow me to work.  They were required to

21   find me work and they didn't do it.

22   Q.  And their basis for keeping you out of

23   work was what?

24   A.  It goes back to the letter dated May

25   27, 1997 which was a letter by Bob Dillion

40

1    placing me on enforced leave.

2        Q.  And that subsequently became the

3    subject of your petition before the Merit

4    System Protection Board, did it not?

5        A.  I'm not sure.

6        Q.  It also became the subject of your EEO

7    proceeding; is that correct?

8        A.  I'm not sure.

9        Q.  Let me hand you what we previously

10   discussed in the last session as Defendant's

11   Exhibit 12.  Do you recognize what this

12   exhibit is?

13       A.  This is appealing the decision of

14   enforced leave.

15       Q.  Dated what day, can you tell, looking

16   at the first page of the document?

17               MR. KARLIN:   What was the question?

18               THE WITNESS:  The date.

19               On the first page?

20               MR. KARLIN:   Can you point it to

21   us, speed this up a little.

22               MR. WHITE:   I'm sorry.  My mistake,

23   it does not appear to be on the first page.

24   Let's flip through.

25               MR. KARLIN:   I think it's probably

41

1   the last page.

2   BY MR. WHITE:

3     Q.  Your signature appears on the last page

4   of the four-page document, does it not?

5     A.  Yes.

6     Q.  And the date is June 6, 1997?

7     A.  Yes.

8     Q.  The appeal you're filing with the Merit

9   System Protection Board concerns what?

10     A.  Forced furlough.

11     Q.  That forced furlough is the same forced

12   furlough reflected in the letter you just

13   spoke to us about which is marked as

14   Defendant's Exhibit 10; is that right?

15     A.  I'm not sure.

16     Q.  Do you know of any other forced

17   furlough that you were placed on with the

18   postal service during May and June of 1997?

19     A.  He asked all these questions last time.

20          MR. KARLIN:  I know.  But just --

21          THE WITNESS:  No, I'm not sure.

22          MR. KARLIN:  Let me just take a

23   minute.

24          MR. WHITE:  Take your time.

25          (Thereupon, there was a

42

1                    recess in the proceedings.)

2    BY MR. WHITE:

3        Q.  First of all, you all ready to proceed?

4        A.  Yes.

5        Q.  As it relates to the forced furlough

6    that you were appealing as reflected in

7    Defendant's Exhibit 12, is that the same

8    forced furlough that is reflected in

9    Defendant's Exhibit 10?

10       A.  Appears to be.

11       Q.  Do you know of any other forced

12   furlough?

13       A.  No.

14       Q.  Do you know when you learned that the

15   postal service had determined you were not

16   eligible to receive the EVA credit for fiscal

17   year 1997 within the post office?

18       A.  I'm not sure.

19       Q.  Do you know if it was before or after

20   you entered into the settlement agreement?

21       A.  I'm not sure.

22       Q.  Could it have been November the 4th,

23   1997?

24       A.  I'm not sure.

25       Q.  Do you know who told you?

43

1     A.   Keith Maynord.

2     Q.   Who is Keith Maynord?

3     A.   He was a gentleman that they brought in

4   as a -- for just a short period of time, just

5   about that period of time, just to do my EVA

6   thing then he was gone.

7     Q.   What position did Mr. Maynord hold with

8   the postal service?

9     A.   I believe it was act -- he was acting

10  plant manager, I believe.

11    Q.   Acting plant manager for what facility?

12    A.   South Florida.

13    Q.   For the reporter, if you can tell us

14  what South Florida was.   South Florida what?

15    A.   Mail Processing Center.

16    Q.   For the reporter, Maynord is

17  M-A-Y-N-O-R-D.

18          Let's move on to Defendant's Exhibit

19  22.

20          (Thereupon the document referred to

21          was marked as Defendant's Exhibit

22          No. 22 for Identification, a copy

23          of which is attached hereto.)

24  BY MR. WHITE:

25    Q.   Let me hand you this document and ask

1    you whether or not you recognize it.

2          MR. KARLIN:   Is there a question

3    pending?

4    BY MR. WHITE:

5      Q.  Do you recognize this document?

6      A.  Well, it's made up of 9 pages.

7          Without having reread this whole

8    thing, I recognize it.

9      Q.  What is it you recognize it to be?

10     A.  It's an EEO complaint.  There is a

11   corresponding narrative written by me on

12   February 4th, '98.

13     Q.  Does this appear to be the complaint

14   and the attachment thereto that you filed

15   with regard to your disqualification from the

16   EVA credit that we have been discussing?

17     A.  Repeat that question one more time,

18   please.

19     Q.  Does this appear to be the EEO

20   complaint of discrimination that you filed

21   against the postal service with regard to

22   your disqualification from the EVA credit

23   that we have been discussing for the last

24   half an hour?

25     A.  Appears to be.

1    Q.  I notice on entry number 12 -- before

2    we get into that, on the bottom portion of

3    Defendant's Exhibit 22, does that appear to

4    be your signature?

5    A.  Yes.

6    Q.  And the top of this document reflects

7    it's an EEO complaint of discrimination in

8    the postal service; is that right?

9    A.  Yes.

10    Q.  Do you know of any other complaint you

11    filed with the EEOC regarding your

12    disqualification from the EVA than this one

13    which appears in front of you?

14    A.  I'm not sure.

15    Q.  You think there might be another one?

16    A.  I'm not sure.

17    Q.  How many did you file?

18    A.  How many EEO's have I filed?

19    Q.  With regard to your disqualification

20    from the EVA in 1997, fiscal year 1997?

21    A.  One.

22    Q.  Looking at the complaint which is

23    Defendant's Exhibit 22 I notice here that you

24    have indicated in block 11 different types of

25    discrimination that you assert you were

46

1    subjected to as it relates to your

2    disqualification from the EVA credit; is that

3    correct?

4       A.  Yes.

5       Q.  And in here it says your race,

6    Caucasian; is that right?

7       A.  Yes.

8       Q.  How was your race a part of your

9    disqualification from the EVA credit?

10      A.  This goes -- there is also retaliation.

11      Q.  I will come to that, too.

12      A.  That's how it applies.

13      Q.  How did your race play a part in your

14   disqualification from the EVA credit?

15      A.  I was white.  Mr. Fernandez was -- I'm

16   sorry, race?

17      Q.  That's correct.

18      A.  I was non-Hispanic.  Mr. Fernandez was

19   Spanish, Hispanic.

20      Q.  Other than that observation, did your

21   race have anything to do with your

22   disqualification from the EVA credit for

23   fiscal year 1997 at the postal service?

24      A.  I believe it did.

25      Q.  How?

1    A.  Being non-Hispanic, Mr. Fernandez being

2    Hispanic, proposed to put me on enforced

3    leave when he should have put me on limited

4    duty.

5    Q.  Do you know of any other employee

6    working under Mr. Fernandez who provided

7    postal management with letters from treating

8    physicians indicating that they were

9    ineligible to work under Mr. Fernandez?

10    A.  I do not know.

11    Q.  How did your color play a part in the

12    elimination from the EVA credit in fiscal

13    year 1997 that we've discussed here for the

14    last half hour?

15    A.  Being white, non-Hispanic.

16    Q.  Would the rationale be the same you

17    just provided us as to your race being

18    Caucasian?

19    A.  Yes.

20    Q.  How did your religion play a part in

21    your disqualification from the EVA program in

22    fiscal year 1997?

23    A.  For the period of time that I have been

24    at South Florida, I have been taking abuse

25    from Sergio, Dillion, and a few other

1    employees, which even included law violations

2    against me.  I would turn my cheek, go on, do

3    my job, and they would still retaliate

4    against me.  And this was ongoing, and this

5    is another form of that retaliation.

6         By me just turning around, which I'm

7    supposed to do for my religion and love my

8    brother as myself, okay, they took advantage

9    of this.  And they took advantage of it, and

10   they took advantage of it, and they took

11   advantage of it, and took advantage of it.

12        Well, rather, you know, rather than

13   do -- show fight or whatever, I don't do

14   that.  So what I do, I was forced -- in this

15   case they wouldn't leave me alone.  The

16   managers knew about it.  They didn't stop it.

17   I was forced to take this legal action.

18   Q.  Did you ever become aware of whether or

19   not Fernandez or Dillion were aware of what

20   your religion was?

21   A.  They could have been.

22   Q.  Do you have any reason to believe that

23   they were?

24   A.  I suspect that they knew, but I'm not

25   sure.

49

1    Q.  Do you have any reason to believe that

2    they did?

3    A.  Through conversations.

4    Q.  What conversations?

5    A.  Conversations I've had with others

6    about my religion.

7    Q.  When you say others, who are you

8    talking about?

9    A.  I can't be sure that I have told them

10    in discussions, but I have reason to believe

11    that they were aware of it.

12    Q.  I am waiting to hear that reason or

13    those reasons.

14    A.  I just feel that they had reason to

15    know.

16    Q.  You indicate here in Defendant's

17    Exhibit 22 that your national origin played a

18    part in your elimination from the EVA credit

19    back in fiscal year 1997.

20         How did your national origin play a

21    part?

22    A.  Once again, I was a USA citizen, born

23    in the USA.  Sergio was not.  Mr. Fernandez

24    was not.

25    Q.  Do you know whether or not he was a

50

1    United States citizen?

2        A.   He could have been a citizen.   I do not

3    know.

4        Q.   So --

5        A.   But he was born in Cuba.

6        Q.   And what role did that disparity play

7    in your elimination from the EVA credit in

8    fiscal year 1997?

9        A.   Once again he chose, because I wasn't

10   party to him or whatever, he chose to put

11   me -- proposed to put me on enforced leave

12   when in fact he should have put me on limited

13   duty.

14       Q.   Do you know of any other postal

15   employee who provided letters indicating

16   their inability to work under Fernandez or

17   work full-time schedules in writing that

18   Fernandez would have caused to be eliminated

19   from the EVA program?

20       A.   Repeat that one more time.

21       Q.   You have indicated that national origin

22   is a reason for your loss of eligibility for

23   EVA during fiscal year 1997.

24            In response to a question about how,

25   you indicate that Fernandez's treatment of

1    you by placing you on enforced leave and his

2    being of Cuban national origin as opposed to

3    your apparently being born in the United

4    States is the reason.

5          I'm trying to explore that with you

6    and find out whether or not you were aware of

7    any other individual like yourself who

8    provided letters to the post office

9    indicating that you were not eligible to come

10    back to work under Fernandez as we've already

11    discussed in Defendant's Exhibit 7.

12    A.  I don't have that knowledge.

13    Q.  In Defendant's Exhibit 9.

14    A.  I don't have that knowledge.

15    Q.  Okay.  Let's move on.

16          In your complaint, Defendant's

17    Exhibit 22, you indicate that your sex, being

18    a male, played a part in your

19    disqualification from the EVA program; is

20    that right?

21    A.  You can disregard that.

22    Q.  Does that mean that your sex, being a

23    male, did not play a part in your

24    disqualification from the EVA program?

25    A.  Correct.

1     Q.  With regard to age, you indicate 44,

2     that was your age at the time you filed the

3     complaint?

4     A.  Yes.

5     Q.  How did your age play a part in your

6     disqualification from the EVA program?

7     A.  Mr. Fernandez was under age 40 and, for

8     some reason, he took being over 40 as a way

9     of targeting me.  And we discussed how these

10    things are -- how if he would have allowed me

11    to be on limited duty prior to doing proposed

12    enforced leave, subsequently enforced leave,

13    subsequently MSPB, that none of this would

14    have been necessary.  None of it.

15    Q.  With regard to age, are you aware of

16    any other employee working under Fernandez

17    who was over the age of 40 who provided

18    letters indicating his medical ineligibility

19    to work under Fernandez who were disqualified

20    from the EVA program?

21    A.  No, sir.

22    Q.  You indicate in the complaint, which is

23    Defendant's Exhibit 20, that retaliation

24    played a part and you indicated the date was

25    March the 7th, 1997.

53

1      A.   Do you have that document?

2      Q.   I'm not sure what document you're

3   talking about.

4      A.   You said Exhibit 20.

5      Q.   I said Exhibit 20?

6           I meant Exhibit 22.

7      A.   Okay.  I have 22.

8      Q.   Yeah, 22 being the complaint.  You

9   indicate there that retaliation played a part

10  in your disqualification from the EVA credit

11  and you indicated a date there, says March 7,

12  1997.

13     A.   That's correct.

14     Q.   How did retaliation play a part?

15     A.   Mr. Maynord was in a position to know

16  my standing, and for him to issue an

17  exclusion, he would have to know was I there,

18  why I was there, especially if I told him

19  that the reasons for me not being allowed to

20  work.

21     Q.   You're obviously talking about a

22  conversation between yourself and

23  Mr. Maynord; is that correct?

24     A.   That's correct.

25     Q.   When did that conversation take place?

1    A.  On or about 11/4.

2    Q.  Of 1997?

3    A.  Yes.

4    Q.  Is it fair to say that that's the date

5  at which Mr. Maynord advised you that you

6  were ineligible for the EVA credit for fiscal

7  year 1997 at the postal service?

8    A.  Yes.

9    Q.  Tell us about the conversation you had

10 with Mr. Maynord.

11   A.  He said I wasn't eligible for EVA, even

12 though we had met our goals.

13   Q.  What else did you talk about?

14   A.  I told him I had been cleared to work

15 by the United States Postal Medical Unit and

16 my doctor, but I wasn't allowed to return to

17 work till 10/25/97.

18        I told him it wasn't my fault that I

19 wasn't -- that I didn't have the so-called

20 hours.  I told him it was retaliatory and

21 told him the nature of the situation with

22 Mr. Fernandez.

23        He said he didn't know of my case.

24 He'd get back to me.  And he never did get

25 back to me.

1    Q.  Did you have any other discussion with

2    him?

3    A.  I don't recall.

4         MR. WHITE:  We are up to Defendant's

5    Exhibit 23.

6         (Thereupon the document referred to

7         was marked as Defendant's Exhibit

8         No. 23 for Identification, a copy

9         of which is attached hereto.)

10   BY MR. WHITE:

11   Q.  Following the filing of your complaint

12   that we've discussed, Defendant's Exhibit 22,

13   did you receive a letter from the EEO

14   compliance and appeals coordinator on or

15   about April 17, 1998?

16   A.  Yes.

17   Q.  I have placed that before you; is that

18   correct?

19   A.  Yes.

20   Q.  It defines the issue as follows:  You

21   were excluded from the EVA bonus due to lack

22   of contribution.  The date of the incident

23   reported was November 7, 1997.  And then the

24   list of types of discrimination being race,

25   color, religion, national origin, sex,

1    retaliation, and age as we previously

2    discussed; is that correct?

3      A.  No.  The date of the incident was

4    November 4th, not November 7th.

5      Q.  I'm sorry.  November 4th, 1997.

6           You received this letter on or about

7    April of 1998; is that right?

8      A.  Yes.

9      Q.  Did you disagree with the issue as

10   defined?

11     A.  Yeah, I disagree with it.

12     Q.  Not now.  I'm asking if at the time

13   back in April of 1998 did you disagree with

14   the issues as defined?

15     A.  Yes.

16     Q.  Did you advise the postal service or

17   EEO in accordance with the instructions set

18   forth in this letter, which is Defendant's

19   Exhibit 23rd?

20     A.  Back in February.

21     Q.  Back in February what?

22     A.  '98.

23     Q.  In other words, before this letter was

24   received by you?

25     A.  Yeah.

1    Q.  In response to receiving this letter,

2    which is Defendant's Exhibit 23, did you

3    advise the agency that you disagreed with the

4    issues as defined by the letter?

5    A.  I contended all along that the lack of

6    contribution was not by me not contributing,

7    it's because they forced me not to

8    contribute.

9    Q.  I'm asking the question, in response to

10   receiving the letter which is Defendant's

11   Exhibit 23, did you advise the agency that

12   you disagreed with the agency regarding the

13   manner in which the issue was defined in that

14   letter?

15   A.  If you're saying after I received this

16   letter and they defined these specific issues

17   did I write them something about that, no.

18   Q.  Who is Rosie Carlies?

19   A.  She's an employee of the United States

20   Postal Service.

21   Q.  What does she do for the postal

22   service?

23   A.  She is a manager of distribution

24   operations.

25   Q.  And how long have you known her?

1      Q.  Is it fair to say she found there was

2   sufficient evidence to warrant the action

3   that was taken?

4      A.  I don't think it's fair.

5      Q.  I didn't ask you whether you thought it

6   was fair.  I asked you --

7      A.  Yeah, you did.

8      Q.  I said, is it fair to say that Ms.

9   Borowski concluded that there was sufficient

10   evidence to warrant the action taken, is that

11   in essence what she says in this letter?

12      A.  That's what she says.

13      Q.  Did you have an opportunity to discuss

14   the matter with Ms. Borowski prior to her

15   issuing the letter?

16      A.  No.

17          Well, I wrote her a letter, yeah.  I

18   didn't really verbally exchange things, I

19   mean, talk to her face to face or over the

20   phone or anything.

21      Q.  Let me hand you what I'm marking as

22   Defendant's Exhibit 29.

23          (Thereupon the document referred to

24          was marked as Defendant's Exhibit

25          No. 29 for Identification, a copy

84

1          of which is attached hereto.)

2    BY MR. WHITE:

3      Q.  And I ask you whether or not you

4    recognize this document.

5          MR. KARLIN:    Do you have another

6    copy?  I'm sorry.

7          THE WITNESS:  Yes.

8    BY MR. WHITE:

9      Q.  What do you recognize this document to

10   be?

11     A.  It's an EEO complaint that was --

12     Q.  Do you recognize it?

13     A.  I said yes.

14     Q.  I'm sorry, you recognize this to be

15   what?

16     A.  An EEO complaint.

17     Q.  If we look at the first page of this

18   document which we have marked Defendant's

19   Exhibit 29, up on the upper left-hand corner

20   in bold print it says what?

21     A.  Precomplaint -- information for a

22   precomplaint counseling.

23     Q.  And for what case number?  There are

24   two reflected there.  You can read them both.

25          For what case number?

85

1      A.  1-H-333-0047-99.

2      Q.  If we flip to the next page of this

3    three-page document, that has your signature

4    there; is that correct?

5      A.  Yes.

6      Q.  All right.

7           And next to it the date is what?

8      A.  4/19/99.

9      Q.  Is this in fact the document that you

10   initiated EEO proceedings with regard to the

11   disciplinary action culminating in

12   Ms. Borowski's April 12 letter of 1999?

13     A.  (No verbal response.)

14     Q.  You didn't agree with what Ms. Borowski

15   did in her letter of April 12; is that

16   correct?

17     A.  That's correct.

18     Q.  And so you initiated proceedings with

19   the EEOC, didn't you?

20     A.  No.

21     Q.  What did you --

22     A.  Well, it's possible.  I'm not sure on

23   that.

24     Q.  Let's look through Defendant's

25   Exhibit 29.

86

1          What are you raising in the context

2     of the EEO in Defendant's Exhibit 29?

3       A.  Discrimination and disparity of

4     treatment.

5       Q.  Based on what?

6       A.  Based on the fact that other employees

7     have noted that Ms. Carlies has allowed more

8     than eight employees in that operation

9     without discipline, another individual.

10      Q.  Is the subject of this complaint or the

11    matters raised in document 29 the

12    disciplinary proceedings that Ms. Carlies

13    initiated against you from July '98?

14          Let me put them all out so you can

15    know what we are looking at.

16          I am looking for step A, a step A

17    letter.  I'm not sure where it is in your

18    stack.  Use whatever you need to respond to

19    the question.

20          MR. KARLIN:  What was the question

21    again?

22    BY MR. WHITE:

23      Q.  I am trying to find out what the matter

24    is that he's raising in this information for

25    precomplaint counseling under the case number

87

1    1-H-333-0047-99.

2        A.   The information is stated on that

3    precomplaint.

4        Q.   What are you raising?

5        A.   It says right there.

6        Q.   And that is?

7        A.   Race, color, sex retaliation, national

8    origin.

9        Q.   Those are the bases for discrimination,

10   but what allegation are you complaining

11   about?

12       A.   Retaliation.

13           MR. KARLIN:  He's asking what

14   factual allegations led you to file the

15   complaints.  What happened which caused you

16   to file this complaint?

17           THE WITNESS:  Receiving statements

18   from two employees stating that they had seen

19   other people, more than eight employees in

20   that same operation I had worked, and they

21   weren't disciplined, but I was.

22   BY MR. WHITE:

23       Q.   The discipline that you are complaining

24   that you got that nobody else got is the

25   letter of warning that we just talked about

1    Q.  That's what I'm trying to figure out.

2        All right.  Defendant's Exhibit 29

3    again under case number 1-H-333-0047-99,

4    other than filing the initial --

5    A.  Is that Exhibit 29?

6    Q.  Yes, sir.

7        Other than filing this information

8    for precomplaint counseling, as we have

9    discussed, did you ever file a formal

10   complaint of discrimination?

11   A.  Yes.

12   Q.  Where is it?

13   A.  Filed one on Sergio Fernandez.

14   Q.  Excuse me.  Let's be very clear.

15   A.  Okay.

16   Q.  As it relates to case number

17   1-H-333-0047-99, did you ever file a formal

18   complaint of discrimination under that case

19   number?

20   A.  I'm not sure.

21   Q.  Would you have provided that to your

22   lawyer, a copy of it?

23   A.  I'm not sure.

24        MR. KARLIN:   Why don't we take five

25   minutes.

1          MR. WHITE:   Okay.

2          (Thereupon a recess was taken in

3          the deposition, after which the

4          deposition continued as follows:)

5     BY MR. WHITE:

6       Q.  Let me hand you now what we have now

7     marked as Defendant's Exhibit 30.

8          (Thereupon the document referred to

9          was marked as Defendant's Exhibit

10         No. 30 for Identification, a copy

11         of which is attached hereto.)

12    BY MR. WHITE:

13      Q.  Let me ask whether or not you recognize

14    this to be a letter we sent to you certified

15    receipt.  The letter is dated September 30,

16    1990, with regard to the proceedings you

17    initiated in the case number 1-H-333-0047-99

18    dealing with the request for discipline that

19    we've been talking about that took place

20    culminating in the letter of April 18, '99.

21         Looking back at Exhibit 29 just to

22    refresh your recollection after the break, we

23    are talking about the proceedings you

24    initiated with your information for

25    precomplaint counseling, case number

1      1-H-333-0047-99.

2              This letter which is Defendant's

3      Exhibit 30 is the agency's final interview

4      notice that was sent to you on or about

5      September 30, 1999; is that correct?

6        A.  I think so.

7        Q.  And did you understand that this

8      letter, which is Defendant's Exhibit 30, tell

9      you -- what is it you understood this letter

10     to tell you that you could do?

11             I want to point out that there is a

12     second page to Defendant's Exhibit 30, is

13     there not?

14       A.  Yes.

15       Q.  And that by its own terms is a form

16     PS form 2579A which is a notice of right to

17     file individual complaint; is that correct?

18       A.  Yes.

19       Q.  And did you receive these two documents

20     which make up Defendant's Exhibit 30 some

21     time about September 30, 1999?

22       A.  Yes.

23       Q.  And the question I asked you before the

24     break, do you know whether or not you ever

25     filed a formal complaint after receiving this

1    letter?

2       A.   Not sure.

3       Q.   To dot I's and cross T's, can you tell

4    me what this Defendant's Exhibit 31 is?

5              (Thereupon the document referred to

6              was marked as Defendant's Exhibit

7              No. 31 for Identification, a copy

8              of which is attached hereto.)

9              THE WITNESS:   It looks like it's a

10   certified mail received by me on 10/8/99.

11   BY MR. WHITE:

12      Q.   Do you know whether or not that is the

13   same article reflected in Defendant's Exhibit

14   Number 30 that you are acknowledging the

15   receipt thereof?

16      A.   Yes.

17      Q.   Yes, it is?

18      A.   Yes.   Was that 31?

19      Q.   31, that's right.

20              Do you know what an EEO complaint

21   tracking system is?

22              Have you ever seen one?

23      A.   EEO complaint tracking system?

24              I think I've seen that.

25      Q.   Okay.

1          Let me hand you, then, what we'll

2    mark as Defendant's Exhibit Number 32, and

3    let me ask whether or not you recognize this

4    exhibit.

5          (Thereupon the document referred to

6          was marked as Defendant's Exhibit

7          No. 32 for Identification, a copy

8          of which is attached hereto.)

9          THE WITNESS:  I do not recognize it.

10   BY MR. WHITE:

11     Q.  You do not.

12          Do you know whether or not the

13   United States Postal Service maintains a

14   computer data bank reflecting who has filed

15   EEO complaints?

16     A.  I believe they do.

17     Q.  Have you ever checked the system to

18   find out whether or not you have in fact

19   filed a complaint under case number

20   1-H-333-0047-99?

21     A.  I'm not sure.

22     Q.  Okay.

23          Move on, then, to number 33,

24   Defendant's Exhibit 33.  Take a minute and

25   look through the document, tell me if you

1    recognize that.

2         (Thereupon the document referred to

3         was marked as Defendant's Exhibit

4         No. 33 for Identification, a copy

5         of which is attached hereto.)

6         THE WITNESS:  It's a request for

7    disciplinary action by Rosie.

8    BY MR. WHITE:

9      Q.  This is Rosie Carlies?

10     A.  Yes.  And also Sandy Richardson.

11     Q.  All right.

12         And do you recall the events

13    surrounding the circumstances that produced

14    this request for disciplinary action by

15    Rosie, which is reflected in Defendant's

16    Exhibit 33?

17     A.  Yes.

18     Q.  And briefly what assignment were you

19    working with the postal service during the

20    time frame described in Defendant's

21    Exhibit 33?

22         If you need to go through and

23    refresh your recollection, feel free.

24     A.  Yeah.  Actually, I got there before I

25    was to work.  This is dated 4/10.  I began

1    work at 4:00.  And actually I was there prior

2    to 4:00.

3        Q.  All right.

4            Are we talking about --

5        A.  The attached.

6        Q.  November 3rd, 1999?

7        A.  I believe so.

8        Q.  And were you in fact working as a

9    supervisor of distribution operations, an SDO

10   assigned to the small parcel bundle sorter on

11   two or three on that day?

12       A.  Yes.

13       Q.  And your supervisor at that time was

14   who, if you remember?

15       A.  I'm not sure.

16       Q.  Where in the chain of command was Rosie

17   Carlies in relation to you on that date?

18       A.  I'm not sure.

19       Q.  Do you know if she would have been a

20   first-level or a second-level supervisor?

21       A.  I'm not sure.

22       Q.  Did you have any encounter with her on

23   that day?

24       A.  Yes.

25       Q.  And what was the basis of that

96

1   encounter?

2       A.   I had talked to -- when I came in

3   early, I talked to the supervisor that was

4   there, Simon Ham, and he told me what was

5   going on.  And it was different than the

6   norm.  In fact, we had never run this

7   so-called Miami mail, I believe it was.  And

8   so he explained what was going on.  And he

9   called Rosie.

10          What I had asked him was, you know,

11  can we pull a report, which is the normal

12  standard operating procedure when a tour

13  comes in.

14      Q.   Before we get to that.  Hold up a

15  second.

16          Can we describe basically what a

17  small parcel bundle sorter is, and let me see

18  if I can describe it and you tell me if I am

19  right or wrong.

20      A.   Okay.

21      Q.   A small parcel bundle sorter is a

22  mechanized mail processor that sorts small

23  parcels and bundles of mail on one of four

24  conveyer belts taking it to a clerk; is that

25  right?  Yes or no?

1       A.   Not exactly.

2            Mail comes to the clerk via conveyer

3   belts.  They key a code from a key station

4   and that goes on to one conveyer belt.

5       Q.   The code --

6       A.   Four conveyer belts go into one again

7   and the one distributes the mail.

8       Q.   And the code we are talking about are

9   the marked zip codes; is that correct?

10      A.   Yes, zip codes.

11      Q.   All right.

12           And the machine responds to that

13  inputted zip code and takes the mail to one

14  of -- I'm sorry?

15      A.   The appropriate conveyer.

16      Q.   All right.

17           Does the small parcel bundle sorter

18  also automatically track the number of

19  parcels that are properly processed as well

20  as those that are not properly processed?

21      A.   Yes.

22      Q.   And not being properly processed means

23  improperly keyed; is that right?

24           Well, let me withdraw that and say

25  is it fair to say that improperly keyed mail

98

```
 1     is transported to a reject bin where it's

 2     retrieved and either reprocessed or hand

 3     sorted?

 4       A.  That's the design, but there are some

 5     faults with it.

 6       Q.  Is it also fair to say that with regard

 7     to the small parcel bundle sorter a

 8     supervisor can obtain a hard copy of the data

 9     that is the number of properly versus

10     improperly processed mail by pressing a

11     button on the machine; is that right?

12       A.  (No verbal response.)

13       Q.  You said running a report earlier.

14     What is running a report?

15       A.  Running a report, they have a computer

16     that's -- you're asking me electronic

17     questions that I am not real --

18       Q.  You were trained and experienced in

19     running a small parcel bundle sorter; is that

20     correct?

21       A.  That's correct.

22       Q.  And that machine has the capability of

23     running a report; is that correct?

24       A.  You're getting into electronics and

25     hook-ups and things.  It has a computer
```

1    system that I don't consider is part of the

2    machine other than it does keep track of

3    numbers and things.

4       Q.  That's what I'm asking.

5       A.  You're asking me beyond my expertise.

6       Q.  How do you keep track of how well

7    you're doing as a supervisor of a small

8    parcel bundle sorter machine?

9       A.  Many ways.  It's not just from a

10   report.

11      Q.  Is running a report one of the ways you

12   do it?

13      A.  Yes.

14      Q.  Okay.

15           And what does running a report

16   entail?

17      A.  After you complete a run, you have to

18   stop the machine and then you have to key in

19   certain information and it gets printed out.

20      Q.  Okay.

21           And what is running a run, is that a

22   tour of duty or is that a truckload of mail

23   or what is it?

24      A.  A run, generally speaking, you work on

25   a particular tour.  There could be overlap

1   with the mail that you are running, yeah.  A

2   lot of times that's the case.  We either

3   inherit something or we start something and

4   somebody else inherit it or they start

5   something.

6      Q.  Let's go back now, if we can, to

7   Defendant's Exhibit 33, and you will notice

8   on five pages, I think it is, there is a

9   handwritten account.

10     A.  Okay.

11     Q.  Let's go through the assertions made

12  there and see what your thoughts are on

13  those.

14          It says, does it not, "On November

15  3rd, 1999 at approximately 4:10 p.m., I asked

16  Supervisor Ham to give you the telephone."

17          Do you remember Rosie Carlies or

18  Supervisor Ham asking you to come to the

19  telephone?

20     A.  Actually I had asked Ham to call her,

21  but yeah, he handed me the receiver.

22     Q.  Here in the second paragraph it says,

23  "I said, 'Tom, we will not pull the report.

24  We have 4 more pallets of Miami mail to

25  run.'"

1          Does it not?

2     A.  Is that Rosie saying this?

3     Q.  I'm assuming.  This is part of her

4    request for disciplinary action, and I don't

5    know.

6     A.  Because I had interaction with Simon

7    and her, that's why I'm asking.

8     Q.  Do you recognize Rosie's handwriting?

9     A.  No.

10     Q.  Does it sound as if it's being written

11    from her perspective or you don't know?

12     A.  I am not sure.

13     Q.  Did anybody else tell you not to pull

14    the report because they had four more pallets

15    of Miami mail to run?

16     A.  Simon had told me that.  And since it

17    was different than standard SOP, I had asked

18    him why.  This is prior to even talking to

19    Rosie.

20     Q.  All right.

21          The narrative here on the fifth page

22    of Defendant's Exhibit 33 continues, you

23    said, "'Why' and I cut you off and said, Tom,

24    this is what I want.  Tour two will finish

25    running the Miami mail.  Your clerks

1   will -- "

2     A.  Throw off.

3     Q.  "Throw off the five -- "

4     A.  Digit.

5     Q.  "Digit 330 -- "

6          Can you decipher that for us?

7     A.  It's 330.  That's the first three

8   digits of like Hialeah, Hollywood, Homestead,

9   the Keys.  That's a 330, that's a particular

10  area designated by the first three digits.

11    Q.  "Until they are finished.  Then the

12  Miami mail will be pulled down and it will be

13  set up and/or you" -- maybe it says for

14  you -- "to run 330.  I then asked, do you

15  understand what I'm saying."

16          Do you remember hearing that in the

17  phone?

18    A.  (No verbal response.)

19    Q.  Let me ask you, this discussion that I

20  have just read in this paper, this is a

21  discussion that you had with Rosie on the

22  telephone?

23    A.  Simon and I had talked about that.  But

24  the question to her was why can't we just

25  pull a report, you know, continue doing it.

1    Which is normal procedure.

2       Q.   What was her response to that question?

3       A.   Started yelling and screaming again.

4       Q.   What did you do in response to her

5    yelling and screaming?

6       A.   I withdraw.

7       Q.   Do you know while she was yelling and

8    screaming, according to you, whether or not

9    she said that which I just said here, Tom,

10   this is the way I want to run it, and the

11   rest of what she recited here, or do you

12   know?

13      A.   I believe that's correct.

14      Q.   This is a correct account of what she

15   said?

16      A.   Close enough.

17      Q.   When you indicate that you withdraw

18   when somebody yells and screams at you, how

19   do you withdraw, what do you do?

20      A.   Inward.

21      Q.   Do you respond when people inquire of

22   you during your time of withdrawal or not?

23      A.   Similar to when you ask me questions.

24   I also --

25      Q.   Have I been yelling at you during the

104

1    course of this deposition?

2       A.   Like I was saying, similar to when you

3    ask me questions, I'll go to think.  I think

4    things out.  I have to, you know, I think

5    inwardly.

6       Q.   Fair enough.  But I want --

7       A.   Your second question was no, you

8    haven't been yelling at me.

9       Q.   That's what I'm trying to understand

10   here, you're equating a pause.

11      A.   Yes, I pause.

12      Q.   And I want the record to reflect

13   whether or not there has been any yelling or

14   screaming, as you characterized occurred on

15   the floor of your workplace, none of that has

16   taken place during the course of the

17   deposition; is that right?

18      A.   Have you -- anybody in here, no, nobody

19   has been yelling.

20      Q.   Okay.

21           That's just your manner of dealing

22   with questions, is you'll pause and then

23   respond?

24      A.   Many times.

25      Q.   Okay.

105

1          Let me continue on with the letter.

2          Do you recall whether or not Rosie

3     would have asked you whether or not you

4     understood her directions?  I mean --

5     A.  Yes.

6     Q.  -- did you hear that question from her?

7     A.  Yes.

8     Q.  Did you respond to her?

9     A.  I attempted to respond.  She had cut me

10    off again.

11    Q.  When you say you attempted to respond,

12    is it possible that there was one of those

13    lengthy pauses?

14    A.  It's possible.

15    Q.  Do you know whether or not she would

16    have thereafter left wherever she was on the

17    phone and tried to find you?

18    A.  I don't understand the question.

19    Q.  At the time you had the discussion with

20    Rosie Carlies on the telephone back on

21    November 3rd, 1999, where physically were

22    you?

23    A.  I was at the SPBS machine by the

24    telephone.

25    Q.  And where, if you know, was Rosie?

106

1     A.  I assume she was in the office.  I

2  don't know.

3     Q.  What office are you talking about?

4     A.  Right across the building, MDO office.

5     Q.  Is that 100 yards, 200 yards or 10

6  yards?

7     A.  Left hand, between 50 and 100.

8     Q.  How long does it take to get from the

9  MDO office to a small parcel bundle sorter

10 machine on the floor?

11    A.  Several minutes.

12    Q.  After the discussion that you have

13 acknowledged having with her where she ends

14 up asking whether or not you understand, do

15 you know whether or not she travelled to the

16 small parcel bundle sorter machine?

17    A.  Do I know whether she travelled after

18 that?

19    Q.  Yes.

20    A.  At some point she did, yes.

21    Q.  Do you know whether or not she came

22 within a few minutes?

23    A.  No.

24    Q.  You don't know?

25    A.  No.

1    Q.  Where were you after having this

2    discussion?

3    A.  After she gave me the instructions, I

4    followed the instructions to the T.  I didn't

5    pull a report.  I let them finish them out.

6    I let my clerks throw off the 330.  I let

7    them finish whatever they were doing and pull

8    their own report and set up all -- everything

9    that she asked me to do, I did.

10    Q.  What did you do?

11    A.  You asked me where I went.  I had some

12    other things to do.  Simon was there.  He is

13    another supervisor.  He was running the

14    machines.

15         I went to several places.  I know I

16    was in the general clerk's office.  And I

17    know I was in data site doing some of my

18    daily functions.

19    Q.  All right.

20         There is a passage here in which Ms.

21    Carlies apparently describes arriving at the

22    small parcel bundle sorter machine and

23    finding the telephone that she had been

24    speaking to you on laying off the hook.

25         Had you left the telephone off the

1  hook?

2    A.  I think so.

3    Q.  I'm sorry?

4    A.  I think so.

5    Q.  All right.

6        And you just told us that you had a

7  variety of things that you did.

8    A.  That's correct.

9    Q.  Do you know whether or not Ms. Carlies

10  attempted to page you to come to the small

11  parcel bundle sorter supervisor's desk

12  following your discussion with her after

13  which you left the telephone off the hook?

14    A.  Eventually I found that out, but I

15  didn't find it out until after I had come out

16  of the data site office which is way up in

17  the front end of the building outside the

18  main work area through a hallway and into

19  another room.

20        Once I came out of there, I was

21  walking down the main hallway and somebody

22  said, did you hear Rosie page you?

23        And I said, no.

24        And they go, well, she was so mad,

25  she's never heard her being that mad before.

1          And so I went to the next area,

2     which was the general clerk's office, and I

3     did some things in there.  I came out of that

4     office and I was going back to my machine,

5     the SPBS, then I hear a page.  This could

6     have been, I don't know, quite a while.

7       Q.  What is quite a while, and if we start

8     from the time when you put the phone down on

9     the supervisor's desk at the small parcel

10    bundle sorter machine.

11      A.  An estimate, 15 minutes.

12      Q.  Fifteen minutes before you, again,

13    heard the voice of Rosie Carlies?

14      A.  That's an approximation.

15      Q.  Okay.

16          And what did she say or do when you

17    saw her then?

18      A.  When I saw her, she said -- she was

19    standing over against the wall with a man by

20    the name of Glover and said, follow me or

21    come with her to the office, is essentially

22    what she said, come with her to her office.

23    So I proceeded to go to the office with her.

24      Q.  I see here on page 3, the handwritten

25    portion of Defendant's Exhibit 33.

```
1        A.   Page 3.

2        Q.   'Cause it's got a circle with a three

3   around it.

4             It says, "When you got to the

5   office, I asked you if you had a problem and

6   you just stared at me."

7             You remember that encounter?

8        A.   First of all, she walked briskly to the

9   office.  We got to the office, she shuts the

10  door.  She confronts me and she is yelling.

11  Have you got a problem?  Not just asking,

12  have you got a problem?  Yelling at me.

13       Q.   What was your response?

14       A.   I don't know where she's coming from,

15  why she is yelling at me and saying that.

16  Why is she saying do I have a problem.  I had

17  no idea where she was coming from.  It was

18  frightening.

19       Q.   Did you respond orally to her at all?

20       A.   I don't recall.

21       Q.   Do you remember her asking you during

22  the encounter in her office whether or not

23  she was trying to find out if you understood

24  the instructions she was giving you and

25  whether or not you just put the phone down
```

111

1    while she was talking to you and walked away?

2    Did she ask you about those things?

3      A.   I have no idea of what she was thinking

4    about whether I listened to her instruction.

5    If she was over at SPBS as she states and as

6    you state she says, she would have seen

7    everything was as she instructed.

8      Q.   I'm asking whether or not in the office

9    did she confront you as she describes in this

10   account?

11     A.   Did she confront me?

12     Q.   Yes, sir.  Did she say, I'm talking to

13   you and trying to find out if you understand

14   the instructions I'm giving you and you just

15   put the phone down while I'm talking to you

16   and walk away.

17          Did she ask you about that in the

18   office?

19     A.   You seem to be saying two things to me.

20   You seem to be saying something that's

21   occurring in the office and something that

22   occurred prior.

23          Which are you saying?  I don't

24   understand what you're asking.

25     Q.   While you were in the office with her

112

1    and as you described it, she is yelling at

2    you.  What was she yelling?

3       A.  I don't remember exact words.

4       Q.  Is it something like what she says she

5    was yelling here in this letter, which is, I

6    was trying to find out if you understood the

7    instructions that I am giving you and you

8    just put the phone down while I'm talking to

9    you and walk away.

10              Did she yell that at you?

11      A.  Hold on.  I am having trouble with the

12    context of what she is writing.  Bear with

13    me.

14      Q.  Take your time.

15      A.  I don't recall her saying -- trying to

16    find out if you understood the instructions.

17    I think she's written this after the fact.

18      Q.  All right.

19              You say you don't remember.  Is it

20    possible she said it but you don't remember

21    it?

22      A.  I don't think so.

23      Q.  What did she talk about?  What was she

24    saying inside the office?

25      A.  She started yelling, have you got a

113

1  problem.  I don't know where she's coming

2  from.

3          What do you mean, you got a problem.

4  So I was looking at her like wondering what

5  she was saying.

6    Q.  Did you say anything to her?

7    A.  No.

8    Q.  Did she tell you that, as your

9  supervisor and manager, she wasn't going to

10  tolerate the type of behavior that you were

11  demonstrating to her?

12    A.  You're saying not yelling back at her,

13  yeah.

14    Q.  Did she say that she would not tolerate

15  the type of behavior that you were giving

16  her?

17    A.  I don't recall exactly what she said.

18    Q.  At what point did you leave her office?

19    A.  She was still yelling at me, so I went

20  to get right next door my supervisor, who was

21  Chris Powell.  I knew he was right next door,

22  'cause I didn't think it was right for

23  somebody to be screaming and hollering at me.

24    Q.  Did you say anything to Ms. Carlies

25  during your time inside her office?

114

1    A.  I believe so, but I can't recall

2  exactly what it was.

3    Q.  Is it possible you didn't say anything?

4    A.  No.

5    Q.  After you encountered the -- was it

6  assistant MDO Christopher Powell, what

7  happened?

8    A.  He came out the offices, was in the

9  hallway within probably ten yards of her

10  office.  And I told him what she had said.

11  And he went in to talk to her.  And then he

12  said, you need to leave the building.

13    Q.  Were you told to clock out that day?

14    A.  We don't really clock out.  I was told

15  to leave the building.

16    Q.  And effectively what did that mean in

17  terms of your employment that day?

18    A.  I had no idea what was going to happen.

19        They sent me home.

20    Q.  Did you continue to be paid for the

21  rest of your duty that day?

22    A.  Did they pay me?

23    Q.  Yes, sir.

24    A.  I think so.

25    Q.  Who is Robert Glover?

115

1      A.  He was a supervisor at the time on the

2   platform.

3      Q.  What was his involvement in this

4   encounter, if any?

5      A.  Apparently Rosie asked him to come over

6   there.  I don't know what he would be doing

7   over in that area.

8      Q.  Let me hand you our next exhibit, which

9   will be Defendant's Exhibit 34.

10          (Thereupon the document referred to

11          was marked as Defendant's Exhibit

12          No. 34 for Identification, a copy

13          of which is attached hereto.)

14   BY MR. WHITE:

15      Q.  And ask whether or not you recognize

16   this one?

17      A.  Yes.

18      Q.  What do you recognize this to be?

19      A.  It's a proposed letter of warning in

20   lieu of a time off suspension.

21      Q.  And what is the basis of this proposed

22   letter of warning?  What circumstances is it

23   based upon?

24      A.  Based on that same day, November 3rd,

25   1999.

1   Q.  The same events that we just talked

2   about?

3   A.  I don't know if they're the exact.

4   Q.  In Defendant's Exhibit 34, the same

5   events?

6   A.  (No verbal response.)

7   Q.  Take a minute and look through the

8   documents before you answer.

9           MR. KARLIN:   What's the question?

10  BY MR. WHITE:

11  Q.  Does he recognize the document?

12  A.  Yes.

13  Q.  And the proposed letter of warning

14  contained in Defendant's Exhibit 34, that's

15  the same events we have been talking about

16  reflected in Defendant's Exhibit 33 for the

17  last ten or fifteen minutes, right, it's the

18  same event back on November 3rd?

19  A.  It's the same event.

20  Q.  Is it fair to say that she was charging

21  you with unaccepted conduct due to your

22  failure to respond and comply with directives

23  given to you?

24          I'm not asking whether you agree

25  with what she did, but that's what she did;

117

1    is that right?

2        A.  That's one of the things, yeah.  And I

3    do not agree with it.

4        Q.  In fact, you appealed it; is that

5    correct?

6        A.  In fact, it states in here --

7            MR. KARLIN:    Just answer the

8    question.

9            Did you appeal this?

10            THE WITNESS:  Yes.

11   BY MR. WHITE:

12       Q.  You appealed that to the plant manager,

13   Ms. Richardson?

14       A.  Yes.

15       Q.  And who was she in relation to you?

16       A.  I think she was acting plant manager.

17       Q.  Let me hand you our next listed

18   exhibit.  This will be 35.

19            (Thereupon the document referred to

20            was marked as Defendant's Exhibit

21            No. 35 for Identification, a copy

22            of which is attached hereto.)

23   BY MR. WHITE:

24       Q.  And do you recognize Defendant's

25   Exhibit 35?

**FERNANDEZ & ASSOCIATES**
**444 Brickell Avenue, Suite 718, Miami  FL 33131**

118

1      A.   Yes.

2      Q.   What is it you recognize Defendant's

3   Exhibit 35 to be?

4      A.   It's a letter of decision from Sandy

5   Richardson.

6      Q.   And it's dated January 18, 2000; is

7   that correct?

8      A.   .That's correct.

9      Q.   Is it fair to say that in this letter

10   Miss Richardson makes a finding that, "The

11   charges outlined in the proposed letter is

12   fully supported by the evidence of record and

13   warrants the action."

14      A.   What are you saying?

15      Q.   "I find, however, that the charges

16   outlined -- "

17      A.   Okay.   That's what she says.

18      Q.   She's basically telling you that she is

19   overruling your objection and sustaining the

20   disciplinary action; is that correct?

21          She agrees that there is evidence to

22   support the proposed action, is that what

23   she's saying in this letter?

24      A.   That's what she's saying.

25      Q.   Okay.

**FERNANDEZ & ASSOCIATES**
**444 Brickell Avenue, Suite 718, Miami  FL 33131**

1          Did you continue to contest the

2     disciplinary action of Ms. Carlies reflected

3     in Defendant's Exhibit 33?

4       A.  Yes.

5       Q.  And how did you do that?

6       A.  Followed the grievance procedure and

7     followed the recommendation in this document

8     35 and sent a response to Karen Borowski.

9       Q.  And what was the result of your appeal?

10      A.  She sent me a letter.

11      Q.  Advising you what?

12      A.  I'm sure you got a copy of it, don't

13    you?

14      Q.  That one I don't have.

15      A.  That one you don't have.

16      Q.  That one I don't have.

17      A.  You're serious, right?

18      Q.  I am serious.

19      A.  She basically supported their view.

20      Q.  In other words, she upheld the proposed

21    disciplinary action?

22      A.  That's correct.

23      Q.  All right.

24          And in response to that, is it fair

25    to say that you filed a complaint of

**FERNANDEZ & ASSOCIATES**
**444 Brickell Avenue, Suite 718, Miami  FL 33131**

120

1    discrimination?

2        A.   Discrimination, retaliation, yes.

3        Q.   Let me hand you what we have marked as

4    Defendant's Exhibit 36.

5            (Thereupon the document referred to

6            was marked as Defendant's Exhibit

7            No. 36 for Identification, a copy

8            of which is attached hereto.)

9    BY MR. WHITE:

10       Q.   Do you recognize this exhibit?

11       A.   Yes.

12       Q.   And what do you recognize this to be?

13       A.   This is, I think, the EEO complaint

14   that I filed.

15       Q.   Regarding what incident?

16       A.   Regarding more than one incident.

17       Q.   Well, let's look at the document itself

18   for a moment.

19       A.   Okay.

20       Q.   The case number is 1-H-333-0012-00, is

21   it not?

22       A.   That's correct.

23       Q.   Okay.

24            Down in box 12 it reflects the date

25   on which the alleged act of discrimination

121

1    took place, and you indicate what, if you can

2    read through the stamp?

3        Does that say something like

4    1/25/00?

5     A.  Looks like it.

6     Q.  What took place on or about late

7    January of 2000 that you were complaining

8    about?

9     A.  The document you gave me, 36, states

10   that on 4/14/99, I opposed the discriminatory

11   practices of Ms. Carlies, the defendant.  And

12   1-H-333-0047-99, basically in that one I

13   cited that she has treated me more harshly

14   than Liz Ettienne, a black female.  And she

15   opposed me and responded -- and she opposed

16   me because I had filed an EEO on her.

17    Q.  But as it relates to this complaint

18   that you are filing on March the 8th, 2000,

19   under 1-H-333-0012-00, what is the basis of

20   this complaint?

21    A.  Well, I guess this is showing you

22   initially that retaliation.

23    Q.  How did she retaliate in this complaint

24   which is Defendant's Exhibit 36?

25    A.  I participated in EEO activity against

**FERNANDEZ & ASSOCIATES**
**444 Brickell Avenue, Suite 718, Miami  FL 33131**

1    her and that's why she chose to take this

2    other disciplinary action against me.

3        Q.  Okay.

4            So I understand you, we've earlier

5    discussed the events which make up

6    Defendant's Exhibit 24; this being

7    Ms. Carlies' initial request for disciplinary

8    action from July 18, '98.

9            And you remember we went through

10   these events; is that correct?

11       A.  We went through those events, yes.

12       Q.  Which culminated in your filing an

13   information for precomplaint counseling as

14   reflected in Defendant's Exhibit 29, right?

15       A.  What was the question?

16       Q.  In Defendant's Exhibit 24, we have the

17   reflection that Rosie initiated disciplinary

18   action against you, right?

19       A.  Yes.

20       Q.  From the July 18, '98 events that

21   culminated in your initiating proceedings

22   reflected in Defendant's Exhibit 29; is that

23   correct?

24       A.  I'm not sure without -- it's a lot of

25   information.  I have to look at it.

123

1      Q.  I understand.

2          The first complaint that you had

3    about Rosie came from Rosie's disciplinary

4    request against you for the time -- when she

5    was supervising you over the Scan Where You

6    Band system, right?

7      A.  Okay.  That's --

8      Q.  That caused you to file Defendant's

9    Exhibit 29, the information for precomplaint

10   counseling form, right?

11     A.  No.  Again, it wasn't until I got this

12   information from these other two employees

13   that I was treated differently that I did

14   this precomplaint thing.

15     Q.  I understand that.  But how you were

16   treated differently is you were disciplined

17   for this, according to you, and they weren't,

18   right?

19     A.  That's correct.

20     Q.  All right.

21          So that caused you to file

22   Defendant's Exhibit 29, right?

23     A.  Correct.

24     Q.  Based on this, you suggest Rosie

25   retaliated against you when she issued the

1    request for disciplinary action reflected in

2    Defendant's Exhibit 33, right?

3      A.  Correct.

4      Q.  And that culminated in your filing

5    Defendant's Exhibit 36?

6      A.  Correct.

7      Q.  The actual complaint, right?

8      A.  ·I believe so.  The reason -- there is a

9    reason I hesitate.

10      Q.  Defendant's Exhibit 37 reflects a

11    letter dated April 27, 2000 from the EEO

12    compliance and appeals manager, does it not?

13          (Thereupon the document referred to

14          was marked as Defendant's Exhibit

15          No. 37 for Identification, a copy

16          of which is attached hereto.)

17          THE WITNESS:  Yes.

18    BY MR. WHITE:

19      Q.  And in there they frame the issue that

20    they are agreeing to investigate as being the

21    fact that you had received a letter of

22    decision regarding a proposed letter of

23    warning in lieu of time off suspension, the

24    date of the incident being January 25 of

25    2000; is that correct?

1      A.   That's what they say.

2      Q.   Did you object to the issues as defined

3  by the agency in that letter?

4      A.   Do you have your copy?  I want to be

5  able to --

6           MR. KARLIN:   May I have a copy,

7  please.

8  BY MR. WHITE:

9      Q.   Did you object to the issue as they

10  defined it in that letter?

11     A.   No, I did not.

12     Q.   Okay.

13          Let me go through the EEO complaint

14  a little bit more.  This being Defendant's

15  Exhibit 36.  I notice that you checked down

16  here race, Caucasian, is one of the types of

17  discrimination that you suffered.

18          Can you tell me how your race played

19  a factor?

20     A.   This is the second of the two EEO's.

21          Yes, I'm white.

22     Q.   Well, we'll get to color in a minute.

23  It indicates race --

24     A.   I haven't finished.

25     Q.   I'm sorry.

126

1      A.  My race is Caucasian.  Hers is black.

2      Q.  You finished?

3      A.  Because of the fact she took action

4    against me.

5      Q.  Are you aware of any non-Caucasian who

6    refused to respond orally to specific

7    instructions from a supervisor, either on the

8    telephone or in person, who did not receive

9    disciplinary action?

10     A.  No.

11     Q.  I notice in your complaints you list

12   color, being white, as the basis for the

13   discrimination as you assert in Defendant's

14   Exhibit 36.

15           How did your color play a part in

16   these events?

17     A.  I am white.  She is black.  She chose

18   to put me down.  She tried to -- she has

19   threatened to take me out of supervision.  I

20   took it as a -- she is attacking me because

21   I'm not the same as she.

22     Q.  And on what do you base that concern?

23     A.  Well, she has stated as such.

24     Q.  What did she state?

25     A.  You better look for a new job.

127

1    Q.  Because why?

2    A.  I'm an employee, she is disciplining

3    me.  She says, you better look for a new job.

4    My thing is she's looking to fire me.

5    Q.  Did she say why?

6    A.  No.

7    Q.  So how does your color play into that?

8    A.  Well, obviously I'm not of the same

9    color.

10    Q.  Other than that simple observation, is

11    there any reason that you have to believe

12    that your color played a part in the

13    disciplinary actions which culminated in your

14    complaint reflected in Defendant's

15    Exhibit 36?

16    A.  Repeat that question one more time.

17    Q.  How did your color play a part in

18    the --

19    A.  I was white; she is black.  She

20    already -- we went over this.

21    Q.  Other than simply the fact that you're

22    white and she is black, is there any other

23    reason to believe that your color played a

24    part?

25    A.  Any other reason?

128

1    Q.  Yes, sir.

2    A.  I'm not sure.

3    Q.  Do you know of anybody of any other

4    color who failed to either orally, on the

5    telephone, or in a face-to-face discussion

6    with Ms. Carlies where they were receiving

7    specific instructions who failed to respond

8    who was not disciplined?

9    A.  On the phone I wouldn't know. I'm not

10   sure on the other one.

11   Q.  I notice in your complaint, Defendant's

12   Exhibit 36, you indicate your sex, being a

13   male, was a basis for the discrimination that

14   you suffered.

15        Can you explain to us how it is that

16   your sex played a part in these allegations?

17   A.  She is female, I am male.  I think she

18   viewed it as a power threat that I am a male,

19   therefore, took action against me.

20   Q.  And on what do you base that assertion?

21   A.  The way she raises her voice to try to

22   intimidate me, stating things.  And in her

23   statement that our partial truce, like not

24   following her instructions.  I followed her

25   instructions.

129

1          I didn't hear her pages and she said

2     I should have or I did have and accused me of

3     not following her directives when I didn't

4     hear it.  And that's an impossibility.  As

5     soon as I heard her one page when I came out

6     of the office, I went right there.

7          I had heard somebody else had told

8     me that she paged me on going down to the

9     office and said that she was very mad and

10    they hadn't heard her be that mad.

11    Q.  What role did the sex play in that?

12    A.  Like I just answered that question.

13    Q.  Is that an assumption that you have or

14    is there any objective basis for you to

15    believe that sex played a part in her

16    behavior towards you?

17    A.  She at one time became married to one

18    of the higher-ups in the facility.  Nickerson

19    was his name.  Her name used to be Nickerson.

20    Q.  What's that got to do with the

21    allegation that sex was the basis of

22    this discrimination?

23    A.  She used sex to get to her position.  I

24    don't give her sex.

25    Q.  Are you suggesting that your indication

1    of sex being involved in the discrimination

2    that you assert in Defendant's Exhibit 36 was

3    sexual favors?

4        A.   I didn't give any sexual favors.

5        Q.   Are you suggesting that she in any way

6    suggested to you that you needed to?

7        A.   No.

8        Q.   Have you ever discussed sex with Rosie

9    Carlies?

10       A.   Not that I am aware of.

11       Q.   What objective basis do you have, if

12   any, for asserting that your sex as a male

13   played a part in the discrimination that you

14   assert took place as reflected in Defendant's

15   Exhibit 36?

16       A.   It's a power thing with her.

17       Q.   How do you know?

18       A.   How?

19       Q.   Yes, sir.

20       A.   Just all of her actions toward me and

21   toward myself show that.

22       Q.   How?

23       A.   Sex to get to her position.  She's

24   ridiculing another employee who is a male,

25   and not ridiculing females, ridiculing me,

```
 1    taking discriminatory acts against me,

 2    letters of warning, suspensions, because I'm

 3    a man.

 4      Q.  Do you know of any female employee who

 5    refused to respond orally to specific

 6    instructions either on the telephone or in a

 7    face-to-face encounter with Ms. Carlies who

 8    was not disciplined?

 9      A.  I'm not sure.

10      Q.  I notice in your complaint you also

11    checked retaliation.  And I think we

12    discussed earlier that the retaliation you

13    think was based upon your having initiated or

14    participated in protected activity in the

15    case we talked about earlier,

16    1-H-333-0047-99; is that correct?

17      A.  That's one of them, yes.

18      Q.  Is there any other?

19      A.  She's aware of the MSPB.  she was aware

20    of this second EEO.

21      Q.  Which is the second EEO?

22      A.  The 2001.

23      Q.  The 2001 is the one that we are talking

24    about, right?

25      A.  Right.
```

1    Q.  Well, she can't retaliate based on

2    something you are complaining about.  That's

3    a poorly fashioned question.

4           You're not asserting, are you, that

5    she was retaliating for your having filed

6    Defendant's Exhibit 26, are you, or 36?  I'm

7    sorry if I said 26.

8    A.  36.  Repeat the question.  I was

9    looking for 26.

10   Q.  Well, let's go back, and I'm going to

11   ask you, as it relates to Defendant's

12   Exhibit 36, you indicate that retaliation was

13   one of the basis for your filing a complaint.

14   A.  That's correct.

15   Q.  In the body of that you reflect the

16   earlier proceedings that you initiated under

17   1-H-333-0047-99 the first request for

18   disciplinary action Ms. Carlies has initiated

19   against you.

20   A.  And I also stated that her harsh

21   language toward me, also stated that, quote,

22   "You better look for a new job."  And then

23   three weeks later she gives me another letter

24   of warning.  I am tired of your nonchalant

25   attitude.  All those derogative things.

133

1          I was on medication at the time and

2     I just had a brother deceased.  And I just

3     don't think those are appropriate.

4       Q.  Let's go through some of the documents

5     that you all provided to me earlier during

6     the course of today's proceedings.

7          One of the documents your counsel

8     provided to us is what I will mark as

9     Defendant's Exhibit 38.

10          (Thereupon the document referred to

11          was marked as Defendant's Exhibit

12          No. 38 for Identification, a copy

13          of which is attached hereto.)

14    BY MR. WHITE:

15      Q.  And I think I have already given you a

16    copy of this.  This purports to be a written

17    response that you --

18      A.  Where did you find that?

19      Q.  Close to the top.

20          Is it fair to say that this is a

21    written response that you made to

22    Richardson's determination with regard to

23    your disciplinary action?

24      A.  I'm not sure who it was sent to.

25      Q.  By its own terms in the first line does

Evelyn Lopez-Brignoni, M.D.

(305) 670-1411
Fax (305) 670-2811

1031 Ives Dairy Road
Suite 234 - Bldg. #4
N. Miami Beach, FL 33179

9400 S. Dadeland Blvd.
PH - 7
Miami, FL 33156

May 8, 1997

Joann Feindt
Plant Manager
South Florida
Mail Processing Center

DEFENDANT'S
EXHIBIT
9
00-6193-CV-SEITONICH

Re:    Thomas Butler
       SS #:   314/62/0751

Dear Ms. Feindt:

As a follow-up to my letter of April 14, 1997, M . Butler is cleared to return to full-time duties on May 12, 1997.

As stated before, he should not work under the s pervision of Sergio Fernandez, at least for the time being.

Please feel free to contact me for any further que tions.

Sincerely,

Evelyn Lopez-Brignoni, M.D.

MEDICAL UNIT Civil
2200 N.W. 72 AVENUE
MIAMI, FL 33152-9451
MAY 1 2 1997

EXHIBIT 4



# UNITED STATES
# POSTAL SERVICE

May 27, 1997

SE09:RDillion:LC:cnbl:Supv: TButler



Letter of Decision - Placement on Enforced Leave

Thomas Butler                          CERTIFIED NO. P597 643 904
Supervisor, South FL MPC               RETURN RECEIPT REQUESTED
7480 Camno Real #105P
Miami FL  33143-6871

On May 2, 1997, you were issued a notice proposing to place you on enforced leave from the U.S. Postal Service based on your current medical condition.

I have given full consideration to your personal answer of May 15, 1997, and to your written answer of May 13, 1997, and all other evidence of record. I find, however, that the evidence warrants your placement on enforced leave until such time as you are able to furnish medical documentation demonstrating to the satisfaction of management that you are able to perform the duties of your position.

You will be carried in a leave without pay status but you may request to use available sick leave or annual leave in lieu of leave without pay. In your response you indicated that your doctor has released you to work forty (40) hours per week as of May 12, 1997, however, you must still not work with Sergio Fernandez as a Supervisor. You further indicated that you believe this action violates the Family and Medical Leave Act.

First, I must decide if the limitations presented are too restrictive to allow you to perform your duties. Prior to May 12, 1997, you were limited to work only twenty (20) hours per week. Since there are no part-time Supervisors in this facility, it would be impossible to provide work within those limitations and still be an efficient organization. However, that was not the only restriction. You are not able to work under the Supervision of Mr. Fernandez. That restriction has not changed. The South Florida Processing and Distribution Center presently has twenty three (23) Mail Processing Supervisory positions. In light of our recent service performance, it would adversely affect the efficiency of the operation to move you to other duties when you have been trained and is experienced in your current operation. It is not practical to "fit" the Postal Service to employees. Rather, employees must "fit" the needs of the Postal Service. This office cannot afford to

*EXHIBIT 5*

Thomas Butler
Page 2
May 27, 1997

retrain you in a new position.  Therefore, I find that the limitation placed on you by your physician are too restrictive to allow you to continue working.

This office simply cannot afford to move Supervisors around and retrain them to allow them to work at another assignment for a short period of time.  Since your doctor indicates that this restriction is for "the time being", it would be beneficial to allow you to fully recuperate and return to your position.

Additionally, I have considered the claim that is action may be in violation of the FMLA. You will be afforded the full protection under the Act.  Your absence up to 480 hours, provided it is supported by medical documentation, will be approved and designated as Family and Medical Leave.  For the forgoing reasons, I find that the placement on enforced leave is for such cause as to promote the efficiency of the Service.  This action will be effective June 6, 1997.

As a preference eligible, you have the right to appeal this decision in writing to the Merit Systems Protection Board (MSPB), Atlanta Regional Office, 401 W. Peachtree Street, N.W., 10th Floor, Atlanta GA  30308-3228 within thirty (30) calendar days from the effective date of this decision.  If you appeal to the MSPB, you should state whether you do or do not wish a hearing and you should furnish me a copy of your appeal.

For further information on appeals procedures, contact, Stephen H. Murray, Sr. Labor Relations Specialist, Labor Relations, 2200 NW 72 Avenue, Miami, Florida, 33152-9401. Attached for your reference are a copy of the MSPB Regulations and a copy of the Appeal Form.


Robert Dillon
Senior Manager, Distribution Operations
South Florica Processing and Distributions Center

**EMPLOYEE REGULAR MAIL**

## UNITED STATES MERIT SYSTEMS PROTECTION BOARD
### APPEAL

| | AGENCY USE ONLY |
|---|---|

### INSTRUCTIONS

The purpose of this form is to help you provide important information to the U.S. Merit Systems Protection Board ("The Board") when you file an appeal. You are not required to use this form, and you are not limited to answering the questions on the form if you feel there is other information you wish to provide. However, if you do not use this form, your appeal documents must comply with the Board's regulations. Your agency's personnel office will provide you with a copy of these regulations and the Board advises you to review them.

All appeals filed before agency action has been taken, will be considered premature and will be returned without action.

All appellants who elect to use this form should complete Parts I through V. Only those who are appealing reduction-in-force (RIF) actions are required to complete Part VI. The information must be typed or printed clearly. Answer all questions and use "N/A" when the question is not applicable to your appeal.

You may supplement your response to any question in the space provided on page 4 or, if needed, on separate sheets of paper. If separate sheets are used, please put your name and Social Security number at the top of each page, indicate by number which question you are answering, and attach the extra pages to the form.

In addition to the formal appeals process, appellant may elect to use the Board's Voluntary Expedited Appeals Procedure (VEAP) by marking the appropriate box in Part II below. A detailed explanation of the expedited process is presented on the last page of this form.

Where to file—You or your representative are required to file one original and one copy of this form, together with its attachments, with the Board's regional office identified in the decision notice provided by the agency. Filing must be made either by personal delivery during normal business hours to the appropriate Board regional office or by mail addressed to that office. The Board recommends but does not require that you use certified mail.

IMPORTANT
All appellants must sign and date the form in the space provided at the end of page 4 for it to be accepted by the Board, and to indicate approval of the contents of the entire form.

### PRIVACY ACT STATEMENT

This form requests personal information which is relevant and necessary to reach a decision in your appeal. The U.S. Merit Systems Protection Board collects this information in order to process appeals under its statutory and regulatory authority. Since your appeal is a voluntary action you are not required to provide any personal information in connection with it. However, failure to supply the U.S. Merit Systems Protection Board with all the information essential to reach a decision in your case could result in the rejection of your appeal.

You should know that the disclosure of the U.S. Merit Systems Protection Board on appeal are the administrative operations and, as such, are available to the public under the provisions of the Freedom of Information Act. Additionally, it is possible that information contained in your appeal file may be released as required by the Freedom of Information Act. Some information about your appeal will also be used in depersonalized form as a data base for program statistics.

### PART I. APPELLANT IDENTIFICATION

| 1. NAME (Last, first, middle) | 2. SOCIAL SECURITY NUMBER |
|---|---|
| BUTLER THOMAS PHILIP | 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 |

| 3. PRESENT ADDRESS (Number and street, city, state, and ZIP code) YOU ARE REQUIRED TO NOTIFY THE BOARD OF ANY ADDRESS CHANGE IN ORDER TO INSURE THE CORRECT DELIVERY OF A DECISION. | 4. HOME PHONE (Include area code) |
|---|---|
| 7840 CAMINO REAL P-105 MIAMI FL 33143-6871 | (305) 271-1898 |
| | 5. OFFICE PHONE (Include area code) |
| | (954) 436-4359 |

### PART II. EXPEDITED APPEALS

6. VOLUNTARY EXPEDITED APPEALS PROCEDURE. For a matter appealable to the Board, any appellant may elect the Voluntary Expedited Appeals Procedure as an alternative to the formal MSPB appeal process. For a detailed explanation of the Voluntary Expedited Appeals Procedure, see p. 1.

☐ Yes. I elect the Voluntary Expedited Appeals Procedure

☒ No. I do not elect the Voluntary Expedited Appeals Procedure

### PART III. APPEALED ACTION

7. BRIEFLY DESCRIBE THE AGENCY ACTION YOU WISH TO APPEAL AND ATTACH ANY RELEVANT DOCUMENTS INCLUDING THE PROPOSAL LETTER, THE DECISION LETTER, AND THE RELEVANT SF 50 OR ITS EQUIVALENT.

Forced Funlough

| 8. NAME AND ADDRESS OF AGENCY (including Bureau, or other Division as well as street address, city, state, and ZIP code) | 9. APPELLANT'S POSITION TITLE AND DUTY STATION AT TIME OF ACTION |
|---|---|
| SFMPC 16000 PINES BLVD PEMBROKE PINES FL 33082 | SDO SFMAC |
| | 10A. GRADE AT TIME OF ACTION | 10B. SALARY AT TIME OF ACTION |
| | 16 | $43,000 PER yr |

NSN 7540-01-090-1230
Previous Edition Usable

Optional Form 283 (Rev 1-93)
Merit Systems Protection Board
5 CFR 1201

DEFENDANT'S EXHIBIT
12
00-6193-CV-SIMONTON

Figure 6—5, MSPB Appeal Form 283, Page 1

| 11. ARE YOU A VETERAN OR ENTITLED TO THE EMPLOYMENT RIGHTS OF A VETERAN? ☐ YES ☒ NO | 12. EMPLOYMENT STATUS ☐ Temporary ☐ Applicant ☐ Retired ☐ Permanent ☐ Term | 13. IF RETIRED, DATE OF RETIREMENT (Month, day, year) |
|---|---|---|
| 14. TYPE OF SERVICE ☒ Competitive ☐ Excepted | 15. LENGTH OF GOVERNMENT SERVICE  10 years | 16. LENGTH OF SERVICE WITH ACTING AGENCY  3 | 17. WERE YOU SERVING A PROBATIONARY OR TRIAL PERIOD AT THE TIME ACTION WAS TAKEN BY THE AGENCY? ☐ YES ☒ NO |

| 18. DATE WRITTEN PROPOSED ACTION NOTICE RECEIVED (Month, day, year) (Attach copy)  5/12/97 | 19. DATE FINAL DECISION NOTICE RECEIVED (Month, day, year) (Attach Copy)  5/27/97 | 20. EFFECTIVE DATE OF ACTION (Month, day, year)  6/2/97 |
|---|---|---|

21. WHY DO YOU THINK THE AGENCY WAS WRONG IN TAKING THIS ACTION? (Explain briefly)

Agency Refuses to accept Medical Documentation

22. WHAT ACTION WOULD YOU LIKE THE BOARD TO TAKE ON THIS CASE?

To be Restored to position and be placed back ad work with all benefits

23. IF YOU BELIEVE YOU WERE DISCRIMINATED AGAINST BY THE AGENCY, IN CONNECTION WITH THE MATTER APPEALED, BECAUSE OF EITHER YOUR RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, MARITAL STATUS, POLITICAL AFFILIATION, HANDICAPPING CONDITION, OR AGE, INDICATE SO AND EXPLAIN WHY YOU BELIEVE IT TO BE TRUE. YOU MUST INDICATE, BY EXAMPLES, HOW YOU WERE DISCRIMINATED AGAINST.

24. HAVE YOU FILED A FORMAL DISCRIMINATION COMPLAINT CONCERNING THE MATTER WHICH YOU ARE SEEKING TO APPEAL WITH YOUR AGENCY OR ANY OTHER AGENCY?   ☐ YES (Attach copy)  ☒ NO

| 24A. IF YES, DATE FILED (Month, day, year) | 24B. PLACE FILED (Agency and location) | 24C. HAS THERE BEEN A DECISION? ☐ YES (Attach copy)  ☐ NO |
|---|---|---|

Optional Form 283 (Rev. 5-86)
Page 2

Figure 6—6, MSPB Appeal Form 283, Page 2

25. HAVE YOU, OR ANYONE IN YOUR BEHALF, FILED A FORMAL GRIEVANCE WITH YOUR AGENCY CONCERNING THIS MATTER, UNDER A NEGOTIATED GRIEVANCE PROCEDURE PROVIDED BY A COLLECTIVE BARGAINING AGREEMENT?

☐ YES (Attach copy)    ☒ NO

| 25A. IF YES, DATE FILED (Month, day, year) | 25B. PLACE FILED (Agency and section) | 25C. HAS DECISION BEEN ISSUED?  ☐ YES (Attach copy)  ☐ NO |
|---|---|---|
| 25D. IF YES, DATE FILED (Month, day, year) | 25E. NAME OF ISSUING OFFICIAL | 25F. TITLE OF ISSUING OFFICIAL |

### PART IV. HEARING

26. YOU MAY HAVE A RIGHT TO A HEARING ON THIS APPEAL. IF YOU DO NOT WANT A HEARING, THE BOARD WILL MAKE ITS DECISION ON THE BASIS OF THE DOCUMENTS YOU AND THE AGENCY SUBMIT. IF THE "NO" SQUARE IS CHECKED, THE BOARD WILL PRESUME YOU ARE WAIVING A HEARING. *DO YOU WANT A HEARING?*

☒ YES    ☐ NO

IF YOU CHOOSE TO HAVE A HEARING THE BOARD WILL NOTIFY YOU WHEN AND WHERE IT IS TO BE HELD.

### PART V. DESIGNATION OF REPRESENTATIVE

27. YOU HAVE THE RIGHT TO DESIGNATE SOMEONE TO REPRESENT YOU ON THIS APPEAL, IF HE/SHE AGREES TO DO SO. THIS PERSON DOES NOT HAVE TO BE AN ATTORNEY. THE AGENCY HAS A RIGHT TO CHALLENGE YOUR CHOICE OF A REPRESENTATIVE IF THERE IS A CONFLICT OF INTEREST OR POSITION. YOU MAY CHANGE YOUR DESIGNATION OF A REPRESENTATIVE AT A LATER DATE, IF YOU SO DESIRE, BUT MUST NOTIFY THE BOARD PROMPTLY OF ANY CHANGE.

27A. "I HEREBY DESIGNATE _CHARLES SCININ & ASS_ TO SERVE AS MY REPRESENTATIVE DURING THE COURSE OF THIS APPEAL. I UNDERSTAND THAT MY REPRESENTATIVE IS AUTHORIZED TO ACT ON MY BEHALF."

| 27B. REPRESENTATIVE'S ADDRESS AND PHONE NUMBER | 27C. REPRESENTATIVE'S SIGNATURE | 27D. DATE |
|---|---|---|
| MR. ROSLON G ANNY  P.O. Box H33  DuNedin, FL. 34697  Tel.No. 813-736-5800 | 27E. REPRESENTATIVE'S EMPLOYER  Scinia Associates Inc | |

### PART VI. REDUCTION-IN-FORCE (RIF)

INSTRUCTIONS: FILL OUT THIS PART ONLY IF YOU ARE APPEALING FROM A REDUCTION-IN-FORCE (RIF). YOUR AGENCY'S PERSONNEL OFFICE CAN FURNISH YOU MOST OF THE INFORMATION REQUESTED BELOW.

| 28. RETENTION GROUP AND SUB-GROUP | 29. SERVICE COMPUTATION DATE | 30. HAS YOUR AGENCY OFFERED YOU ANOTHER POSITION RATHER THAN SEPARATING YOU?  ☐ YES  ☐ NO |
|---|---|---|
| 31. TITLE OF POSITION OFFERED | 32. GRADE OF POSITION OFFERED | 33. SALARY OF POSITION OFFERED  $          PER |
| 34. LOCATION OF POSITION OFFERED | 35. DID YOU ACCEPT THIS POSITION?  ☐ YES  ☐ NO | |

36. EXPLAIN WHY YOU BELIEVE YOU SHOULD NOT HAVE BEEN AFFECTED BY THE REDUCTION-IN-FORCE (Explanations could include: You were placed in the wrong retention group or subgroup; an error was made in the computation of your service computation date; competitive area was too narrow; improperly reached for separation from competitive level; an exception was made to the regular order of selection; full 30-day notice was not given; you believe you have reassignment rights (bump or retreat rights); or any other reasons. Please provide as much information as possible regarding such reason.)

Figure 6 – 7, MSPB Appeal Form 283, Page 3

37. SUPPLEMENTAL ANSWER SPACE

---

## EXPLANATION OF VOLUNTARY EXPEDITED APPEALS PROCEDURE (See Part II)

a. *ELECTION BY APPELLANT.* Employees or applicants for employment who are entitled to file an appeal before the Board may elect the voluntary expedited procedure as an alternative to the formal Board procedures. The goal of this expedited process is the issuance of a nonprecedential decision in routine cases within 60 days of the election of the voluntary expedited appeals procedure.

b. *CONSENT BY AGENCY.* If an employee or an applicant for employment elects to use this alternative procedure, the employing agency will be allowed to consent to or decline the procedure as well. In the event the employing agency does not wish to use the expedited procedure, the appeal will be processed in accordance with the formal Board procedures.

c. *REVIEW BY MSPB REGIONAL DIRECTOR.* If the agency consents to the voluntary expedited appeals procedure, the MSPB regional director will review the summary of the case filed by the agency and determine whether the case is appropriate for the expedited procedure. The standards used in making this determination will be the routine, nonprecedential nature of the appeal as well as workload requirements and availability of resources in the MSPB regional office.

d. *PROCESSING OF APPEAL.* If the case is processed under this expedited process, the parties will be notified by an Order of Acknowledgment of their obligation to file a Joint Appeals Record containing statements of issues and positions with respect to those issues, requests for hearing, witness lists, the agency's file and two dates agreed upon by the parties for the hearing. A presiding official specifically trained in informal dispute resolution will contact the parties during this time to ensure that the parties understand their obligations and to help promote an environment conducive to informal settlement.

e. *HEARING AND ISSUANCE OF EXPEDITED DECISION.* In the event settlement is not achieved, a hearing, if requested, will be held at *the employment site* within 15 days from the date the Joint Appeals Record is due. The presiding official will then issue an expedited initial decision no later than 15 days from the close of the hearing. If no hearing is requested, a decision on the record will be issued no later than 60 days from the date of the Board's acknowledgment order.

f. *PETITION FOR REVIEW.* Any party may file a petition for Board review of the expedited initial decision 35 days from the date of the decision. The criteria for review are the same under both the voluntary expedited appeals procedure and the formal appeals procedure.

---

► **ATTENTION—THIS APPEAL MUST BE SIGNED**

| I CERTIFY that all of the statements made in this Appeal are true, complete, and correct to the best of my knowledge and belief. | SIGNATURE OF APPELLANT *Thomas P Butler* | DATE SIGNED 6-6-97 |

U.S. GPO: 1997-181-347/40262    Optional Form 283 (Rev. 5-88) Page 4

Figure 6—8, MSPB Appeal Form 283, Page 4

APPEALS PROCESSING CENTER

 **UNITED STATES**
**POSTAL SERVICE**
FEB 19 1998


DEFENDANT'S
EXHIBIT
20
00-6193-CV-SIMONTON

Mr. Tom Butler
7840 Camino Rel P105
Miami, FL 33143-6878

CERTIFIED MAIL NO. P 591 238 456
RETURN RECEIPT REQUESTED

RE: Tom Butler v. Marvin T. Runyon,
Postmaster General
Agency Case No. 1-H-333-0036-97

Dear Mr. Butler:

We have received the above-referenced complaint of discrimination filed on October 27, 1997. Your complaint has been accepted for investigation. The scope of the investigation will include the following issue(s) only:

Specific Issue(s):              You were given a package from Labor Relations with a copy of a L.O.W. for which you had never received.

Date(s) of Incident:            July 25, 1997

Type(s) of Discrimination:      Race (Caucasian), Color (White), Religion (Quaker), Sex (male), Age (43) and Retaliation (prior EEO activity)

If you disagree with the defined issue(s), you must provide us with sufficient reasons to substantiate your objections, in writing, within seven (7) calendar days of receipt of this letter.

Under the Older Workers Benefit Protection Act, the Postal Service is required to advise you to consult with an attorney should you so desire, prior to the signing of any agreement resolving your complaint. If you do not wish to proceed with this complaint, you may withdraw your complaint by signing the enclosed PS Form 2565-E and returning it to the office where you filed your formal complaint.

Your case has been assigned for investigation. Please be prepared to go forward with your case when the EEO Counselor/Investigator contacts you.

 **Exhibit**
225 N HUMPHREYS BOULEVARD
MEMPHIS TN 38166-0978

PAGE NO. _25_

Mr. Tom Butler                                                                          2

The investigation will be completed within 180 calendar days of the date of
your filing of the complaint, except that the complainant and the Postal Service
may voluntarily agree, in writing, to extend the time period up to an additional
90 calendar days.

If a grievance is pending on the same issue(s) as those addressed in your EEO
complaint, the agency may, in its discretion, defer the processing of your EEO
complaint until the grievance procedure is terminated. When an EEO
complaint is deferred, the 180-day time-in-process clock stops temporarily,
pending the outcome of the grievance procedure. If your complaint is deferred,
you will be notified of the options which may be available to you, and of the
further disposition of the complaint.

When the investigation is completed, you will receive a copy of the investigative
file, and you will be notified of your right to a hearing before an Equal
Employment Opportunity Commission Administrative Judge or of your right to
a final decision by the agency head or designee without a hearing.

You may request a hearing by an EEOC Administrative Judge by notifying the
Senior EEO Complaints Processing Specialist within 30 calendar days of your
receipt of the investigative file and notice of right to file. If you do not receive
your investigative file and notice of right to file within 180 calendar days from
the filing date, you may request a hearing.

If you are dissatisfied with the final decision of the Postal Service, after a
hearing or without a hearing, you may exercise your appeal rights. You may
appeal to the Office of Federal Operations, Equal Employment Opportunity
Commission (EEOC), or you may file a civil action in an appropriate U.S.
District Court within 90 calendar days of your receipt of the decision.

Any appeal to the EEOC must be in writing and filed with the Office of Federal
Operations, Equal Employment Opportunity Commission, P.O. Box 19848,
Washington, DC 20036-0848, utilizing Form 573, Notice of Appeal/Petition to
the Equal Employment Opportunity Commission, Office of Federal Operations.
Along with your appeal, you must submit proof to the EEOC that a copy of the
appeal and any supporting documentation were also submitted to the EEO
Compliance and Appeals Coordinator, Appeals Processing Center.

After 180 calendar days from the date of filing your formal complaint, you may
file a civil action in an appropriate U.S. District Court if the Postal Service has
not issued a final decision on your complaint.

PAGE NO. _30_

Mr. Tom Butler                                                                     3

If you decide to appeal to the Office of Federal Operations, EEOC, you may file
a civil action in an appropriate U.S. District Court within 90 calendar days after
your receipt of the EEOC's decision.  If you do not receive a decision on your
appeal within 180 calendar days from the date of your appeal, you may file a
civil action.

Sincerely,

Otis Maclin, Jr.
EEO Compliance and Appeals Coordinator

Enclosure

cc:  Senior EEO Complaints Processing Specialist, South Florida District
     Allen Donelan, 1800 Coral Way, Miami, FL  33245-9998

HRC42:ZCox:gle:38166-0978

EXHIBIT 4

USPS LID SSO411
MINNEAPOLIS ISSC
DATAKEEPER FLD331P1

PAGE: 1
DATE: 10/21/97

UNITED STATES POSTAL SERVICE
EMPLOYEE HOURS USAGE OF AL, SL, WK, OT, PT AND LM
FOR PAST 26 PAY PERIODS

OFFICE: SOUTH FLORIDA P&DC


DEFENDANT'S
EXHIBIT
21
00-6193-CV-SIMONTON

BUTLER, THOMAS P          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 090  AL BAL:  20.46  SL BAL:  79.0  TOTAL WORK HOURS  821.25
AL  4.0  4.0  72.0 80.0 14.0  80.0 72.0 80.0 80.0 80.0 40.0  80.0 80.0 80.0 48.0 80.0 80.0 80.0 80.0 32.0         40.0
SL                 66.0 72.0                                1.0 40.0                2.8 6.3 5.5 7.8 9.5 3.0 4.0 4.0
WK  8.0                                                          24.0
OT                                                 2.5 7.0 7.8 6.3 5.5 2.8 9.5 3.0
LM       .0

HOURS WK=WORK HOURS(52+35), AL=ANNUAL LEAVE(55), SL=SICK LEAVE(56), OT=OVER TIME(53+68), PT=PENALTY OT(43), LM=LWOP(30+31+59+60)

EXHIBIT    5

PAGE    4

FISCAL YEAR 1997 EAS COMBINED SICK/LWOP LEAVE USAGE OVER 500 HOURS

| NAME | SICK LEAVE HOURS | ANNUAL LEAVE HOURS | FMLA ANNUAL LEAVE HOURS | FMLA SICK LEAVE HOURS | LWOP HOURS | FMLA LWOP HOURS | LVL | OCCUPATION TITLE |
|------|------|------|------|------|------|------|------|------|
| OFFICE: SOUTH FLORIDA P&DC | | | | | | | | |
| KELLER RODACK, BARBARA G | 304.00 | 224.00 | 80.00 | 304.00 | 864.00 | 400.00 | 16 | SUPV DIST OPER |
| TAYLOR, RAY A | 624.00 | 168.00 | .00 | 8.00 | .00 | .00 | 16 | SUPV DIST OPER |
| RODRIGUEZ JR, ENRIQUE | 656.00 | 120.00 | .00 | 480.00 | .00 | .00 | 17 | NETWORKS SPEC |
| CUTLER, THOMAS P | 737.00 | 122.00 | .00 | 631.00 | 8.00 | .00 | 16 | SUPV DIST OPER |
| COOPER, DAVE F | 846.49 | 254.77 | 9.51 | 534.49 | .00 | .00 | 16 | SUPV DIST OPER |

REPORT WISEMAN7.3     FROM DATAKEEPER 10/14/97

≠ 034-62c-5c



**DEFENDANT'S EXHIBIT**
22
00-6193-CV-SIMONTON

FEB 0 6 1998

U.S. Postal Service
## EEO Complaint of Discrimination in the Postal Service

See Instructions and Privacy Act Statement
on Reverse

| 1. Name <br><br> Butler, Tom | 2. SSN <br> 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 | Case No. <br> 1-H-333-0011-98 |
|---|---|---|
| 3. Mailing Address <br> 7840 CAMINO REAL P-105 <br> MIAMI FL 33143-6371 | 4. Home Phone <br> 305 271-1898 | 5. Work Phone <br> 954 436-4356 |
| 6. Position Title (USPS Employees Only) <br> SDO-16, SUPERVISOR DIST OPNS | 7. Grade Level (USPS Employees Only) <br> EAS 16 | |

| 8. Installation Where You Believe Discrimination Occurred (Identify Installation, City, State, and Zip+4) <br> SFMPC <br> 16000 PINES BLVD <br> PEMBROKE PINES FL 33082-9998 | 9. Name & Title of Person(s) Who Took the Action(s) You Allege Was Discriminatory <br> KENNY FERNANDEZ   JACK WATSON <br> BOB DILLON   KEITH MAYNARD ★ <br> JOHN FEINT <br> JOSE LONE |
|---|---|

| 10. I designate this person to be my representative. MYSELF AND ATTORNEY, IF NOT RESOLVED |
|---|

| a. Name <br> THOMAS P BUTLER | Title <br> SDO-16 <br> SUPERVISOR DIST OPNS |
|---|---|
| Mailing Address <br> 7840 CAMINO REAL P-105 | |
| b. Home Phone <br> (305) 271-1898 | c. Work Phone <br> 954 436-4356 |

| 11. Type of Discrimination Alleged <br> Race (Specify): CAUCASIAN   Sex (Specify): MALE <br> Color (Specify): WHITE   Age (Specify): 44 <br> Religion (Specify): QUAKER   Retaliation (Specify Prior EEO Activity 3/7/97 ★ <br> National Origin (Specify): USA   Disability (Specify): | 12. Date on Which Alleged Act of Discrimination Took Place <br><br> 11/4/97 |
|---|---|

13. Explain the specific actions or situation that resulted in your allegation(s) as to how you believe you were discriminated against (treated differently from other employees or applicants) because of race, color, religion, national origin, sex, age, or disability.

KEITH MAYNARD (ACTING PLANT MANAGER) notified me of exclusion from EVA BONUS STATING lack of contribution. I FELT my MSPB CASE RESOLVED. Then This retaliation. I told KEITH This was unfair & unethical since I had been cleared to work by The USPS Medical UNIT and my doctor but was not allowed to return to work until 10/25/97. IT WAS NOT MY fault. In addition it was due to Discriminatory Practice of Sergio Fernandez He said he didn't know of my case and would get back to me Monday. How can He exclude me From a Bonus not knowing the facts? He has yet to GET BACK TO ME. How could He not KNOW about Prior EEO ACTIVITY?

| 14. I have discussed my complaint with an EEO Counselor <br> Yes (Date of final interview: Per Certified # Z 361 220 189 <br> No | 15. Name and Signature of EEO Counselor |
|---|---|

16. Corrective Action Sought

REINSTATEMENT OF EVA; JSP; $1000 FOR Time & Preparation AND Related expenses for 11/4 and SEE ATTACHED For RETALIATION!

| 17. Signature of Complaint <br> Thomas P Butler | 18. Date of this Complaint <br> 2-6-98 |
|---|---|

PS Form 2565, December 1995

PAGE NO. 1/6

Originating Office, Processing Center
P.O. Box 19357, Dept. SFD-C

Z 034 620 501

I have reported In an EEO Format That I was the only white male NON HISPANIC, over age 40, of Quaker Religion Born in the USA, supervisor on T-1 To be continually harassed and intimidated by MDO SERGIO FERNANDEZ. MR FERNANDEZ IS A HISPANIC male, under age 40, NON Quaker, BORN in CUBA.

I am the only known individual in our district to be placed on enforced Leave. I've indicated That soo16 Robert Brace, paylocation 101, male, under 40, NON cacaussion, NON Quaker, WAS NEVER EMBARASSED, humiliated, Threatened or intimidated by MDO SERGIO FERNANDEZ.

As stated about 3-5-97, date of injury, After a 30 minute meeting in The MDO office (Angelo, Tom, Sergio — Rosie), I was counseling employee Julio Burgos (per Sergio Fernandez request). Mr Fernandez Broke up The counseling and began harassing me about my operation (which he had pulled me away From for a 40 minutes,

within ~ 15 minutes after this Harassment my condition worsened To the Point I was dizzy, and couldn't function and had to request To Leave (3971). As I was Driving home I feared that my body was not normal, experiencing symptons That were unusual to me. I then drove immediately to the nearest Emergency medical Treatment Facility (MEMORIAL WEST HOSPITAL) (Documentation provided). MEMORIAL WEST REFERRED ME TO SEE A Psychiatrist, thereby acknowledging the potential severity of my injury. Dr Evelyn Lopez BRIGNONI, psychia Evaluated and Treated me and submitted my diagnosis To Postal management and The POST MEDICAL UNIT of Dr Vicente (GMF) (Documentation submitted). The Doctors findings support my claim PAGE NO 119

2

receiving from my manager Sergio Fernandez.

I have stated that the incident of 3/5/97 triggered my stress to a level requiring immediate medical attention. Mr Fernandez had been harassing me and creating a stressed environment for me since I first came to SFMPC. He has made me have lunch during a meeting that was scheduled at my lunch time (supportive statement provided). On 2/19/97 he was vindictive toward me concerning a staffing problem, he stated "I'll take care of that, I'll put you in charge of the FSM" on 2/25/97 he threatened me stating "This is your training week, wait till next week." on 4/12/96 He ~~changed~~ changed my work hours (hours that I worked), a direct violation of FLSA. I had Joann Feindt correct this violation. On 3/4/97 some employees met with Joann Feindt concerning employee complaints of Sergio Fernandez, I feel my operation and self have suffered corresponding reprisal. On numerous occasions Mr Fernandez has humiliated and embarrassed me in front of my employees and peers. He intimidates employees and supervisors on the workroom floor. (supportive document ~~attached~~ - Letter 8/16/97 Arnita Williams; naps minutes 7/19/97; letter July 19, 1997 Katherine Radicioni; letter 500 Ruth Murray; statement of facts, Sharon Ricci; letter 7/13/97 Ed Cuevas, letter 7/12/97 Sharon Ricci.

On 11/20/96 I received an EAS merit Performance Evaluation from mgr Sergio Fernandez, Jack Watson meeting the objectives and expectations of the position on 11/4/97 Keith Maynard (Acting Plant manager) notified me of exclusion from EVA Bonus stating lack of contribution. I felt like my nerves had ~~been~~



This retaliation occurred Threatening me with additional loss of income pain and suffering. I told Keith This was unfair and unethical since I had been desired to work by the USPS medical unit and my doctor, however I wasn't allowed to work. He stated he didn't know of my case and would get back to me the following Monday (He has yet to get back with me as of 2/5/97. He insisted I had a lack of contribution which I again stated it was not my fault. I subsequently had to go home having a relapse of my prior condition.

On 7/25/97 I received a package from Labor Relations (Tobe Lowe) In the package was a Low From Jack Watson dated in Feb of 1997. I had never seen this Low. I was unaware that I was even going to get the letter let alone discover it by accident in the package from Tobe Lowe on 7-25-97 (nearly 5 months after the alledged Letter was dated.) I believe it to be an unethical and discriminatory procedure. Furthermore I contend, it was designed to be retaliatory and discriminatory to my prior EEO of 3-7-97 (Bob Allou, Jack Watson, Sergio Fernandez, Tobe Lowe, Joann Feindt)

I have 9 other letters from employees attesting to my character. (Ric Amizquitta, supr maint operations; P Gainor, AMC; Lori Lakiss; Leda Baxter, data site; Norris Thompson; Diane Lane; Sandra Castro; and Brenda Fite).

NOTE, it also took nearly 5 months and 4 attempts in writing including a letter to Postmaster General Marvin Runyon in order to get a change. PAGE NO. 521

4

NOTE TOO, Mike Balcom SDO 16 T-3 received 10 Times The Amount of EVA That I received.

The date of my Injury was 3-5-97. Today in 2-5-98, elve months Later, and my leisure time is still being picked apart from volumeous reports, correspondence, affidavits, etc trying to resolve This EEO, That is a direct result Of having discriminatory practices levied on me initially by NDO Fernandez, and subsequently retulitorially discrimination by MNO Fernandez and others.

I want to Point out That my Sick Leave Balance was very good prior To This incident. I have letters of recognition concerning sick leave accumulation of 250 hrs within 3 years of service, and over 500 hours of sick leave accumulated in less than 7 years of Service (documentation provided)

Workers Compensation was provided with copies of medical costs, fees, phone calls, mileage, ~~loans~~ interest on loans ~~from~~ Retirement Plans; mailing expenses, paper costs, time for completing all EEO forms, medical paperwork, Driving, copying mailing counseling, lost leisure time, as well as requests for the return of all leave, night differential, OT, Thrift savings, Bene Holidays, ~~EVA~~ a pile EVA. I have over 1 Foot of paper documentation at my home, and I have sent at least twice this amount out to various agencies, doctors, lawyers, NAPS representatives. I had asked for $35,000 in additional money To cover ~~of this $10,000 expence~~ Pain, Suffering, False Loan Feb 1997, and FLSA violation 4-12-96. Another $10,000 would Total $45,000 and would compensate for a years Salery related to out of pocket/Leisure expenses To prepare all This information.

PAGE NO. 122

1        Z 034 62. 501                    2/4/98

COMPENSATORY DAMAGES FOR NON-PECUNIARY HARM

1. THE Following NON PECUNIARY LOSSES AS A RESULT OF THE
*I HAVE INCURRED*
DISCRIMINATORY CONDUCT of THAT I HAVE PREVIOUSLY STATED:
    THE EMOTIONAL PAIN AND SUFFERING I INCURRED THROUGH DISCRIMINAT
                                    and others
CONDUCT OF MAO SERGIO FERNANDEZ, BOB DILLON, JOANN FEINAT, TOBE
LOWE, JACK WATSON, KEITH MAYNARD HAVE BEEN SEVERE AND ON GOING.
    I have submitted documents (Doctor Reports, Doctor Diagnosis, Doctor
                                              phone calls   postal mailings
Treatments, Doctor Bills (mileage, medical, Rx, Paperwork etc); Emergence
                                    phone calls              postal mail,
Health Care (memorial west, mileage, medical bills, paperwork etc;
legal expense
Technically, This case has been in process at least from
March 5, 1997 and has yet to be resolved (Eleven months). In fact
it has even expanded greatly in the form of retaliation from the abou
mentioned individuals.
    I have requested monetary compensation of $5000 and $10,000
initially for Pain and Suffering, Time of preparation of documents, related cost
in mileage, postal mailings, cost of documents etc. As the case prolonged and
expanded in length of time, increased retaliation and discrimination
I was subjected to ongoing stress, inconveniences and mental anguish.
I worried if my health would improve, whether I would have a job,
whether I would be further humiliated in front of my peers or employer
whether I would be allowed to do my job without interference or
                            continue to
fear of reprisal. Many employees make comments about the humiliation
I received at the hands of Sergio Fernandez. Some individuals back
away from me when talking fearing that I'm like a leper, some of them
have made comments that seem to point to my confidential diagn
which I have told no one about excluding doctor, ma
    I have applied to several jobs prior too and after I

2

in which I have a related college degree and work experience, and in plant support. I have not been given any position. I feel that it is directly related to this case,

I have had to take out a loan against a twenty year old Life Insurance Plan established for retirement purposes in order to make financial commitments that were not problems prior to March 5, 1997. I have had to pay interest on this money,

I have had to take on additional employment to help defer some of those losses. This has led to other inconvenience such as less leisure time, loss time with wife and family.

I was financially unable to take personal vacation time that I had earned. I was unable to spend the X-mas Holiday 3 or 4 days in INDIANA with my 65 relatives on X-mas eve. I'm sure my wife was worried about my health, my job, our security. I suspect this must have carried over to her work. However, she seemed to handle things admirably under the conditions.

I loss the enjoyment of playing golf with a friend of 7 years. During which time we enjoyed friendly competition and comraradery nearly twice a week for 7 years. In the past 11 months I have yet to play him head to head. I miss it very much. Although I have tried to play him on at least two occasions this case has always taken presidence to my enjoyment.

Much of my leisure time has been devoured by volumes of the paperwork and responses to this case and health condition. It seems as if a year of my life has gone by and that I have missed out on a lot. ( Fun, Friendship, vacation, X-mas, travel, Golf, Family & Life Liberty and the Pursuit of happiness



3

Some of my coworkers state that I've had it easy. I would not wish what I am going through onto Anyone. Many people can't imagine how life is without a week of pay, let alone months of pay, loss of bonuses because a management wouldn't allow me to return to work, even with a doctors release, and the VSIS medical units release.

In addition due to the length and scope of this investigation, and broadened retaliation and discrimination I'm seeking an additional $10,000 for a false LOW dated February 1997. Although I have been told by Tobe Lewe that it was put in my file by mistake. It caused me undue stress at a time when I was attempting to recover from severe depression. In Addition I am requesting yet another $10,000 for MDO Sergio Fernandez falsifying my work hours on 4-12-96. I understand that Joan Feindt corrected his falsification after several months. However, I feel this may have contributed to the MDO, Sergio Fernandez taking such a retaliatorial and vindictive behavior towards me subsequently adding to his harassment and humiliation of me. His threats and intimidation toward me only increased in number and severity.

I have yet to receive any compensation from workers Comp in regards to medical Bills, Loss of Leave, night differential, OT, Thrift Savings, interest, Holidays, Benefits,.

How does one put a price on the loss suffered by one's spouse. She cared for me, worried about me, coped with me, loved me, supported prayed for me while in addition performed her own job. I'm sure she suffered mental anguish as well. I love her for her support

4

I spent many hours searching papers, filling out applications, interviewing and in job search. It was difficult trying to get financial income while not being allowed to return to work by management. How do you explain to a prospective employer that you are trying to recover from severe depression or that you are over qualified for their minimum wage position, or why you would accept a minimum wage job over an approximately $45,000 - $50000/year position. How could you let them know that your employer wouldn't allow you to return to work even though your doctor released you for work, I think back to the coworker that stated that I had it easy.

I definitely want to be made whole; the harassment, intimidation, humiliation, and retaliation to cease; OWCP to fulfill its commitment to me; and to receive above stated compensations. If these requests were to be met I would not have to request an EEOC hearing and subsequently submit an intent to sue followed up by Civil Action to include all the above, court costs, attorney fees, costs for pain and suffering and any additional damages.

Thomas P Butler
2-4-98

APPEALS PROCESSING CENTER 

 **UNITED STATES POSTAL SERVICE**

SOUTH FL. DISTRICT



APR 1 7 1998

Mr. Tom Butler
7840 Camino Real P. 105
Miami, FL 33143-6871

CERTIFIED MAIL NO. <u>P 471 062 888</u>
RETURN RECEIPT REQUESTED

RE:  Tom Butler v. Marvin T. Runyon,
Postmaster General
Agency Case No. 1-H-333-0011-98

Dear Mr. Butler:

We have received the above-referenced complaint of discrimination filed on February 4, 1998. Your complaint has been accepted for investigation. The scope of the investigation will include the following issue(s) only:

| | |
|---|---|
| <u>Specific Issue(s):</u> | You were excluded from the EVA bonus due to lack of contribution. |
| <u>Date(s) of Incident:</u> | November 4, 1997 |
| <u>Type(s) of Discrimination:</u> | Race (Caucasian), Color (white), Religion (Quaker), National Origin (USA), Sex (male), Retaliation (prior EEO activity), and Age (43) |

If you disagree with the defined issue(s), you must provide us with sufficient reasons to substantiate your objections, in writing, within seven (7) calendar days of receipt of this letter.

Under the Older Workers Benefit Protection Act, the Postal Service is required to advise you to consult with an attorney should you so desire, prior to the signing of any agreement resolving your complaint. If you do not wish to proceed with this complaint, you may withdraw your complaint by signing the enclosed PS Form 2565-E and returning it to the office where you filed your formal complaint.

Your case has been assigned for investigation. Please be prepared to go forward with your case when the EEO Counselor/Investigator contacts you.

Mr. Tom Butler                                                                                    2

The investigation will be completed within 180 calendar days of the date of
your filing of the complaint, except that the complainant and the Postal Service
may voluntarily agree, in writing, to extend the time period up to an additional
90 calendar days.

If a grievance is pending on the same issue(s) as those addressed in your EEO
complaint, the agency may, in its discretion, defer the processing of your EEO
complaint until the grievance procedure is terminated. When an EEO
complaint is deferred, the 180-day time-in-process clock stops temporarily,
pending the outcome of the grievance procedure. If your complaint is deferred,
you will be notified of the options which may be available to you, and of the
further disposition of the complaint.

When the investigation is completed, you will receive a copy of the investigative
file, and you will be notified of your right to a hearing before an Equal
Employment Opportunity Commission Administrative Judge or of your right to
a final decision by the agency head or designee without a hearing.

You may request a hearing by an EEOC Administrative Judge by notifying the
Senior EEO Complaints Processing Specialist within 30 calendar days of your
receipt of the investigative file and notice of right to file. If you do not receive
your investigative file and notice of right to file within 180 calendar days from
the filing date, you may request a hearing.

If you are dissatisfied with the final decision of the Postal Service, after a
hearing or without a hearing, you may exercise your appeal rights. You may
appeal to the Office of Federal Operations, Equal Employment Opportunity
Commission (EEOC), or you may file a civil action in an appropriate U.S.
District Court within 90 calendar days of your receipt of the decision.

Any appeal to the EEOC must be in writing and filed with the Office of Federal
Operations, Equal Employment Opportunity Commission, P.O. Box 19848,
Washington, DC 20036-0848, utilizing Form 573, Notice of Appeal/Petition to
the Equal Employment Opportunity Commission, Office of Federal Operations.
Along with your appeal, you must submit proof to the EEOC that a copy of the
appeal and any supporting documentation were also submitted to the EEO
Compliance and Appeals Coordinator, Appeals Processing Center.

After 180 calendar days from the date of filing your formal complaint, you may
file a civil action in an appropriate U.S. District Court if the Postal Service has
not issued a final decision on your complaint.

Mr. Tom Butler                                                                                  3

If you decide to appeal to the Office of Federal Operations, EEOC, you may file a civil action in an appropriate U.S. District Court within 90 calendar days after your receipt of the EEOC's decision. If you do not receive a decision on your appeal within 180 calendar days from the date of your appeal, you may file a civil action.

Sincerely,

*Otis Maclin Jr.*

Otis Maclin, Jr.
EEO Compliance and Appeals Coordinator

Enclosure

cc:  Senior EEO Complaints Processing Specialist, South Florida District

HRC42:ZCox:je:38166-0978

U.S. Postal Service

# Information for Precomplaint Counseling

99-447

| Certified No. | or Hand Delivered On: |
| By (initials) | Informal No. |

Important: Please Read Carefully. This is the only notification that you will receive regarding the necessity for you to complete this form. This form should be completed and returned to the EEO Office within 10 calendar days.

1-H 333-0647-99

On __4-14__, 19 __99__ you requested an appointment with an EEO Counselor.

## A. Requester Information

Name (Last, First, MI) Butler Tom

Social Security No. 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

Home Telephone No. (305) 271-1898

Mailing Address 7840 CAMINO REAL P-105  MIAMI, FL 33143-6871

Postal Facility Where You Work SFMPC

Position Title SDO

Grade Level EAS-16

Office Telephone No. (594) 436-4356

Pay Location 301

Tour 3

Off Days (If Tour I, Show Nights Off) MON, TUE

Duty Hours 1600-0050

Employment Status: ☐ Applicant ☐ Casual ☐ TE ☑ Career

Time in Current Position 10 Years _____ Months

## B. Discrimination Factors

In the Postal Service, prohibited discrimination includes actions taken based on your Race, Color, Religion, Sex, Age (40+), National Origin, Physical and/or Mental Disability, or Retaliation (actions based on your participation in prior EEO activity). These categories are referred to on this form as factors.

RACE, COLOR, SEX, RETALIATION, NATIONAL ORIGIN

What Factor(s) of Discrimination Are You Alleging (Be Specific; Describe, i.e., Race-Black, Sex-Female)?
RACE - WHITE NON HISPANIC          - NATIONAL ORIGIN - USA
SEX - MALE
RETALIATION - PRIOR EEO's
     - EVENTS OF MANAGER CARLIES TOWARD ME PRIOR TO LOW

For Retaliation Allegations Only: If you are alleging retaliation discrimination, provide the date(s) and specifics of the EEO activity which you feel caused you to be retaliated against.

1. On 3-12-97, 19 97, I engaged in EEO activity.  Case No.: 1H 333-0018-97

2. On 10-27-97, 19 97, I engaged in EEO activity.  Case No.: 1H 333-0011 98

3. On 4-17-97, 97, " " " "  1H 333-0036-97

## C. Description of Incident/Activity

Please use the space below to briefly describe the incident or activity which prompted you to seek EEO counseling at this time.

On APRIL 18, 19 99, the following occurred: I RECEIVED Two statements from employees AL RISK and Johnny Sanchez ATTESTING TO THE FACT THAT I WAS DISCRIMINATED AGAINST BY MGO CARLIES concerning A LOW THAT WAS ISSUED TO ME for having more than 3 employees in my operation (SWYB). I had appealed THE LOW TO BOB Dillon and subsequently TO THE SE AREA. Both appeals were overturned, the ~~BISCO~~ ACTION STOOD, when I received The two statements on April 18, 1999 I KNEW THAT I had been discriminated against, shown disparity of Treatment because LIZ ETTIENE received no Low, RETALIATION FROM PRIOR EEO's became even clearer. I wish This continued harrassment would stop.

TransFORM PS Form 2564-A, December 1995 (Page 1 of 3)

DEFENDANT'S EXHIBIT 29  00-6193-CV-SIMONTON

Explain why you believe, based on the factors you cited in Section B, that you were treated differently than other employees in similar situations.

1. _LIZ ETTIENNE_          _BLACK, HAITIAN, FEMALE, NO RETALIATION_
(Name of Employee)          (Factor(s) describing employee, i.e., Race-Black, Sex-Female)

was treated differently than I when:

2. _____          _____
(Name of Employee)          (Factor(s) describing employee, i.e., Race-Black, Sex-Female)

was treated differently than I when:

3. _____          _____
(Name of Employee)          (Factor(s) describing employee, i.e., Race-Black, Sex-Female)

was treated differently than I when:

## D. Officials Responsible for Action

Provide the name(s) of the official(s) who took the action which prompted you to seek counseling at this time.

| 1a. Name | | 1b. Title |
| ROSIE CARLIES | Low | MDO |
| 1c. Office | | 1d. Grade Level |
| SFMPC | | ? |
| 2a. Name  SE AREA MANAGEMENT - STEP B | | 2b. Title |
|         BOB DILLON    a    STEP A | | ACTING PLANT MANAGER |
| 2c. Office | | 2d. Grade Level |
| SFMPC | | ? |

Retaliation Allegations Only: Was/were the official(s) listed in Section D above aware of your prior EEO activity (Explain?)    ☑ Yes    ☐ No

1a  Rosie Carlies          PROBABLY

2a  BOB DILLON          YES
2b  SE AREA MANAGEMENT    PROBABLY Karen Borowski,
      HUMAN RESOURCES

## E. Resolution Sought

What are you seeking as a resolution to your complaint?

1 THROW OUT Low
2 ATTORNEY COSTS & FEES
3 COMPENSATORY & PUNITIVE DAMAGES
4 HARASSMENT & INTIMIDATION BE STOPPED
5 TO BE MADE WHOLE

6 Reimbursement for phone calls to doctor, attorney, NAPS,
7 Reimbursement for mileage to doctor, attorney, NAPS
8 Reimbursement for mailings
9 300,000 for PAIN suffering, Retaliation, Discrimination
10 300,000 for PAIN & suffering for wife
11 Reimbursement for driving time and lost Leisure Time
12 TSP made whole
13 obtain EUA GUCS
14 return all leave, night differential or a benefits
15 reimbursement cost of preparing documentation electronic copying & medical paperwork

## F. Grievance/MSPB Appeal

On the incident which prompted you to seek EEO counseling, have you:

1. Filed a grievance on the issue?    ☑ No    ☐ Yes    If yes, _____
                                                           (Date)          (Step)

2. Filed an MSPB appeal on this issue?    ☑ No    ☐ Yes    If yes, _____
                                                                (Date Filed)

3. Veteran's Preference?    ☑ No    ☐ Yes    If yes, number of points _____

TransFORM PS Form 2564-A, December 1995 (Page 2 of 3)

16 interest on loads repaid
17 EUA Earnings

## G. Anonymity

You have the right to remain anonymous at the Counseling stage of EEO Complaint Processing.

Do you desire anonymity?     ☐ Yes     ☑ No

## H. Representation

You have the right to retain representation of your choice. (Check One)

☐ I authorize the person listed below to represent me.

| | |
|---|---|
| (Name of Representative) | (Title) |
| (Organization) | |
| (Mailing Address) | |
| (City/State/ZIP + 4) | (Telephone Number) |

☑ I waive the right to representation at this time.

## I. Privacy Act Statement/USPS Standards of Conduct

Privacy Act Notice. The collection of this information is authorized by Public Law 92-261, Equal Employment Act of 1972; 29 U.S.C., sections 621 et seq. and 701 et. seq.; and Executive Order 11478 as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center

for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

USPS Standards of Conduct. Postal Service regulations require all postal employees to cooperate in any postal investigation. Failure to supply the requested information could result in disciplinary action (ELM 666).

## J. Documentation

Please attach any documentation you wish to submit to support your allegation(s). Include a copy of any written action(s) which caused you to seek counseling at this time.

Note: If you are alleging mental and/or physical disability, you MUST submit medical documentation of your disability at this time or during counseling.

## K. Authorization

| Your Signature  _Thomas P Butler_ | Date  4-19-99 |
|---|---|

Return To:

---

### NOTICE:  COMPLETE THIS SECTION ONLY IF YOU NO LONGER SEEK EEO COUNSELING

I hereby request that you close this file from processing. I fully understand that this complaint file will not be reopened once closed, and I waive my right to any further EEO Appeal on this matter. I stipulate that my decision not to pursue counseling is voluntary and did not result from threat, coercion, intimidation, promise or inducement.

| Your Signature | Date |
|---|---|



**UNITED STATES**
**POSTAL SERVICE**

September 30, 1999        CERTIFIED NO. Z 419 468 162
                         RETURN RECEIPT REQUEST

> DEFENDANT'S
> EXHIBIT
> _30_
> 00-6193-CV-SIMONTON

Tom Butler
7840 Camino Real #1-5
Miami, FL 33143-6871

RE: Final Interview Notice (outcome of EEO pre-complaint counseling)
**Case No. 1H-333-0047-99,** date of incident 04-18-99 .

Dear Counselee:

Due to the time restraint mandated by the CFR 1614, your complaint was not resolved.
Therefore we are forwarding your rights to appeal this matter.

Enclosed you will find a NOTICE OF RIGHT TO FILE AN INDIVIDUAL
COMPLAINT Form 2579. Also, enclosed is a Form 2565, EEO COMPLAINT OF
DISCRIMINATION IN THE US POSTAL SERVICE. Should you decide to pursue this
matter formally, please complete the Form 2565 in its entirety and submit to the SR. EEO
COMPLAINTS PROCESSING SPECIALIST, US POSTAL SERVICE. SOUTH
FLORIDA DISTRICT, 2200 NW 72 AVENUE, MIAMI, FL 33152-9411. within **fifteen
(15) days** of receipt of this letter.

The date you receive this notice will become the date of final interview. Thank you for
your cooperation.

**PENALTY ENVELOPES WILL NOT BE ACCEPTED TO SUBMIT YOUR P.S.
FORM 2565 (APPEAL FORM).**

*Rosalind Moultry-H*
Mgr. EEO Complaint Proc
South Florida District

Attachments
cc: file
    Regular Mail w/attachm

rmh



U.S. Postal Service

# Notice of Right to File Individual Complaint

| Counselee Name (Last, First, MI) | Informal Case No |
|---|---|
| BUTLER, TOM | 1H333004799 |

This notice will attest to the fact that on _____ I advised you of the actions taken concerning the allegation(s) of discrimination which you brought to my attention. If the matters which you raised during the precomplaint processing stage have not been resolved, you have the right to file a formal complaint within 15 calendar days of the date this notice is received. PS Form 2565 EEO Complaint of Discrimination in the Postal Service, is being provided to you for this purpose. The complaint must be in writing signed by you and delivered to:

> EEO OFFICE - SOUTH FL DISTRICT
> C/L ROSALIND MOULTRY-HOWARD
> 2200 NW 72 AVENUE
> MIAMI, FL 33152-9411

The complaint will be deemed timely filed if it is delivered in person or postmarked before the expiration of the 15 calendar day filing period, or, in the absence of a legible postmark, if it is received by mail within 5 calendar days of the expiration of the 15-day filing period.

An EEO discrimination complaint can be processed only if the complainant alleges he or she has been discriminated against on the basis of race, color, religion, sex, national origin, age, disability or retaliation for past EEO activity. In addition, courts have ruled the complainant has the burden of presenting evidence which would give rise to an inference of discrimination. A complaint must contain the following information:

(1) Your name, address, position, and level;

  -- If you change your address, you have a regulatory requirement to immediately report the change to the EEO Compliance and Appeals Coordinator located in your area. (Employees at Postal Service Headquarters and Headquarters Field Units, and employees of the Inspection Service should notify the EEO Appeals Review Specialist at Postal Service Headquarters.)

(2) The specific action or matter complained of, the date of occurrence, and the names of the official(s) who took the action alleged to be discriminatory;

  -- You cannot add matters which were not discussed during counseling.

(3) The specific type of discrimination alleged, e.g., race - black, sex - female, etc.;

  -- If you allege disability discrimination, the alleged disability must be more than a temporary condition.

  -- If you allege age discrimination, you must have been at least 40 years of age on the date the alleged discriminatory action occurred.

(4) A brief statement of the facts which led you to believe you were discriminated against, and the names of similarly situated individuals whom you believe were treated differently than you.

  -- If you allege a failure to accommodate a disability or your religion, you must explain the accommodation sought and why you sought it.

  -- If you allege retaliation you must show a connection between the action about which you are complaining and your past EEO activity, and you must show that management was aware that you had engaged in protected activity when the alleged discriminatory action occurred.

(5) The name of the EEO Counselor and the date the Notice of Right to File was received.

---

## Privacy Act Notice / USPS Standards of Conduct

**Privacy Act Notice.** The collection of this information is authorized by Public Law 92-261, Equal Employment Act of 1972; 29 U.S.C., sections 621 et seq., and 701 et. seq.; and Executive Order 11478 as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes, where pertinent, in a legal proceeding to which the USPS is a party or has an interest, to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits, to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center

for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employee and other witnesses.

**USPS Standards of Conduct.** Postal Service regulations require all postal employees to cooperate in any postal investigation. Failure to supply the requested information could result in disciplinary action (ELM 666).

| Signature of Counselee | Date | Signature of Counselor | Date |
|---|---|---|---|
|  |  | Pat Jackson | 9-30-69 |

Counselor, if Notice of Right to File is provided to Counselee by mail, it must be sent certified, return receipt requested. Attach signed PS Form 3811, Domestic Return Receipt, to this notice to evidence date of Counselee's receipt.

TransFORM PS Form 2579-A, December 1995

Case #: 1H-333-0047-99
Counselee: Butler, Tom
Final Interview sent out: 09-30-99
(Attach 3800-3811)

Z 419 468 162

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

TOM BUTLER
7840 CAMINO REAL #105
MIAMI FL. 33143-6871

| | |
|---|---|
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

PS Form 3800, April 1995



DEFENDANT'S
EXHIBIT
31
00-6193-CV-SIMONION

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece or on the front if space permits.

1. Article Addressed to:

TOM BUTLER
7840 CAMINO REAL #105
MIAMI FL. 33143-68

USPS
OCT 8 - 1999
SOUTH MIAMI BRA

1H-333-0047-

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)    B. Date of Delivery
   Tom Butler                              10-8-99

C. Signature
X  Thomas P Butler          ☐ Agent
                            ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☒ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

2. Article Number (Copy from service label)
   Z 419 468 162

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M-1789

_____ w/ Appeal rights

RESTRICTED INFORMATION
EEO COMPLAINT DATA - BROWSE FORMAL CASES
CASE: 1H333004799 CASE CODE: F1 COMPLAINT TYPE: 0  LAST NAME: BUTLER

CASE PROCESSING DATA

DATE FORMAL FILED: *No formal*       DATE ACCEPTED FOR INVESTIGATION:
DATE ASSIGNED INVESTIGATOR:          INVESTIGATOR NUMBER:
DATE OF 90 DAY EXTENSION:            DATE COMPLETED INVESTIGATION:
              NTE:                                  NTE:
DATE REQUEST FAD W/O HEARING:        DATE EEOC HEARING REQUEST:

FINAL AGENCY DECISIONS

EEOC CASE NO:                        DATE AJ RETURNED:
DATE RETURNED TO AJ:                 DATE EEOC HEARING:
DATE REC'D AJ'S FINDINGS:            AJ'S FINDINGS:
USPS FINDING:                        DATE FAD:
TYPE CLOSURE:                        REASON FOR DISMISSAL:
REMARKS:
REMARKS2:
 PF01=MAIN MENU, PF03=END, PF07=BACK ONE SCREEN, ENTER=BROWSE FILE

DEFENDANT'S
EXHIBIT
32
00-6193-CV-SIMONTON

CASE: 1H333004799                    RESTRICTED INFORMATION

EEO COMPLAINT DATA - BROWSE FORMAL CASES


LAST NAME: BUTLER                FIRST NAME: THOMAS        MIDDLE INITIAL: P
SOC SEC NO.: ████████           TYPE OF COMPLAINT: 0      DATE FORMAL FILED:

*never filed formal*


PF01=MAIN MENU, PF03=END, PF07=BACK ONE SCREEN, ENTER=BROWSE FILE

Case 0:00-cv-06193-AMS   Document 84   Entered on FLSD Docket 03/18/2003   Page 140 of 164

CASE:  1H333004799                    RESTRICTED INFORMATION

EEO COMPLAINT DATA - UPDATE PRECOMPLAINT CASES
                    INFORMATION ON COMPLAINANT

LAST NAME: BUTLER          FIRST NAME: THOMAS        MIDDLE INITIAL: P
SOC SEC NO.:               FINANCE NO:: 118675       DES ACT: 090
RATE SCHEDULE CODE: E      GRADE LEVEL: 16           GENDER: M
MINORITY CODE: E           FACILITY TYPE NO.: 5
                           EEO COMPLAINANT DATA
FINANCE NO.: 118675        POST OFFICE: SOUTH FLORIDA P&DC
                     COMPLAINT COUNSELING - BASIS
PRIMARY ISSUE: 16          RACE: E                   COLOR:
GENDER: M   RELIGION:      AGE:                      NATIONAL ORIGIN:
DISABILITY (P OR M):       RETALIATION: Y            NONE:
                           PRECOMPLAINT INFORMATION
TYPE OF COMPLAINT: 0                                 DUAL FILING: N
INITIAL CONTACT: 990423    COUNSELOR NUMBER:         COUNS ASSIGNED:
INIT. INTERVIEW:           COUN EXTENSION:           ADR ELECTION:
NATURE OF SETTLEMENT:      COUN EXT   NTE: 990722    ADR SETTLEMENT:
COUN SETTLEMENT:
SETTLEMENT AMOUNT:                                   RIGHT TO FILE: 991008
                                                     NTE: 990523

 PF01=MAIN MENU, PF03=END, PF07=BACK ONE SCREEN, ENTER=UPDATE FILE





**UNITED STATES POST OFFICE**
**SOUTH FLORIDA PROCESSING & DISTRIBUTION CENTER**
**PEMBROKE PINES, FL 33082-9997**

9 1999

<u>**REQUEST FOR DISCIPLINARY ACTION**</u>

EMPLOYEE'S NAME: _Thomas Butler_

SOCIAL SEC. #: _31462-0751_

JOB TITLE: _Supervisor Processing + Distribution_

EMPLOYEE'S REPORTING TIME AND DAYS OFF: _1600_

UNIT OR BRANCH: <u>SOUTH FLORIDA PROCESSING & DISTRIBUTION CENTER</u>

PAY LOCATION: _301_    TOUR: _3_

DEFENDANT'S
EXHIBIT
_33_
00-6193-CV-SIMONTON

WHAT TYPE AND DEGREE OF DISCIPLINARY ACTION ARE YOU RECOMMENDING?

LETTER OF WARNING: _____

SUSPENSION: _Low in lieu of 7_    INDEFINITE: _____
        (NUMBER OF DAYS)

EMERGENCY: _____    REMOVAL: _____

ACKNOWLEDGED: _____    FDGM/PM OTHER: _____

REQUESTING SUPERVISOR'S NAME: _Rosie B Carles_

SSN#: ████████████    SIGNATURE: _Rosie B Clark_

DATE SIGNED: _11/18/99_

CONCURRENCE BY: _____ TITLE: _Plant Manager_

REVIEWED BY: _____ TITLE: _Plant Manager_
        (FUNCTIONAL AREA MGR)

REVIEWED BY: _____    TITLE: _____
        MGR H/R

ATTACH TO THE BACK OF THIS REQUEST APPROPRIATE DOCUMENTATION LISTED IN
ITEM #:

EXHIBIT NO. _____

PAGE 2

1. WHAT IS YOUR REASON FOR REQUESTING DISCIPLINARY ACTION? FULLY DOCUMENT
WHAT INFRACTIONS THE EMPLOYEE COMMITTED AND INCLUDE DATES, TIME AND
PLACES. LIST ALL DOCUMENTATION PROVIDED WITH THIS FILE.

*See attached*

EXHIBIT NO._____

PAGE   5

PAGE 3

**2.  WHO COMPLETED THE INVESTIGATION IN REFERENCE TO THE ABOVE INFRACTION?
(ALL INVESTIGATION MUST BE COMPLETED PRIOR TO REQUESTING DISCIPLINE.)**

Rosie B Carles
Manager, Distribution Operations
Tour 2

**3.   GIVE THE DATES, TIME AND WHO WAS PRESENT DURING THE PRE-DISCIPLINARY
INTERVIEW WITH THE EMPLOYEE ABOUT THIS INFRACTION.  (THIS PRE-DISCIPLINARY
INTERVIEW MUST BE COMPLETED PRIOR TO REQUESTING DISCIPLINE.)**

Rosie B Carles, Manager Distribution
Operations Tour 2
Barbara Crews, NAPS
Tom Butler, Supervisor Processing
and Distribution

11/5/99 @ 1958

EXHIBIT NO._____

PAGE____11____ OF __141__

PAGE 4

4. WHAT DID THE EMPLOYEE SAY DURING THE PRE-DISCIPLINARY INTERVIEW WHEN QUESTIONED IN REFERENCE TO THIS INFRACTION? *He wants to choose his own Representative. He did not want Bobbie Crews, he wants Rogers Quinlan*

5. LIST DATES OF DISCUSSIONS, IF ANY, GIVEN TO THE EMPLOYEE IN REFERENCE TO INFRACTIONS OF THIS NATURE.

DISCUSSION: _____*N/A*_____

6. WHAT DISCIPLINARY ACTION HAS BEEN TAKEN AGAINST THIS EMPLOYEE IN THE PAST. LIST ALL ACTIONS IN SEQUENCE AND INCLUDE DATES. *Low dated 8/21/98 (See attached)*

7. YOU MUST CONSULT WITH EAP STAFF FOR THEM TO DETERMINE WHETHER AN EAP REFERRAL IS NECESSARY. THIS IS TO BE ACCOMPLISHED PRIOR TO DISCIPLINARY BEING INITIATED. WHO CONSULTED WITH THE EAP STAFF AND DATE:

CONTACTED EAP: ▓▓▓▓▓▓▓▓ *@ 7:45 pm left a msg in the recorder*

8. ADDITIONAL INFORMATION RELEVANT TO THIS DISCIPLINARY REQUEST. *No additional information at this time*

EXHIBIT NO._____

PAGE_____ OF____

On November 3 1999 at approximately 4:10 pm, I asked Supervisor Tom to give you the telephone.

I said "Tom we will not pull the report we have 4 more pallets of Miamis Mail to run.

You said "why" and I cut you off and said Tom this is what I want, Don I will finish running the Miami Mail. Your clerks will throw off the 5-Digit 330 until they are finished. Then the Miami Mail will be pulled down and it will be Set-up to _____ you to run 330. I then asked do you understand what I'm saying there was complete silence. I said again Do You understand there was still complete silence

I then handed the telephone to Wanda Harris (Chief Shop Steward) and told her to let me know

EXHIBIT NO.

②

I then got up from my desk and walked to the SBS where you were suppose to be. When I got there you were not there and the telephone was off the hook, laying beside the phone.

I then paged you to come to the SBS Supervisors desk. You did not come.

I called the General Clerks office and Carla Amdur, the General Clerk on Tour 3 said you had just left out of her office.

I paged you again to come to the SBS Desk and you did not come.

I called the Data Site and asked for you and Alex Digiacomo said you had just walked out of

When you finally came back to the operation I asked you



When you got to the office I asked
asked you if you had a problem
and you just starred at me. I
said I am talking to you and
trying to find out if you understand
the instructions I am giving you
and you just put the phone down
while I am talking to you and
walk away. You Still ~~saying~~ dont
Saying thing.

Well I said Tom, I am you
Supervisor/Manager and I will
not tolerate this type of behavior.

EXHIBIT NO._____

You just turned Around and walked out the Door. I walked out behind you. You were talking to A/MSS Christopher Powell. I instructed you to End Tour and Leave the Building. Then all of a sudden you want to say something. You say why. I asked Christopher Powell to make sure you leave the building. Chris Powell instructed you to return to work Rose B Parks on temorrow as MSS T-2

EXHIBIT NO.


**UNITED STATES**
**POSTAL SERVICE**

November 4, 1999

Rosie Carlies
MDO - Tour 2
SFPDC

On Wednesday, November 3, 1999, at approximately 16:08, MDO Rosie Carlies requested that I report to the SPBS Supervisors' desk. The telephone receiver on the desk was off the hook.

At approximately 16:20, Ms. Carlies paged Thomas Butler to the SPBS. At approximately 16:25 Ms. Carlies paged Thomas Butler a second time. Thomas Butler reported to the SPBS area at approximately 16:35. At that time Ms. Carlies requested Thomas Butler go with her to the MDO Office.

Robert L. Glover
Networks Specialist
SFPDC

EXHIBIT NO._____

PAGE____/ ᗡ____OF____' Ꮯ____

16000 PINES BLVD.
PEMBROKE PINES FL 33082-9997
954-436-4399
FAX· 954-436-4316

 **UNITED STATES POSTAL SERVICE**

DATE: November 29, 1999

REF: SE09:RCarlies:RA:srl/Supv/Low/Butler

SUBJ: Proposed Letter of Warning In Lieu of Time Off Suspension



TO: Thomas Butler
    Supervisor, Distribution Operations



**CERTIFIED NO: Z 419 512 741**
**RETURNED RECEIPT REQUESTED**

This Proposed Letter of Warning in Lieu of a (7) Day Time Off Suspension is being issued to you for the following reason(s):

You are charged with Unacceptable Conduct due to your failure to respond and comply with directives given to you.

On November 3, 1999, you were assigned to supervise the small parcel bundle sorter (SPBS) on tour three. On that day at approximately 4:10 p.m., I called Simon from the supervisor's desk at the SPBS, and I asked him to give you the telephone. At that time, I advised you not to end the report, that there were four more pallets of mail to run on the machine. You began to question me, and I cut you off stating, "Tom, this is what I want. Tour 2 will finish running the Miami mail. Your clerks will throw off the 5-digit 330 mail until they are finished. Then the Miami mail will be pulled down and it will be set up for you to run 330." I then asked, "Do you understand what I am saying?" You failed to acknowledge or respond to my directive, and said absolutely nothing. I then handed the telephone to Chief Steward Wanda Harris, and asked her to let me know if you said anything. I left the Manager's office and walked to the SPBS. When I arrived at the machine you were not in the area and the telephone was off the hook laying on the desk. I then paged you to report to the supervisor's desk at the SPBS. You failed to respond to the page or report to the SPBS. I then called the general's clerk's office and was informed by general clerk Carla Amour that you had just walked out of that office. I again paged you to report to the SPBS supervisor's desk. You failed to respond to the page, and failed to report to the SPBS. I then called data site, and was informed by clerk Alex Degiacomo that you had just walked out of that office. You finally reported to the SPBS area at 4:35 p.m. At that time, I instructed you to report to the Manager's office. When we arrived at the Manager's office, I asked you if you had a problem. You stared at me and did not respond. I advised you that I was talking to you and asked if you understood my instructions. I also asked why you had put the telephone receiver down on the supervisor's desk at the SPBS and walked away in the middle of our conversation. You again stared at me and said nothing. I then stated to you that I am your Manager, and I will not tolerate this kind of behavior. You stared at me, said nothing, and walked out of the office. I followed you out of the office as you began talking to Acting Manager Christopher Powell. I approached you and instructed you to end your tour of duty and leave the building. You responded "Why?" I did not respond to you, and asked Manager Powell to make sure you left the building. Manager Powell then instructed you to leave the building and to return to work the following day as scheduled.

EXHIBIT NO. _____5_____

When questioned about this matter in an investigative interview, you responded that you wanted Robert Quinlan to represent you, not Bobbi Crews. Your response does nothing to

Thomas Butler
November 29, 1999
Page Two

explain or justify your actions on November 3, 1999, of failing to respond to me while I was giving you instructions on the telephone, and placing the telephone receiver on the desk and walking away; failing to respond to my pages; and your failure to respond to me in the Manager's office.

You must understand that as a Postal employee, you have a responsibility to perform the duties of your position conscientiously and effectively, giving to the performance of those duties earnest effort and best thought. You are expected to comply with all Postal Service rules and regulations, and to obey the instructions of your Manager. Clearly, by your actions cited above you have failed in those responsibilities.

As a Supervisor of Distribution, you have an even greater responsibility. You set the example for other employees. Your actions cited above on November 3, 1999, demonstrate that you are either unwilling or unable to be responsible to the position you now hold. The instructions that I gave you over the telephone were clear and reasonable. There is no reason why you should not have responded to me, and complied with my instructions. The fact that you refused to acknowledge my instructions, placed the telephone receiver down on the desk, and walked away from your operation; and then failed to respond to my pages, indicates that you fail to understand your responsibility to comply with instructions given to you. Moreover, your actions of simply staring at me, and refusing to respond when I addressed you in the Manager's office, and then leaving the office while I was still trying to talk to you, demonstrates a deliberate disrespect for authority that will not be condoned. Further, your actions raise serious question as to your of dedication, loyalty, and job commitment. If you believe that in your position you are not required to acknowledge, respond, and comply to directives given to you by a Manager, than you seriously misunderstand your role as a supervisor.

Clearly, as a Supervisor of Distribution you expect your employees to respond to your directives, and to comply with your instructions. As a Manager, I expect no less from you. Your actions on November 3, 1999, of failing to acknowledge my directives to you, putting the telephone down and walking away while I was still engaged in conversation with you, failing to respond to pages, and failure to respond to me in the Manager's office, and again walking out of the office in the middle of my conversation, cannot be condoned and are a legitimate reason for this action.

The following element of your past record has been considered in taking this action:

| DATE | TYPE | CHARGE |
|------|------|--------|
| August 21, 1998 | Letter of Warning | Unsatisfactory Performance due to failure to perform supervisory duties in a satisfactory manner, and failure to follow instructions concerning proper staffing of operations. |

This Proposed Letter of Warning is being issued to you in Lieu of a 7-Day Time-Off Suspension based on the above-cited deficiency. This letter is also to inform you that you must correct your work deficiencies. Further, you must demonstrate adherence to Postal

Thomas Butler
November 29, 1999
Page Three


Service regulations. Failure to correct your work deficiencies may result in further disciplinary action, including your removal from the Postal Service.

You and/or your representative may review the material (if any) relied upon to support the reasons for this Proposed Letter of Warning in Lieu of a 7-Day Time-Off Suspension at the Labor Relations Office, Miami Processing & Distribution Center, 2200 N.W. 72nd Avenue, Miami, FL, between the hours of 8:30 a.m. and 4:30 p.m. If you do not understand the reasons for this Proposed Letter of Warning in Lieu of a 7-Day Time-Off Suspension, contact the undersigned for a further explanation.

You and/or your representative may appeal this Proposed Letter of Warning in Lieu of a 7 Day Time-Off Suspension by filing an answer within ten (10) calendar days from your receipt of this letter, either in person or in writing, or both, before Saundra Richardson, Plant Manager, South Florida Processing and Distribution Center, 16000 Pines Boulevard, Pembroke Pines, FL 33082-9997. You also may furnish affidavits or other written material to Saundra Richardson within ten (10) calendar days from your receipt of this letter. You will be afforded a reasonable amount of official time for the above purpose if you are otherwise in a duty status. You will receive a written decision after the expiration of the 10 calendar day period for reply. All of the facts in your case, including any reply you submit, will be given full consideration before a decision is rendered.



Rosie Carlies
Manager, Distribution Operations
South Florida P&DC


**Employee Regular Mail**



cc:    Labor Relations - Miami
       Plant Manager **(Letter of Decision Required)**
       MDO T-3 South FL P&DC
       OPF



EXHIBIT NO._____

PAGE_____ OF ___

 **UNITED STATES POSTAL SERVICE**

DEFENDANT'S
EXHIBIT
35
00-6193-CV-SIMONTON

 JAN 2 7 2000

LABOR RELATIONS
SOUTH FLORIDA DISTRICT

**DATE:** January 18, 2000

**REF:** SE09:SRichardson:RA:ac:LOD:propsusp:butlert

**SUBJ:** Letter of Decision

**TO:** **Thomas P. Butler**
Supervisor, Distribution Operation
7840 Camino Real Apt 105P
Miami FL 33143-6871

CERTIFIED NO. Z 419 545 422
RETURN RECEIPT REQUESTED

You received a Proposed Letter of Warning in Lieu of a (7) Day Time-Off Suspension based upon the charge Unsatisfactory Conduct due to your failure to respond and comply with directives given to you. In the letter you were apprized of your appeal rights and afforded an opportunity to respond to the charges. I am in receipt of your written response dated December 8, 1999. I note that you did not respond to me personally. I have given careful consideration to all evidence of record, and the contentions you raise in your response. I find however, that the charge as outlined in the proposed letter is fully supported by the evidence of record, and warrant the action. The reason for my decision is as follows:

On November 3, 1999, you were assigned to supervise the small parcel bundle sorter (SPBS) on tour three. On that day, at approximately 4:10 p.m., Manager Rosie Carlies called the supervisor's desk at the SPBS, and asked Supervisor Simon Ham to give you the telephone. At that time she advised you not to run the report, that there were four more pallets of mail to run on the machine. You began to question her, and she interrupted you stating "Tom, this is what I want. Tour 2 will finish running the Miami mail. Your clerks will throw off the 5-digit 330 mail until they are finished. Then the Miami mail will be pulled down and it will be set up to for you to run 330." She then asked "Do you understand what I am saying?". You failed to acknowledge or respond to her directive, and said absolutely nothing. She then handed the telephone to Chief Steward Wanda Harris, and asked her to let Carlies know if you said anything. Manager Carlies left the Manager's office and walked to the SPBS. When she arrived at the machine you were not in the area and the telephone was off the hook laying on the supervisor's stand up desk. Carlies then paged you to report to the supervisor's desk at the SPBS. You failed to respond to the page or report to the SPBS. She then called the general's clerk's office and was informed by general clerk Karla Andur that you had just walked out of that office. Carlies again paged you to report to the SPBS supervisor's desk. You failed to respond to the page, and failed to report to the SPBS. Carlies then called data site, and was informed by clerk Alex Degiacomo that you had just walked out of that office. You finally reported to the SPBS supervisor's desk at 4:35 p.m. At that time Manager Carlies instructed you to report to the Manager's office.

EXHIBIT NO.

Thomas P. Bulter
Letter of Decision
January 18, 2000
Page Two


When you arrived at the Manager's office, she asked you if you had a problem. You starred at her and did not respond. She advised you that she was talking to you and asked if you understood her instructions. She also asked why you had put the telephone receiver down on the supervisor's desk at the SPBS and walked away in the middle of a conversation. You again starred at Carlies and said nothing. She then stated to you that she was your Manager, and that she would not tolerate this kind of behavior. You starred at her, said nothing, and walked out of the office. Carlies followed you out of the office as you began talking to Acting Manager Christopher Powell. Carlies then approached you and instructed you to end your tour of duty and leave the building. You responded "Why?". Carlies did not respond to you, and asked Manager Powell to make sure you left the building. Manager Powell then instructed you to leave the building and to return to work the following day as instructed.

In your response dated December 8, 1999, you contend that you attempted to respond to Carlies' directives to you, but that you were cut off. You also stated that you did not respond to the pages because you did not hear them. You further state that you walked out of the Manager's office because Carlies stated that you looked "stupid". Having carefully examined all evidence of record, I find your contentions without merit. Having found that you are guilty of the charge as outlined in the Proposed Letter of Warning in Lieu of a (7) Day Time-Off Suspension, I must now examine the nexus to your employment.

The nexus is obvious. As a Postal employee you have a responsibility to perform the duties of your position conscientiously and effectively, giving to the performance of those duties earnest effort and best thought. You are expected to comply with all Postal Service rules and regulations, and to obey the instructions of your Manager. Clearly by your actions cited above you have failed in those responsibilities.

As a Supervisor of Distribution, you have an even greater responsibility. You set the example for other employees. Your actions cited above on November 3, 1999, demonstrate that you are either unwilling or unable to be responsible to the position you now hold. The instructions that Manager Carlies gave you over the telephone were clear and reasonable. There is no reason why you should not have responded to her, and complied with the instructions. The fact that you refused to acknowledge her instructions, placed the telephone receiver down on the desk, and walked away from your operation; and then failed to respond to her pages; indicates that you fail to understand your responsibility to comply with instructions given to you. Moreover, your actions of simply starring at Carlies, and refusing to respond when she addressed you in the Manager's office, and then leaving the office while she was still trying to talk to you demonstrates a deliberate disrespect for authority that will not be condoned.

EXHIBIT NO.

Thomas P. Bulter
Letter of Decision
January 18, 2000
Page Three

Further, your actions raise serious question as to your of dedication, loyalty, and job commitment. If you believe that in your position you are not required to acknowledge, respond and comply directives given to you by a Manager, than you seriously misunderstand your role as a supervisor.

Having found nexus, I must now examine if the penalty imposed is proper. In doing so, I will consider your tenure of service, the seriousness of the charge against you, the past element of record cited in the letter, the contentions you raise in your response, any mitigating factors, and all other evidence of record. In consideration of these factors, I find that the penalty imposed is proper. It is my decision, therefore, that the Proposed Letter of Warning in Lieu of a (7) Day Time-Off Suspension is sustained.

You have the right to request a review of this decision in writing within fifteen (15) calendar days from the date of your receipt of this letter. Direct your request to:

<div align="center">

Karen A. Borowski
Manager, Human Resources
Southeast Area Office
220 N Humphreys Blvd
Memphis TN  38166-0840

</div>

You should furnish me with a copy of your appeal. You are entitled to a representative of your own choosing throughout your appeal. You will be afforded a reasonable amount of official time for preparation of your case if you are otherwise in a duty status.

Saundra D. Richardson
Plant Manager
South Florida Mail Processing Center

**EMPLOYEE REGULAR MAIL**

Emp. SS #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

cc:    Labor Relations Office, Miami        Personnel Services/L. Raphael
       Plant Manager, SFMPC                  Personnel Services/T. Hernandez
       Sr MDO, T3, SFMPC                     Personnel Service/E. Alam
       MDO, T3, SFMPC
       Official Personnel Folder

EXHIBIT NO.

PAGE    3

I also wish to receive the following services (for an extra fee):

1. ☒ Addressee's Address
2. ☐ Restricted Delivery

...dditional services.
...the reverse of this form so that we can return this
...t of the mailpiece, or on the back if space does not
... Requested" on the mailpiece below the article number.
... will show to whom the article was delivered and the date

...ssed to:
...mas P. Butler
...pv., Distribution Supv.
1840 Camino Real Apt. 105P
Miami, FL 33143-6871

4a. Article Number
Z419 541 422

4b. Service Type
☐ Registered ☒ Certified
☐ Express Mail ☐ Insured
☐ Return Receipt for Merchandise ☐ COD

7. Date of Delivery
1-25-00

5. Received By: (Print Name)
X Tom Butler

6. Signature: (Addressee or Agent)
X [signature]

8. Addressee's Address (Only if requested and fee is paid)

PS Form 3811, December 1994 102595-99-B-0223 Domestic Return Receipt

Is your RETURN...

Thank you for using Return Receipt Service.

EXHIBIT NO. D

PAGE ...

U.S. Postal Service

# EEO Complaint of Discrimination in the Postal Service

See Instructions and Privacy Act Statement on Reverse

| 1. Name TOM BUTLER | 2. SSN 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 | Case No 1H333001200 |
|---|---|---|

| 3. Mailing Address 7840 CAMINO REAL P-105 MIAMI FL 33143-6871 | 4. Home Phone 305 271-1898 | 5. Work Phone (954) 436-4356 |
|---|---|---|

| 6. Position Title (USPS Employees Only) SDO | 7. Grade Level (USPS Employees Only) 16 |
|---|---|

| 8. Installation Where You Believe Discrimination Occurred (Identify Installation, City, State, and ZIP+4) SFMPC 16000 PINES BLVD. PEMBROKE PINES, FL 33082 | 9. Name & Title of Person(s) Who Took the Action(s) You Allege Was Discriminatory ROSIE CARLIES MAO T- |
|---|---|

10. I designate this person to be my representative. I RESERVE THIS RIGHT AT THIS TIME

| a. Name Tom BUTLER | Title SDO |
|---|---|

DEFENDANT'S EXHIBIT 36 00-6193-CV-SIMONTON

Mailing Address 7840 CAMINO REAL P-105 MIAMI FL 33143-6871

| b. Home Phone (305) 271-1898 | c. Work Phone 954-436-4356 |
|---|---|

11. Type of Discrimination Alleged

☒ Race (Specify): CAUCASION
☒ Color (Specify): WHITE
☐ Religion (Specify):
☐ National Origin (Specify):

☒ Sex (Specify): MALE
☐ Age (Specify):
☒ Retaliation (Specify Prior EEO Activity):
☐ Disability (Specify):

12. Date on Which Alleged Act of Discrimination Took Place MAR 10

RECEIVED
1/??? CO

13. Explain the specific actions or situation that resulted in your allegation(s) as to how you believe you were discriminated against (treated differently from other employees or applicants) because of race, color, religion, national origin, sex, age, or disability.

SEE 3 page ATTACHMENT dated 3-13-00

14. I have discussed my complaint with an EEO counselor
☐ Yes (Date of final interview: _____)
☒ No

15. Name and Signature of EEO Counselor
FOR ROSALIND MOULTRY-HOWARD

16. Corrective Action Sought
SEE CEC

17. Signature of Complainant Thomas P Butler

18. Date of This Complaint 3-8-00

TransFORM PS Form 2565, December 1995

ON 4-14-99, I OPPOSED DISCRIMINATORY PRACTICES OF THE DEFENDANT (1H333-0047-99). MRS CARLIES HAD TREATED ME MORE HARSHLY THAN THAN LIZ ETTIENNE, A BLACK FEMALE WHO HAD NOT PARTICIPATED IN PROTECTED ACTS AGAINST THE DEFENDANT. BECAUSE I PARTICIPATED IN EEO ACTIVITIES AGAINST THE DEFENDANT, THE DEFENDANT WAS MOTIVATED TO INTENTIONALLY DISCRIMINATE AGAINST ME. THE DEFENDANT INTENTIONALLY INFLICTED EMOTIONAL HARM TO CAUSE FUTURE HARM. SHE HAS REPEATEDLY USED HARSH LANGUAGE TO INTIMIDATE ME WHICH IS A DIRECT AND UNFAIR LABOR PRACTICE. WHERE ON 8-5-98 MRS CARLIES STATED "You had better Look for a new Job." Three weeks LATER MRS CARLIES ISSUED ME A Letter of Warning. MRS CARLIES Further STATED "I'm TIRED OF YOUR NON CHALENT ATTITUDE." I HAD EXPLAINED TO HER THAT I WAS TAKING MEDICINE FOR A PRIOR ON THE JOB INJURY CONDITION AND ALSO FOR THE FACT THAT MY BROTHER HAD JUST DIED ON 4-12-98. SHE STATED, "I WISH I HAD SOME OF THAT."

A DIRECT CORRELATION EXISTED BETWEEN BOB DILLON PRESSURING MRS Carlise To TAKE ACTION AGAINST ME FOR PARTICIPATING N PRIOR PROTECTED ACTIVITIES. THE Timing of Bob Dillon's AFFIDAVIT (5-28-98), Dillon's Coercion OF THE DEFENDANT concerning Robin Laughlin interrogated (7-7-98) and MRS CARLIES THREAT TO THE PLAINTIFF (8-5-98) AND MRS CARLIES DISCIPLINE OF THE DEFENDANT (Low 8-21-98) SHOW DISCRIMINATORY INTENT.

THE PSYCHOLOGY IS QUITE SIMPLE. THE Defendant

Mrs. Carlise was in control. She decided to discriminate or not as she chose. After I filed EEO charges against her, the dynamics changed. The EEO became a professional challenge to her supervisory authority. Her own behavior became scrutinized by upper management. Now, Mrs. Carlises, with the help of the agency is building a paper trail against me, attempting to prove to her superiors that she was right all along.

Section 704 of the Civil Rights Act of 1964 protects the plaintiff for participating in the proceedings under the Act. However, Mrs. Carlies devised a system of continuing violations. Her intent and motive was hidden by the plaintiffs so called "inadequate performance."

Managers especially concerned with "challenges to his/her authority" may retaliate in such a way that his/her motivation is quite clear, such as an adverse action toward a thirteen year employee soon after learning that a charge of discrimination has been filed. Retaliation is by definition an intentional violation of the Civil Rights Act. Words spoken reflect the illegal intent. Rosie stated "You better look for a new job." Mrs. Carlies also stated to the plaintiff that "You look stupid." This was just moments before she kicked the plaintiff out of the building, in front of other employees and subsequently issued the plaintiff additional discipline in another letter in lieu of suspending, effectively suspending the plaintiff twice for the same reason (Double Jeopardy). Coupled with the fact that Mrs. Carlies (T 2) was

These events suggests retaliation. Evidence was shown that management was upset, had motive for retaliation, and retaliated. The fact that Mad Carlies was upset further strengthens this case. The veiled threats was the method the boss used warning the complainant that his protected activities were incompatable with his job. The imposition of new standards for the plaintiff (white, male) than for Liz Ettienne (black female) strongly suggests retaliation by Mad Carlies (black female) against the plaintiff (white male).

For these reasons, Plaintiff asks for judgement against the defendant for damages of $300,000, payment of attorney fees & costs pursuant to 42 USC $2000 e-5(k) and all other relief the court deems appropriate

Thomas F Butler
Thomas F Butler
3-13-00

APPEALS PROCESSING CENTER


**UNITED STATES
POSTAL SERVICE**

APR 2 7 2000


DEFENDANT'S
EXHIBIT
37
00-6193-CIV-SIMONTON

Mr. Tom Butler
7840 Camino Real, P-105
Miami, FL 33143-6871

CERTIFIED MAIL NO. 7000 0520 0015 4120 8779
RETURN RECEIPT REQUESTED

RE: Tom Butler v. William J.
Henderson, Postmaster General
Agency No. 1-H-333-0012-00

Dear Mr. Butler:

We have received the above-referenced complaint of discrimination filed on
March 14, 2000. Your complaint has been accepted for investigation. The
scope of the investigation will include the following issue(s) only:

| | |
|---|---|
| Specific Issue(s): | You received a Letter of Decision regarding a proposed Letter of Warning in Lieu of Time Off Supension. |
| Date(s) of Incident: | January 25, 2000 |
| Type(s) of Discrimination: | Race (Caucasian), Color (white), Sex (male), Retaliation (prior EEO activity) |

NOTE: If your complaint involves an allegation of age discrimination, the Postal
Service is required by the Age Discrimination in Employment Act of 1967, as
amended, to advise you that you may consult with an attorney should you so
desire to do so before signing any agreement resolving your complaint of age
discrimination.

If you disagree with the defined issue(s), you must provide us with sufficient
reasons to substantiate your objections, in writing, within seven (7) calendar
days of receipt of this letter. If you do not wish to proceed with this complaint,
you should notify your local EEO Office.

Your case has been assigned for investigation. Please be prepared to go forward
with your case when the EEO Counselor/Investigator contacts you. The
investigation will be completed within 180 calendar days of the date of your
filing of the complaint, except that you may voluntarily agree, in writing, to
extend the time period up to an additional 90 calendar days. Should you seek
to amend your complaint, any amendment would extend the time period for
completing the investigation by an additional 180 days except that the

Mr. Tom Butler                                                                                          2

investigation of this complaint and any amendments could not extend past 360 calendar days from the date on which you filed this formal complaint.

When the investigation is completed, you will receive a copy of the investigative report, and you will be advised of your right to request a hearing before an Administrative Judge appointed by the Equal Employment Opportunity Commission, or of your alternative right to request a final decision by the Postal Service without a hearing. Should you fail to request one of the options described above the agency will issue a final decision based on the merits of your complaint.

You may request a hearing by an EEOC Administrative Judge appointed by the Equal Employment Opportunity Commission by making such a request, in writing, to the District Director of the Equal Employment Opportunity Commission at the following address:

> District Director, Miami District
> U.S. Equal Employment Opportunity Commission
> One Biscayne Tower
> 2 S. Biscayne Blvd., Ste 2700
> Miami, FL 33132-2491

You must make your hearing request within thirty (30) calendar days of the date on which you received the investigative report and provide a copy of that hearing request to the District EEO Complaints Processing Office. If you have not received your copy of the investigative report within 180 calendar days from the date on which you filed your formal complaint, you may request a hearing by writing directly to the EEOC District Office shown above, with a copy to the District EEO Complaints Processing Office, at any time up to thirty (30) calendar days from the date of your receipt of the report of this investigation.

If you are dissatisfied with the Postal Service's final agency decision where there has been no hearing, or with the Postal Service's final action on the decision of an Administrative Judge following a hearing, you have certain appeal rights. You may appeal a final agency decision where no hearing has been held to the Office of Federal Operations, Equal Employment Opportunity Commission at the address shown below, within thirty (30) calendar days of the date of your receipt of the final agency decision, or you may file a civil action in an appropriate U.S. District Court within 90 calendar days of your receipt of the final agency decision. You may also appeal a final action by the Postal Service implementing a decision of an Administrative Judge following a hearing to the Office of Federal Operations of the Equal Employment Opportunity Commission within thirty (30) calendar days of the date of your receipt of that final action or you may file a civil action in an appropriate U.S. District Court within ninety (90) calendar days of the date of your receipt of the final action. Finally, you may respond to an appeal by the Postal Service in connection with its final action not to implement a decision of an Administrative Judge following a hearing or you may file a civil action in an appropriate U.S. District Court within ninety (90) calendar days of the date of your receipt of the final action and appeal.

Mr. Tom Butler                                                                    3

Any appeal to the EEOC must be in writing and filed with the Office of Federal
Operations, Equal Employment Opportunity Commission, P.O. Box 19848,
Washington, DC 20036-0848. Along with your appeal, you must submit proof
to the EEOC that a copy of the appeal and any supporting documentation were
also submitted to the EEO Compliance and Appeals Coordinator, Appeals
Processing Center.

After 180 calendar days from the date of filing your formal complaint, you may
file a civil action in an appropriate U.S. District Court if the Postal Service has
not issued a final decision on your complaint or if no final action has been
taken on a decision by an Administrative Judge.

If you initially choose to file an appeal with the Office of Federal Operations
(OFO), of the Equal Employment Opportunity Commission, you may file a civil
action in an appropriate U.S. District Court within 90 calendar days after your
receipt of the OFO's decision. You may also file a civil action in an appropriate
U.S. District Court if you have not received a decision on your appeal within
180 calendar days of the date on which you filed your appeal with the Office of
Federal Operations.

Sincerely,

Rafael A. Martorell
Manager, EEO Compliance and Appeals

Enclosure

cc: Manager, EEO Complaints Processing, South Florida District

HRC42:ZKing:ZK:38166-0978



| SENDER: | Tom Butler 1-H-333-0012-00 | |
|---|---|---|

<table>
<tr><td rowspan="6" style="writing-mode: vertical">RETURN ADDRESS completed on the reverse side?</td><td><b>SENDER:</b>       Tom Butler 1-H-333-0012-00<br>ACC ZK<br>☐ Complete items 1 and/or   additional serv...<br>   Complete items 3, 4a, an...<br>☐ Print your name and address on the reverse of this form so that we can return this card to you.<br>☐ Attach this form to the front of the mailpiece, or on the back if space does not permit.<br>☐ Write "Return Receipt Requested" on the mailpiece below the article number.<br>☐ The Return Receipt will show to whom the article was delivered and the date delivered.</td><td>I also wish to receive the follow-<br>ing serv    for an extra fee):<br><br>1. ☐ Addressee's Address<br>2. ☐ Restricted Delivery</td><td rowspan="6" style="writing-mode: vertical">Thank you for using Return Receipt Service.</td></tr>
</table>

| 3. Article Addressed to: | 4a. Article Number |
|---|---|
| | **7000 0520 0015 4120 8779** |
| | **4b. Service Type** |
| **MR TOM BUTLER** | ☐ Registered        ☒ Certified |
| **7840 CAMINO REAL P-105** | ☐ Express Mail      ☐ Insured |
| **MIAMI FL 33143-6871** | ☐ Return Receipt for Merchandise   ☐ COD |
| | **7. Date of Delivery**<br>X |
| 5. Received By: (Print Name)<br>X    TOM BUTLER | 8. Addressee's Address (Only if requested and fee is paid) |
| 6. Signature (Addressee or Agent)<br>X    11 B12 4 21 | |